# EXHIBIT A

101 EAST KENNEDY BOULEVARD SUITE 1200
TAMPA, FL 33602-5838
813.221.1010 813.223.7961 fax www.zuckerman.com




Marcos E. Hasbun (813) 321-8220
mhasbun@zuckerman.com

December 20, 2016

**Via e-mail, first-class and certified mail return receipt requested**

Robert L. Candy
Tri-State Zoological Park of Western Maryland
12605 Moores Hollow Rd.
Cumberland, MD 21502
tristatezoo@aol.com

The Honorable Sally Jewell
Secretary of the Interior
U.S. Department of the Interior
1849 C St. N.W.
Washington, DC 20240
Secretary_jewell@ios.doi.gov

Daniel Ashe
Director, U.S. Fish & Wildlife Service
1849 C St. N.W., Rm. 3331
Washington, DC 20240
Dan_ashe@fws.gov

**Re: Notice of Intent to File Citizen Suit Pursuant to the Endangered Species Act Tri-State Zoological Park of Western Maryland**

Pursuant to Section 11 of the Endangered Species Act (ESA), 16 U.S.C. § 1540(g)(2)(A)(i), this letter constitutes notice that People for the Ethical Treatment of Animals, Inc. ("PETA") intends to file suit after the expiration of the 60-day notice period against Tri-State Zoological Park of Western Maryland, a Maryland corporation located at 12605 Moores Hollow Rd., Cumberland, MD 21502, and Robert L. Candy as an individual and in his capacity as the Chief Executive Officer, principal, and registered agent of the Tri-State Zoological Park of Western Maryland (collectively, "Tri-State Zoo"), in federal district court pursuant to 16 U.S.C § 1540(g)(1)(A) for chronic and ongoing violations of the ESA, 16 U.S.C. § 1538(a)(1)(B), (G) and its implementing regulation, 50 C.F.R. § 17.21. PETA has engaged the law firm of Zuckerman Spaeder LLP, which has offices in Baltimore, Maryland, to file and prosecute any such suit, if necessary.

Specifically, PETA intends to file suit under the ESA against the Tri-State Zoo to challenge and enjoin the facility's ongoing "take" of five (5) tigers (Mowgli, Cheyenne, and Cheyenne's three (3) offspring, Kumar, Cayenne, and India), two (2) ring-tailed lemurs, and two (2) lions (Peka and Mbube), unless the Tri-State Zoo places them in reputable sanctuaries.




If Tri-State Zoo wishes to correct the ESA violations described below and avoid litigation, it should immediately contact Zuckerman Spaeder LLP to effectuate the transfer of these tigers, the lemurs and the lions within sixty (60) days to a reputable sanctuary. In this regard, PETA will secure, arrange, and pay for the placement, transport and veterinary care necessary for these animals' relocation to a reputable sanctuary, where they may express species-typical behavior in a safe, sanitary, and enriching environment.

## I. The Endangered Species Act

The ESA prohibits the "take" of endangered and threatened species within the United States. 16 U.S.C. § 1538(a)(1)(B), (G); 50 C.F.R. §§ 17.21, 17.31(a). "The term 'take' means to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19). "'Take' is defined . . . in the broadest possible manner to include every conceivable way in which a person can take or attempt to take any fish or wildlife." *Babbitt v. Sweet Home Chapter of Communities for a Great Or.*, 515 U.S. 687, 704-05 (1995) (citing S. Rep. No. 93–307, p. 7 (1973); U.S. Code Cong. & Admin. News 1973, pp. 2989, 2995); *see also* H.R. Rep. No. 93-412, p. 154, 150 (1973) (the House Report stated that "the broadest possible terms" were used to define restrictions on takings and includes "harassment, whether intentional or not"). The ESA applies equally to endangered and threatened species living in captivity. *See, e.g.*, 80 Fed. Reg. 7380, 7385 (Feb. 10, 2015) ("[T]he ESA does not allow for captive held animals to be assigned separate legal status from their wild counterparts on the basis of their captive status.")

Tigers and lemurs are listed as "endangered" under the ESA. 50 C.F.R. § 17.11(h). Lions are listed as either "endangered" or "threatened" depending upon their subspecies—the subspecies *panthera leo leo* is listed as "endangered" and the subspecies *panthera leo melanochaita* is listed as "threatened"—both to which the "take" prohibition applies. *Id.* § 17.11(h); *see also id.* § 17.40(r) (members of the threatened subspecies *panthera leo melanochaita* are subject to the protections of a special rule).

As described below, the conditions in which Tri-State Zoo maintains the endangered and threatened animals in its custody "harm"[1] and "harass"[2] those animals in violation of Section 9 of the ESA, 16 U.S.C. § 1538(a)(1)(B), (G), and its implementing regulation, 50 C.F.R. § 17.21(c)(1).

---

[1] "Harm" is defined by regulation as "an act which actually kills or injures wildlife. Such act may include significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding or sheltering." 50 C.F.R. § 17.3.

[2] "Harass" is defined by regulation as "an intentional or negligent act or omission which creates the likelihood of injury to wildlife by annoying it to such an extent as to significantly disrupt normal behavioral patterns which include, but are not limited to, breeding, feeding, or sheltering." *Id.*




## II. Tri-State Zoo is Engaging in Ongoing Takes of Two Lemurs in Violation of the ESA

Tri-State Zoo currently confines two endangered ring-tailed lemurs together, in conditions that, as set forth below, harm and harass the animals, interfering with their essential behavioral patterns, causing them injury, and placing them at risk for further injury, in violation of the ESA.[3]

### A. Tri-State Zoo Denies the Lemurs Adequate Environmental Enrichment and Social Grouping

On the brink of extinction, wild ring-tailed lemurs are only found in the southwest portion of Madagascar. The territories of wild ring-tailed lemurs range from fourteen to fifty-six acres in size. Traveling in groups, they roam about their range each day foraging for food. J. I. Pollock, *Spatial Distribution and Ranging Behavior in Lemurs*, *in* The Study of Prosimian Behavior 359, 379-80 (G. A. Doyle & R. D. Martin eds., 1979). Lemurs spend over one-third of their time on the ground, but they are known to spend time in all layers of their natural habitats.

Ring-tailed lemurs are highly social animals with advanced cognitive abilities. Unlike some subspecies of lemurs, ring-tailed lemurs live in large social groups ranging in size from eight to twenty individuals. *Kuehl v. Sellner*, 161 F. Supp.3d 678 (N.D. Iowa 2016) (finding zoo's treatment of lemurs constituted unlawful "take" in violation of the ESA); ; *see also* C.B. Mowry & J.L. Campbell, *Nutrition*, *in* Ring-tailed Lemur (*Lemur catta*) Husbandry Manual 2 (American Ass'n of Zoos & Aquariums, 2001).

Meeting the physical and psychological needs of captive lemurs includes providing them with the opportunity to socialize with other lemurs and with necessary environmental enrichment. Even the U.S. Department of Agriculture's ("USDA") animal care regulations, which set the "minimum requirements" for both endangered and non-endangered captive animals used in exhibitions under the Animal Welfare Act (AWA), 7 U.S.C. § 2143(a)(2), expressly require animal exhibitors to "develop, document, and follow an appropriate plan for environmental enhancement adequate to promote the psychological well-being of nonhuman primates." 9 C.F.R. § 3.81. These environmental enhancement plans must include "specific provisions to address the social needs of nonhuman primates of species known to exist in social groups in nature." *Id.* § 3.81(a). The social housing of primates "must be in accordance with currently accepted professional standards, as cited in appropriate professional journals or reference guides, and as directed by the attending veterinarian." 9 C.F.R. § 3.81(a). These mandatory enhancement programs aim to give nonhuman primates "an environment in which they can express the wide range of behaviors practiced by others of their species in nature." USDA, Animal & Plant Health Inspection Serv., *Final Report on Env't Enhancement to Promote the Psychological Well-Being*

---

[3] One of the two lemurs was allegedly acquired after four ring-tailed lemurs, one unidentified baby lemur, and several other animals were killed at Tri-State Zoo when a main building caught on fire in 2006. *Our Incredible Loss*, Tri-State Zoological Park, http://tristatezoologicalpark.com/our-incredible-loss.html (last visited Oct. 4, 2016).





*of Nonhuman Primates* § II.E (1999). When enhancements support the ability of captive primates to express a "normal repertoire" or a "full range" of normal behavior, "the intent of the Animal Welfare Act to promote their psychological well-being will be fulfilled." *Id.*

As explained by the court in *Sellner*, housing ring-tailed lemurs with only a single companion of their species is not an appropriate social group, and does not meet the generally accepted animal husbandry practice in lemur care. *Sellner*, 161 F. Supp.3d at 710-11. . Isolating lemurs by depriving them of appropriate socialization is "an extremely harmful proceeding" and causes these social animals to suffer. *Id.*; *see also* R. Ethan Pride, *Optimal Group Size and Seasonal Stress in Ring-tailed Lemurs (*Lemur catta*)* 16 Behav. Ecol. 550 (2005) (finding females in groups that were atypically small or large for their habitat type had higher mean cortisol levels than typical groups).

Despite the established authority on the social and environmental needs of lemurs and the minimum standards provided by USDA regulation, Tri-State Zoo continues to subject its two endangered ring-tailed lemurs to a life of social isolation without adequate enrichment. These lemurs live in a barren cage, with only a wooden perch, a few branches, and plastic toys, which have reportedly not been changed in over a year. This static environment denies them the ability to express normal behaviors such as roaming and deriving intellectual stimulation from a varied habitat, and therefore wholly fails to meet their complex cognitive needs. Further, the lemurs are housed in a group of only two animals, a situation that satisfies neither generally accepted husbandry practices nor the minimum standards of care under the AWA.

Tri-State Zoo fails to ensure the physical, psychological, and social health of the lemurs in its care through adequate enrichment and environmental enhancement, and historically has been cited by the USDA for this failure. Specifically the USDA has cited Tri-State for its failure to:

- Have an environmental enhancement plan that addressed the needs of a singly housed lemur.
- Have a complete environmental enrichment plan for any of the primates.
- Provide additional enrichment to a singly housed lemur who had no sensory interaction with other lemurs.
- Provide a young lemur, who was housed in a dark enclosure, with access to appropriate light.
- Provide a juvenile lemur with an enclosure that met the minimum cage size requirements and thereby denying him sufficient space to make normal postural adjustments.

Tri-State Zoo continues to deny the lemurs in its custody an environment in which they can express a full range of natural behaviors such as species-typical exploration, play, and foraging, as well as social interaction and adjustments. Depriving these lemurs of the social interaction and psychological stimulation fundamental to their physical, social, and psychological well-being constitutes a take in violation of the ESA, by significantly disrupting their normal behavioral patterns. *See* 16 U.S.C. § 1538(a)(1)(B), (G); 50 C.F.R. §§ 17.11(h), 17.21(c)(1); *Sellner*, 161 F. Supp.3d at 713, 718(holding that zoo violated the ESA by isolating a ring-tailed lemur in a small



ZUCKERMAN SPAEDER LLP

enclosure without the opportunity to socialize with other members of her species and ordering the zoo to transfer the lemurs to an appropriate facility).

In addition, it would not remedy the violations but would instead lead to separate ESA violations for Tri-State Zoo to obtain other lemurs or transfer the lemurs in its custody to another zoo or private party through interstate transactions, absent a permit issued only for limited purposes, not including for private ownership or public display. *See, e.g.*, *Elephant Justice Project v. Woodland Park Zoological Soc'y, Inc.*, No. C15-0451-JCC, 2015 WL 12564233 (W.D. Wash. Apr. 7, 2015).

### B. Tri-State Zoo Denies the Lemurs a Safe, Sanitary Environment

Lemurs have many different ways of communicating with one another and olfactory (smell-oriented) communication is one of the most important. Lemurs produce unique scents for this purpose. Unsanitary enclosures "interfere with the lemurs' olfactory senses, to which they are highly attuned." *Sellner*, 161 F. Supp.3d at 703 (internal quotations omitted). Lemurs living in an unsanitary environment is similar "to humans being in a room where there is constantly white noise being amplified." *Id.* (internal quotations omitted).

Unsafe and unsanitary conditions are a chronic problem at Tri-State Zoo, putting the lemurs' health and welfare at risk. Tri-State Zoo does not provide their animals with a clean, sanitary environment, and historically has been cited by the USDA for this chronic failure. Specifically the USDA has cited Tri-State for:

- Failing to keep the lemur enclosure in good repair to facilitate cleaning and eliminate areas where pests could live and hide, and where water could pool.
- Excessive debris, bird feces, clutter, and an unplugged heater near the lemur enclosure.
- A live mouse running into one of two rodent holes in the lemur enclosure. *See* Decision and Order, *In re: Tri-State Zoological Park of Western Maryland, Inc.,* AWA Docket No. 11-0222 (USDA Mar. 22, 2013) (finding that Tri-State and Mr. Candy failed to establish and maintain an effective pest control program, in willful violation of 9 C.F.R. § 3.84(d)).
- Excessive amount of feces and material build-up on surfaces in the lemur, squirrel monkey, and capuchin enclosure.
- A "large amount of untreated structural wood surfaces in the lemur and capuchin enclosures," which were neither waterproof nor readily cleanable.

The accumulation of feces and waste in the lemurs' enclosure and in surrounding areas not only puts their health and welfare at risk, but also interferes with the lemurs' ability to properly communicate, further denying them the opportunity to engage in normal behavior patterns. Such conduct also violates the AWA. 9 C.F.R. § 3.84 ("Excreta and food waste must be removed from inside each primary enclosure daily . . . . If the species of the nonhuman primates housed in the primary enclosure engages in scent marking, hard surfaces in the primary enclosure must be spot-cleaned daily").



ZUCKERMAN SPAEDER LLP

Tri-State Zoo's failure to keep the lemur enclosure free of debris, feces, and pests continually puts the health and welfare of these endangered animals at risk, and directly inhibits their ability to engage in normal behavioral patterns. Accordingly, Tri-State Zoo's ongoing failure to provide these lemurs with a safe, sanitary environment constitutes a prohibited "take" in violation of Section 9 of the ESA, 16 U.S.C. § 1538(a)(1)(B).

## III. Tri-State Zoo is Engaging in Ongoing Takes of Five Tigers in Violation of the ESA

By housing Mowgli, Cheyenne, Kumar, Cayenne, and India in decrepit enclosures without proper enrichment, food, shelter, or sanitation, and by forcing them to engage in inappropriate interactions with the public, Tri-State Zoo deprives these tigers of the ability to engage in normal behavioral patterns and causes them to suffer injury. Accordingly, Tri-State Zoo has "taken" and continues to "take" endangered tigers by harming and harassing these tigers in direct violation of the ESA. 16 U.S.C. § 1532(19).

### A. Tri-State Zoo Denies the Tigers Adequate Enrichment

In the wild, tigers' territories range from 7.72mi$^2$ to 154.44mi$^2$, depending on the availability of prey. J. Goodrich et al., *Panthera tigris* (The IUCN Red List of Threatened Species, 2015), http://www.iucnredlist.org/details/15955/0. Within these ranges, they are free to engage in natural behaviors such as swimming, climbing, stalking and predation. They occupy a variety of habitats, typically comprising dense vegetative cover, sufficient prey populations, and access to water. Tigers are generally solitary, however, they are known to come together for breeding, feeding, and sometimes to socialize and travel in groups.

Captive environments that do not provide adequate enrichment allowing tigers to engage in natural behaviors have a detrimental effect on the animals' physical and psychological well-being. *See* Kathleen Morgan & Chris Tromborg, *Sources of Stress in Captivity*, 102 Applied Animal Behav. Sci. 262, 264 (2007); *see also* Monika S. Szokalski et al., *Enrichment for Captive Tigers (*Panthera tigris*): Current Knowledge and Future Directions*, 139 Applied Animal Behav. Sci. 1 (2012). Enrichment is therefore necessary to deter harmful behaviors like self-mutilation, stereotypical behaviors such as pacing and rubbing, or behaviors like fence chewing that may cause broken teeth.

Enrichment plans for captive carnivores, including tigers, are difficult to develop due to their natural feeding and hunting behaviors and spatial needs. Letícia S. Resende et al., *The Influence of Feeding Enrichment on the Behavior of Small Felids (*Carnivora: Felidae*) in Captivity*, 26 Zoologia 601 (2009). In inadequate captive conditions, thwarted hunting prospects alone appear to cause carnivores like tigers to suffer stress. Morgan & Tromborg, *Sources of Stress in Captivity*, *supra* at 284. Accordingly, enrichment plans should include natural and complex enclosures and environmental enrichment including whole-carcass feeding, novel toys/objects, scratch logs, introduction of new smells, enclosure rotations, pools, and adequate space to run.



ZUCKERMAN SPAEDER LLP

On information and belief, Tri-State Zoo fails to provide their tigers with an appropriate, natural, and complex enclosure by confining them to a converted swimming pool with adjacent dens. The tigers are also denied adequate enrichment and exhibit signs of stress. Confined to their dens (measuring approximately 20 feet by 10 feet) overnight, these complex predators are denied access to the rest of their small enclosures at a time when they are naturally most active. Mowgli, the white tiger, has been observed pacing while confined to his den, a known stereotypic behavior, evidencing severe psychological distress.

Mowgli and Cheyenne, two singly housed tigers, are, on information and belief, provided with a small tub of water and bowling balls as a source of enrichment. Cheyenne is also provided with a tire. Not only is this inadequate enrichment, but bowling balls are of particular concern because tigers can break their teeth on them. This limited enrichment does not encourage the tigers to engage in natural behaviors, especially natural hunting behaviors such as stalking and predation, and is therefore inadequate to provide for the tigers' physiological and psychological well-being.

Siblings Cayenne, India, and Kumai, two sexually mature females and one sexually mature male who are all intact, are further denied an appropriate environment in that they are housed together despite the possibility of inbreeding, a major cause of deleterious mutations, and their apparent incompatibility. Moreover, tigers in the wild typically leave their mother's side at age two or three to find their own territory. As Cayenne, Kumai, and India mature, their inability to leave their mothers side can be an extreme source of stress. Cayenne and India, the two females, are known to exhibit stereotypic pacing behavior, which can indicate poor psychological welfare.

The siblings' main source of environmental enrichment, a small pool, is constantly filled with urine and feces. Decision and Order, *In re: Tri-State Zoological Park of Western Maryland, Inc.*, AWA Docket No. 11-0222, § D.3 (USDA Mar. 22, 2013) (during the enforcement proceeding that resulted in the suspension of Tri-State Zoo's AWA license, Mr. Candy referred to this pool as the tigers' toilet). The constant squalid state of the pool negates any enriching qualities,[4] violates general standards of animal care, and puts the tigers' health and welfare at risk. *See* AZA, *Tiger Care Manual, supra* at 5 ("Pools and moats should be designed for maintaining high water quality . . . and for ease of cleaning and sanitizing, as tigers tend to defecate in water. . . . [A]ll water provided to the animals must be potable, and changed as appropriate to remain fresh and uncontaminated"). *See also* Section III(C), *infra*. Like Cheyenne and Mowgli, the limited enrichment provided to these tigers also denies them the ability to engage in simulated predatory behaviors, which are central to their well-being.

By depriving these tigers of an environment in which they can express natural behaviors, as well as psychological stimulation fundamental to their physical, social, and psychological well-being, Tri-State Zoo's actions constitute a take in violation of the ESA, by significantly disrupting their

---

[4] Cristina Biolatti et al., *Behavioural Analysis of Captive Tigers (*Panthera tigris*): A Water Pool Makes the Difference*, 174 Applied Animal Behav. Sci. 173, 179 (2016) ("It should be highlighted that it is not only the presence of a pool but the quality of the water that makes the difference in playing a key role in tiger welfare").




normal behavioral patterns. *See* 16 U.S.C. § 1538(a)(1)(B), (G); 50 C.F.R. § 17.11(h), 17.21(c)(1).

**B. Tri-State Zoo Denies the Tigers Adequately Implemented Nutrition Protocols**

Tri-State Zoo has denied their endangered tigers an adequate and appropriate diet and potable water, thus interfering with their normal feeding behaviors. The USDA has specifically cited Tri-State for failing to provide their big cats with a veterinarian approved diet.

The AWA requires that food "be wholesome, palatable, and free of sufficient quantity and nutritive value to maintain all animals in good health. The diet shall be prepared with consideration for the age, species, condition size, and type of animal." 9 C.F.R. § 3.129(a). According to industry guidelines, feeding tigers diets which contain high percentages of poultry products are of concern because they may be nutritionally unbalanced. Global Federation of Animal Sanctuaries, *Standards for Felid Sanctuaries* § N-2.m (July 2013).

Tri-State has also, on information and belief, failed to provide the tigers with clean drinking water. Fresh clean drinking water should always be available to tigers, in containers that are "cleaned and disinfected daily." *Id.*; *see also* 9 C.F.R. § 3.130.

Proper nutrition and access to potable water are fundamental to the physical and psychological well-being of any captive animal. Denying captive tigers a species appropriate diet and access to potable water creates a likelihood of injury to them by significantly disrupting their normal feeding behaviors. Therefore, by failing to provide these tigers an adequate and appropriate diet, as well as fresh water, Tri-State Zoo has "taken" and continues to "take" endangered tigers by harming and harassing them in violation of the ESA.

**C. Tri-State Zoo Denies the Tigers a Safe, Sanitary Environment**

USDA inspection records show that Tri-State Zoo is either unwilling or unable to comply with basic sanitation regulations under the Animal Welfare Act. From 2006 to 2015, Tri-State Zoo was cited over fourteen times for chronic noncompliance with USDA regulations regarding waste accumulation and general sanitation with respect to its tiger enclosures alone. Unsafe and unsanitary conditions at Tri-State Zoo continually put the tigers' health and welfare at risk by increasing disease hazards, odors and the attraction of pests.

Tri-State Zoo does not provide its tigers with a clean and sanitary environment—as confirmed by recent eyewitness reports—and historically has been cited by the USDA for this failure. Specifically, the USDA citations that directly impact the sanitation of Tri-State Zoo's tiger enclosures include:

- Floors in many of the off-exhibit areas were in need of general cleaning and removal of debris and excreta. There was also excessive tiger feces and debris that "have built up in between the two board fences at the front of the off-exhibit enclosure inside the shelter."




- There were two approximately 3-inch holes in the concrete floor of Mowgli's off-exhibit enclosure, creating a risk of injury and pest and sanitation issues.
- Tri-State Zoo was cited on six different occasions for confining all five tigers in enclosures with cracked or damaged concrete substrates, making it impossible to properly sanitize the enclosures to prevent disease hazards.
- There was an accumulation of building material stored in the tiger off-exhibit area, impeding adequate cleaning and pest control.
- The pool in Cayenne, Kumar, and India's enclosure was a "murky greenish brown color due to excreta and mulch" in the pool.
- The water in the old tiger enclosure pool was described as a "brown murky fluid" due to "excessive amounts of feces and urine."
- There was food waste (bones) in one of the tiger enclosures left from a feeding three days prior. Standard practices require that uneaten carcass remains be removed from the enclosure within 12 hours.
- There was a dried up dead mouse in a mouse trap outside the young tiger enclosure. A live rat was seen running across the tiger enclosure into one of the two rodent holes along the wall between the barrier fence and the enclosure fence.
- There was a build-up of dirt, excreta, and hair along the front edge of the tiger enclosure.
- Tri-State Zoo's practice of only removing feces and food waste from the animal enclosures, including the tiger enclosures, once per week led to an "excessive amount of feces and food waste" in the enclosures.

Further, Tri-State Zoo's tiger enclosures have both concrete and dirt substrates. Failure to properly clean both types of substrates increase the risks of contamination with micro-organisms and parasites, exposing the cats to potential pathogens. Concrete substrates can be easily cleaned and disinfected; however, the cracks and holes in Tri-State Zoo's concrete floors make effective cleaning and sanitizing impossible.

Tri-State Zoo's failure to keep the tigers' enclosures clean, sanitized, and in good repair, as well as their chronic failure to timely remove animal and food waste from the enclosures violates USDA regulations and fails to meet generally accepted practices of animal care. 9 C.F.R. §§ 3.125(d), 3.131; AZA, *Tiger Care Manual*, *supra* at 13 ("Dirt and grass substrates in outdoor enclosures should be spot-cleaned daily. Hard surface enclosures, both inside and out, should be cleaned daily and disinfected routinely."). The failure to timely remove feces from a tiger's enclosure is an egregious deficiency, constituting a risk to the animals' health and mental well-being. *See Sellner*, 161 F. Supp.3d at 704, 716-17. *See also* 9 C.F.R. § 3.131(a).

By confining these tigers in unsanitary conditions that continually put the tigers' health and welfare at risk, Tri-State Zoo unlawfully harasses them due to the likelihood of injury or sickness. Captive-Bred Wildlife Regulation, 63 Fed. Reg 48634, 48638 (Sept. 11, 1998). Accordingly, Tri-State Zoo's ongoing failure to provide Mowgli, Cheyenne, Cayenne, Kumai, and India with a safe, sanitary environment constitutes a prohibited "take" in flagrant violation of the ESA, 16 U.S.C. § 1538(a)(1)(B). *See Sellner,* 161 F. Supp.3d at 716-17(holding that an



exhibitor violated the ESA by failing to remove excessive excreta from tiger enclosures in a timely manner, such that it created a likelihood of disease).

### D. Tri-State Zoo Denies the Tigers Safe, Appropriate Caging and Housing

Tri-State Zoo has repeatedly been cited for failing to maintain proper tiger enclosures: increasing the risk of escape,[5] facilitating inappropriate contact with members of the public, and providing tigers with inadequate shelter from the elements. USDA citations directly impacting the health, welfare, and normal behavior patterns of the tigers include:

- The tigers did not have adequate shelter from the winter temperatures.
- The back wall of the young tiger enclosure was not within the existing perimeter fence, increasing the risk of escape and "unauthorized entry and contact with the animals."
- The tigers' enclosures were insecure and in poor condition, risking escape and providing easy access to the visitor area.

Enclosures that facilitate unauthorized public contact with the animals fail to meet generally accepted husbandry practices and the minimum standards of care under the AWA, and deprive the tigers of the ability to engage in normal behavioral patterns and cause a likelihood of injury. 9 C.F.R. §§ 2.131(c)(1), 3.127(d). *See* Section III(E), *infra*. There is an inherent danger "for both the viewing public and the exhibited animal(s) where there is any chance that the public could come into direct contact with juvenile or adult big cats." USDA, *Big Cat Question and Answer: Commonly Asked Big Cat Questions*, https://www.aphis.usda.gov/animal_welfare/downloads/big_cat/big_cat_q&a.pdf (last visited Oct. 5, 2016).

Even more egregious are the repeat citations for the facility's failure to provide these endangered animals with adequate shelter from the winter temperatures. Although tigers are known to acclimate to new environments, the AWA requires that tigers be provided with adequate shelter from inclement weather. 9 C.F.R. § 3.127(b). On information and belief, the tigers' outdoor enclosures, with the exception of Mowgli's enclosure, also do not provide them with adequate shade from the sun, contrary to generally accepted animal care standards and AWA regulation. *See* 9 C.F.R. § 3.127(a); AZA, *Tiger Care Manual*, *supra* at 9.

The above incidents show that Tri-State Zoo repeatedly violated AWA regulations. Failure to provide endangered animals with adequate and safe enclosures denies them the ability to engage in normal behaviors such as hiding and resting without risk of overexposure to the sun or other inclement weather, which harasses them, creates a likelihood of injury to them, and is not a generally accepted husbandry practice.

---

[5] USDA inspection reports document an ongoing risk of escape from 2006 to 2015.




**E. Tri-State Zoo Exposes the Tigers to Harassment by Visitors**

Tri-State Zoo harasses endangered tigers by granting members of the public access to "off-exhibit" areas of the enclosure and facilitating direct contact with adult tigers. In fact, Mr. Candy has expressed that he encourages public contact with the tigers in order to "keep them friendly." Decision and Order, *In re: Tri-State Zoological Park of Western Maryland, Inc.,* AWA Docket No. 11-0222 (USDA Mar. 22, 2013).

Encouraging close contact with tigers is opposed by mainstream conservationists and contravenes generally accepted animal husbandry standards. Philip J. Nyhus et al., Tigers of the World 226 (2nd ed. 2010); AZA, *Tiger Care Manual*, *supra* at 77 ("[T]he AZA does not recommend using any tiger as an ambassador or (public) contact animal."); Global Federation of Animal Sanctuaries, *Standards for Felid Sanctuaries*, *supra* at § P-6.b. For captive animals such as Tri-State Zoo's tigers, "forced proximity to or contact with humans can be deleterious to animal well-being." Morgan & Tromborg, *Sources of Stress in Captivity*, *supra* at 280. In a study of zoo-housed leopards, "overall activity was suppressed when visitors were present, and large increases in visitor numbers resulted in increased pacing, a behavioral indicator of agitation or stress." *Id.* (internal citations omitted).

Further, federal regulations explicitly require that exhibited animals "be handled so there is minimal risk of harm to the animal and to the public, with sufficient distance and/or barriers between the animal and the general viewing public so as to assure the safety of animals and the public." 9 C.F.R. § 2.131(c)(1). Allowing members of the public to make physical contact with the tigers violates AWA regulations and interferes with their normal behavioral patterns in violation of the ESA.

Tri-State facilities inappropriate public contact with the tigers—as confirmed by recent eyewitness reports—and historically has been cited by the USDA for this practice. Relevant USDA citations include:

- Tri-State Zoo allowed the public into the off-exhibit area of the tiger enclosure, where there was no barrier to prevent the public from coming into direct contact with the tiger.
- A large group of spectators, including small children, were allowed to enter the off-exhibit area for three tigers and a lion. The USDA inspector reported that children had reached through the bars and petted the young tigers. Mr. Candy told the inspector "that he encouraged contact by the public with the tigers to keep them friendly." *See* Decision and Order, *In re: Tri-State Zoological Park of Western Maryland, Inc.,* AWA Docket No. 11-0222, § H.6.q (USDA Mar. 22, 2013) (finding that Tri-State and Mr. Candy willfully violated 9 C.F.R. § 2.131(c)(1)).
- Tristate allowed the public to enter into the off-exhibit area for one lion and three tigers (14 months). There was no barrier fence for these enclosures in this area. The public, including small children, were allowed to touch the tigers and take photos while being supervised by a volunteer.




Given that tigers spend over three-quarters of their day resting and sleeping, physical contact forces tigers to reduce resting time, and is therefore inherently disruptive to their normal behavior patterns. Not only does the direct public contact harass the tigers, but the practice of giving visitors access to the tigers' dens and denying them an opportunity to retreat to an area in which they are away from the public is known to cause significant distress to captive tigers. *See e.g.* Morgan & Tromborg, *Sources of Stress in Captivity*, *supra* at 278 ("The lack of sufficient retreat space is a significant potential stressor for captive animals").

Forcing these solitary predators to interact with humans, and denying them the opportunity to escape from public interaction, annoys them by significantly disrupting their normal behavioral pattern and is not a generally accepted animal husbandry practice. This ongoing harassment constitutes a take in violation of the ESA. *See* 16 U.S.C. § 1538(a)(1)(B), (G); 50 C.F.R. § 17.11(h); 50 C.F.R. § 17.21(c)(1).

## IV. Tri-State Zoo is Engaging in Ongoing Takes of Two Lions in Violation of the ESA

Tri-State Zoo's long-standing and ongoing failures to provide lions Peka and Mbube with proper enrichment, social grouping, nutrition, housing and caging, and sanitation, its exposure of Peka to inappropriate interactions with the public, and its failure to provide Mbube with adequate veterinary care, deprives the lions of the ability to engage in normal behavioral patterns and causes them to suffer injury. Accordingly, Tri-State Zoo has "taken" and continues to "take" Peka and Mbube by harming and harassing them in direct violation of the ESA. 16 U.S.C. §§ 1532(19), 1538(a)(1)(B), (G); 50 C.F.R. §§ 17.21(c)(1), 17.31(a), 17.40(r).

### A. Tri-State Zoo Denies the Lions Adequate Enrichment and Social Grouping

Primarily terrestrial, the lion's habitat includes open woodlands, thick bush, scrub, and tall grassy areas. Ass'n of Zoos & Aquariums, *Lion Care Manual* 11 (2012). Ideal habitats provide sufficient cover to provide for hunting and denning. Wild lions mainly hunt at night, covering distances ranging from one to eight miles, depending on the availability of food. *Id.* Female lions do most of the hunting by stalking and ambushing predators, frequently taking prey much larger than themselves. *Id.* at 12.

Lions are typically found in large social groups called prides. For African lions, a typical pride structure includes 5 to 9 related adult females and their offspring plus 2 to 6 males who are unrelated to the females but frequently related to each other. Female lions are highly social; often developing preferred groupings between close relatives such as mother/daughter or siblings. *Id.* at 34. Female lions typically stay in their natal prides their entire lives. *Id.* at 12.

Meeting the physical and psychological needs of captive lions requires providing them with the opportunity to socialize with compatible lions, and providing them with necessary environmental enrichment. The AZA recommends that lions be provided with "large spacious enclosures designed to encourage species-appropriate behaviors such as resting, walking, hunting, stalking,





grooming, playing, breeding, etc." *Id.* at 18. All enclosures should allow lions to "retreat from conspecifics through the use of visual barriers, such as rock outcroppings, hills, and foliage, without limiting an animal's access to food, water, heat, or shade." *Id.* In addition to providing social privacy, enclosures should provide shade, and include "various substrates, surfaces to mark, deadfall for scratching, and other aspects in their enclosure that will change their pathways and create complex behavioral opportunities." *Id.*

Tri-State Zoo's lions live alone in separate, barren enclosures, which are unable to meet their social or behavioral needs. In fact, the lion enclosures are so void of any source of enrichment that Tri-State Zoo was cited by the USDA for failing to provide the lions access to shade.

Both Peka and Mbube are denied proper social groups and live in social isolation. Unlike her wild counterparts, Peka has been denied the companionship of her natal pride since she was acquired by Tri-State Zoo. This isolation is particularly detrimental for female lions given their highly social nature.

Tri-State Zoo continues to deny these lions an environment in which they can express a full range of behaviors these apex predators exhibit in nature, including species-typical social interaction. Depriving these lions of the social interaction and psychological stimulation fundamental to their physical, social and psychological well-being, Tri-State Zoo's actions constitute a take in violation of the ESA, by significantly disrupting their normal behavior patterns. *See* 16 U.S.C. § 1538(a)(1)(B), (G); 50 C.F.R. §§ 17.21(c)(1), 17.31(a), 17.40(r).

**B. Tri-State Zoo Denies the Lions Adequately Implemented Nutrition Protocols**

Tri-State Zoo has denied their lions the most basic necessities, including an adequate and appropriate diet and potable water, thus interfering with their normal feeding behaviors. AWA regulation requires that food "be wholesome, palatable, and of sufficient quantity and nutritive value to maintain all animals in good health. The diet shall be prepared with consideration for the age, species, condition, size, and type of animal." 9 C.F.R. § 3.129(a). According to modern husbandry guidelines, feeding lions diets which contain high percentages of poultry products are of concern because they may be nutritionally unbalanced. Global Federation of Animal Sanctuaries, *Standards for Felid Sanctuaries*, *supra* at § N-2.m.

Potable water should also always be available to lions, in containers that are "cleaned and disinfected daily." *Id. See also* 9 C.F.R. § 3.130.

Proper nutrition and access to potable water are fundamental to the physical and psychological well-being of any captive animal. By failing to provide these lions with an adequate and appropriate diet, as well as fresh water, Tri-State Zoo has "taken" and continues to "take" threatened lions by harming and harassing them in violation of the ESA.




### C. Tri-State Zoo Deprives the Lions Safe, Appropriate Caging and Housing

Tri-State Zoo denies its lions adequate shelter from the elements and historically has been cited for this failure. Tri-State Zoo has also been cited for failing to maintain proper lion enclosures increasing the risk of escape.

Tri-State Zoo's ongoing failure to provide the lions with adequate shade to protect them from the sun, exposes them to many associated ailments including overheating, and denies them the ability to engage in normal behaviors such as hiding and resting without risking overexposure to the sun. AZA, *Lion Care Manual*, *supra* at 18 ("All enclosures should allow each animal the ability to retreat from conspecifics through the use of visual barriers, such as rock outcroppings, hills, and foliage, without limiting the animal's access to food, water, heat, or shade"). Access to multiple areas that "provide shade and hiding places are extremely important to the psychological and physical welfare of cats." G. Law et al., *Dispelling Some Common Misconceptions About the Keeping of Felids in Captivity* 35 Int. Zoo Yb. 197, 200 (1997).

Tri-State Zoo's failure to maintain animals in adequate and safe enclosures harass these captive lions, creates a likelihood of injury to them, and is not a generally accepted husbandry practice, nor in compliance with the AWA. 9 C.F.R. § 3.127(a); AZA, *Lion Care Manual*, *supra* at 14 (Generally accepted practices mandate that lions "always have access to shade, especially during warmer months of the year.").

### D. Tri-State Zoo Deprives the Lions Safe, Sanitary Environments

As with the majority of animal enclosures at Tri-State Zoo, USDA inspection records show that Tri-State Zoo has repeatedly failed to comply with the Animal Welfare Act's regulations regarding waste accumulation and general sanitation with respect to their lion enclosures. Unsafe and unsanitary conditions at Tri-State Zoo continually put the lions' health and welfare at risk by increasing disease hazards, odors and the attraction of pests.

The USDA citations directly concerning the sanitation of Tri-State Zoo's lion enclosures include:

- A partial carcass in the lion enclosure from two days prior's feeding.
- The lion enclosures containing excessive accumulations of feces and food waste.

Tri-State Zoo's failure to keep the lions' enclosures clean and sanitized, as well as their failure to remove animal and food waste from the enclosures unequivocally violates AWA regulations and fails to meet generally accepted practices of animal care. 9 C.F.R. §§ 3.125(d), 3.131. The AZA requires that natural substrates, such as those at Tri-State Zoo, be spot-cleaned daily. AZA, *Lion Care Manual*, *supra* at 15. The possible contamination of natural substrates over time can expose the cats "to potentially dangerous concentrations of pathogens," and therefore requires that contaminated substrates be removed periodically. *Id.*



ZUCKERMAN SPAEDER LLP

By confining these lions in unsanitary conditions that continually put their health and welfare at risk, Tri-State Zoo unlawfully harasses the lions due to the likelihood of injury or sickness. Captive-Bred Wildlife Regulation, 63 Fed. Reg 48634, 48638 (Sept. 11, 1998). Tri-State Zoo's ongoing failure to provide Peka and Mbube with a safe, sanitary environment constitutes a prohibited "take" in violation of the ESA. 16 U.S.C. §1538(a)(1)(B), (G); 50 C.F.R. §§ 17.21(c)(1), 17.31(a), 17.40(r). *See Sellner,* 161 F. Supp.3d at 716-17 (holding that a roadside zoo violated the ESA by failing to remove excessive excreta from tiger enclosures in a timely manner, such that it created a likelihood of disease).

**E. Tri-State Zoo Exposes Peka to Harassment by Visitors**

As explained above, for captive animals such as lions, "forced proximity to or contact with humans can be deleterious to animal well-being." Morgan & Tromborg, *Sources of Stress in Captivity*, *supra* at 280; *see also* Matt W. Hayward & Gina J. Hayward, *The Impact of Tourists on Lion* Panthera Leo *Behaviour, Stress and Energetics*, 54 Acta Theriologica 219 (2009) (finding that lions were significantly more likely to exhibit disturbance-indicating behaviors and signs of stress when tourists were present). Relatedly, federal regulations explicitly require that exhibited animals "be handled so there is minimal risk of harm to the animal and to the public, with sufficient distance and/or barriers between the animal and the general viewing public so as to assure the safety of animals and the public." 9 C.F.R. § 2.131(c)(1). Allowing members of the public to make physical contact with the lion is in express violation of the AWA regulations and contravenes generally accepted husbandry practices. Global Federation of Animal Sanctuaries, *Standards for Felid Sanctuaries*, *supra* at § P-6.b.

Tri-State Zoo nevertheless facilitates and encourages inappropriate interactions with Peka, the lioness, by allowing members of the public to touch her through the metal wires of her cage. Given that lions spend approximately twenty hours per day resting and sleeping, physical contact forces lions to reduce resting time, and is therefore inherently disruptive to their normal behavior patterns. Not only does the direct public contact harass Peka, granting public access to her primary enclosure also causes harassment. Denying Peka an opportunity to retreat to an area where she is away from the public violates generally accepted animal husbandry standards and is detrimental to the animal's well-being. *See e.g.* AZA, *Lion Care Manual*, *supra* at 18; Morgan & Tromborg, *Sources of Stress in Captivity*, *supra* at 278 ("The lack of sufficient retreat space is a significant potential stressor for captive animals").

Forcing these apex predators to interact with humans, and denying them the opportunity to escape from public interaction, annoys them by significantly disrupting their normal behavioral pattern and is not a generally accepted animal husbandry practice. This ongoing harassment constitutes a take in violation of the ESA. *See* 16 U.S.C. §§ 1532(19), 1538(a)(1)(B), (G); 50 C.F.R. §§ 17.21(c)(1), 17.31(a), 17.40(r).



### F. Tri-State Zoo Fails to Maintain Mbube in Adequate Body Condition

Mbube, the male lion, is emaciated and suffering from an undiagnosed condition. On Oct. 6, 2016, the USDA cited Tri-State for failing to provide Mbube with adequate veterinary care and mandated that he be examined by a veterinarian with exotic cat experience:

> The 13 year old male lion is not in good health or body condition. He appears thin and the pelvic bones are prominent. His coat is rough and has turned a dark brown. And, the mane has thinned as would be seen on a one year old lion. There is also a watery discharge around the lion's eyes. . . . Although the lion has been under a veterinarian's care, a diagnosis has not been determined. An illness left undiagnosed can lead to suffering of the animal.

USDA, Inspection Report of Tri State Zoological Park of Western Maryland (Oct. 6, 2016). Generally accepted standards of animal husbandry recommend that animals exhibited in zoos "be maintained within the range of moderate body condition scores (4-6 on a 9 point scale)" due to increased health risks, poor reproductive performance, and reduced longevity associated with more extreme body conditions. AZA, *Lion Care Manual*, *supra* at 54. The visibility of Mbube's bones, including his vertebrate, scapula, shoulder, hip and other joints, is of serious concern and arguably puts his body condition at a 1 or 2 on the AZA's 9 point scale. *Id.* at 56.

By allowing Mbube's body condition to deteriorate so severely, Tri-State has failed to provide him with adequate and appropriate veterinary care. Failure to provide timely and appropriate veterinary care unequivocally violates USDA regulations and fails to meet generally accepted practices of animal care. 9 C.F.R. § 2.40(a); AZA, *Lion Care* at 65.

Likewise, allowing Mbube's body condition to deteriorate as a result of Tri-State Zoo's apparent failure to provide Mbube with timely and adequate veterinary care constitutes physical harm to Mbube in violation of the ESA. *See* 16 U.S.C. § 1538(a)(1)(B), (G); 50 C.F.R. §§ 17.21(c)(1), 17.31(a), 17.40(r).

* * *

Tri-State Zoo's chronic and willful disregard for the welfare of its animals led to a 45-day suspension of the facility's Animal Welfare Act license in 2013. Even after their license was suspended, Tri-State Zoo continued to disregard the AWA's minimum standards of care, resulting in an official warning against the facility in 2015. *See* Official Warning Violation of Federal Regulations, MD150021 (USDA May 29, 2015).

Because Tri-State Zoo does not have any employees, the daily care of these endangered and threatened species falls to a group of inadequately trained and relatively inexperienced volunteers. The lack of adequately trained employees was one of the many reasons leading to the suspension of the facilities' AWA license. *See* Decision and Order, *In re: Tri-State Zoological Park of Western Maryland, Inc.,* AWA Docket No. 11-0222, § H.6.d (USDA Mar. 22, 2013).



**ZUCKERMAN SPAEDER LLP**

Tri-State Zoo has also been cited multiple times for failure to maintain a written Program of Veterinary Care, in violation of the AWA, 9 C.F.R. § 2.40(a). *See e.g.* Decision and Order, *In re: Tri-State Zoological Park of Western Maryland, Inc.,* AWA Docket No. 11-0222, § H.6.p, s (USDA Mar. 22, 2013).

These chronic violations of the most basic standards of care demonstrate Tri-State Zoo's inability to adequately provide for endangered and threatened species in violation of the ESA.

Please be advised that the conditions set forth herein violate the ESA's prohibition on the "take" of tigers (Mowgli, Cheyenne, Kumar, Cayenne, and India), two ring-tailed lemurs, and lions (Peka and Mbube). Unless the violations described herein cease immediately, PETA will file suit against the Tri-State Zoo under the ESA at the expiration of sixty (60) days. Pursuant to the ESA, PETA will seek declaratory relief and an injunction against continued violations, including, but not limited to, requesting that the court order the transfer of the five tigers, two lemurs, and two lions to an accredited sanctuary, as well as attorneys' fees and litigation costs.

During the sixty (60) day notice period, PETA is willing to discuss a mutually agreeable remedy for the violations addressed in this letter. Specifically, PETA is willing to bear all costs associated with relocating the tigers, lemurs and lions to a reputable sanctuary. If Tri-State Zoo wishes to pursue this remedy in the absence of litigation, please contact me by phone at (813) 221-1010 or by e-mail at mhasbun@zuckerman.com in order to facilitate placement. You may also contact my partner, Conor O'Croinin, based in my firm's Baltimore office, at (410) 332-0444 or by email at cocroinin@zuckerman.com.

Very Truly Yours,

Marcos E. Hasbun

MEH/vmc

cc:
Zeynep J. Graves, Counsel
PETA Foundation
2154 W. Sunset Blvd.
Los Angeles, CA 90026
(323) 210-2263 (Phone)
(213) 484-1648 (Fax)
ZeynepG@petaf.org

Conor O'Croinin, Esq.