UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MARYLAND
BALTIMORE DIVISION

PEOPLE FOR THE ETHICAL
TREATMENT OF ANIMALS, INC., et al.

CASE NO. 1:17-cv-02148-MJG

v.

TRI-STATE ZOOLOGICAL PARK
OF WESTERN MARYLAND, INC.

_____

**MEMORANDUM IN SUPPORT OF MOTION TO DISMISS PURSUANT TO FEDERAL RULES OF CIVIL PROCEDURE 12(b)(1) and 12(b)(6)**

## I. INTRODUCTION

In this case, the Plaintiffs allege that the Defendants, jointly and severally, have violated the Endangered Species Act. For the reasons set forth below, the Plaintiffs lack standing to make this claim, and have failed to state a claim upon which relief can be granted by this Court.

The Defendants herein are alleged to own and operate what is familiarly called a zoo in Allegheny County, known as Tri-State Zoological Park. Tri-State exhibits many different animals, many of which are obtained from domestic sources, such as other zoos, and many of which are obtained as "rescues", that is, they are taken in because nobody else wants them. Tri-State charges a small admissions fee for visitors to view the animals, and also receives donations to help defray expenses.

The case at bar is one of many litigations against private zoos and aquariums that the Plaintiffs herein, or affiliated organizations or individuals (hereinafter collectively referred to as "PETA") have either brought or threatened to bring in various jurisdictions throughout

the United States. The instant case would appear to be most similar factually to a series of cases that People for the Ethical Treatment of Animals, Inc., (hereinafter "PETA") has brought against the keepers and exhibitors of an orca (killer whale) in Florida.  A brief history of that controversy would be illustrative as to the course of these "animal rights" litigations and the applicability, *vel non*, of the various laws involved.

In 2012, PETA and its affiliates, including the Animal Legal Defense Fund (ALDF) brought suit against the United States Department of Agriculture's Animal and Plant Health Inspection Service (hereinafter sometimes referred to as "APHIS"). The plaintiffs in that Florida case alleged that APHIS had failed in its duty to protect an orca owned by Miami Seaquarium and Festival Fun Parks, LLC. The orca, formerly known as "Toki" and now known as "Lolita", was alleged by the plaintiffs in that case to have inadequate shade, inadequate space, and inadequate companionship, just as the Plaintiffs in the case at bar allege that Defendant Tri-State Zoological Park, Inc., provides inadequate space, companionship, and similar care to the lion, tigers, and lemurs exhibited at Defendants' facility.

When that 2012 lawsuit was filed, Toki/Lolita was not on the endangered species list promulgated pursuant to the Endangered Species Act. Therefore, it was unquestioned that the only law governing the keeping of Toki/Lolita at that time was the Animal Welfare Act (hereinafter "AWA"), which is administered by the U.S. Department of Agriculture's APHIS service. The Animal Welfare Act does not provide for any private cause of action for individuals or organizations, and therefore PETA could not sue the owners of the aquarium directly. Instead, PETA brought suit to compel APHIS to take adverse action

against Miami Seaquarium's license as issued by APHIS. See *Animal Legal Def. Fund v. U.S. Dep't of Agric.*, 1:13-cv-20076-JAL (S.D. Fla., transferred from N.D. Cal, filed Aug. 24, 2012). The District Court in Florida (S.D.) found that the issuance of a license by APHIS is not an occasion for judicial review of all of the factors that went into the decision to issue such a license, and the 11th Circuit Court of Appeals affirmed the District Court's decision. See *Animal Legal Defense Fund v. U.S. Dept. of Agric.*, 789 F.3d 1206 (11th Cir., 2015).

In 2015, after PETA and its affiliates successfully petitioned before the appropriate regulatory agency to have whales of the same subspecies as Toki/Lolita added to the endangered species list, PETA then filed a new Florida lawsuit very similar in character to the case at bar, alleging that the care received by Toki/Lolita, as an endangered species, constituted not only mistreatment under the Animal Welfare Act, but a privately actionable "take" of an endangered species as defined by the Endangered Species Act, despite the plain language of the term seeming to militate against such a reading.  See *People for the Ethical Treatment of Animals, Inc. v. Miami Seaquarium & Festival Fun Parks, LLC*, 189 F.Supp.3d 1327 (S.D. Fl., 2016). (Hereinafter referred to as "*People for the Ethical Treatment of Animals, Inc., [2016]*" to avoid confusion with other PETA litigation).  In that case, the Hon. Ursula Ungaro, for the U.S. District Court of Florida, (S.D.), after an exhaustive treatment of the law that would have fully justified a finding that the AWA is the sole source of law and the sole remedy for even an endangered species lawfully in captivity, stopped just short of such a finding, and instead reached a factual finding that while it is possible for an act committed against a captive animal to be a "take" under the Endangered

Species Act, that none of the acts alleged in the complaint therein rose to the level contemplated as a "take" in the Endangered Species Act. That finding was appealed by the Plaintiffs to the 11th Circuit Court of Appeals and appears to be presently set for oral argument in December, 2017.

The case at bar would appear to be simply a second bite at the apple in a different jurisdiction, and against a Defendant with lesser financial means.[1] At the very heart of this case are two questions: First, whether the Animal Welfare Act preempts, supersedes or nullifies an action under the Endangered Species Act, where an animal was lawfully obtained and is lawfully in captivity pursuant to a permit issued by the U.S. Department of Agriculture—APHIS. Second, if the Endangered Species Act is in fact pertinent in such a case, then can the Plaintiffs herein show that the animals are "harmed" or "harassed" such as to constitute an unlawful "take" of the animals under the Endangered Species Act, where such captive conditions are overseen and approved by APHIS.

While the District Court of Florida in *People for the Ethical Treatment of Animals, Inc. [2016],* 189 F.Supp.3d 1327 (S.D. Fl., 2016), did exhaustive and very scholarly research in arriving at its opinion, that opinion also inexplicably stopped just short of the conclusion toward which it seems to be inexorably driven: that once an animal, even an endangered species, is lawfully in captivity and brought under the auspices of the Animal

---

[1] There are at least two other cases involving similar questions of law, including *Kuehl v. Sellner*, 161 F.Supp.3d 678 (N.D. Iowa, 2016), and Graham v. San Antonio Zoological Society, Inc., 5:2015-cv-01054(W.D. Tx. 2016). The three district courts all appear to reach different conclusions about the questions presented. The Court in *Kuehl, supra*, appears not to have considered the arguments made herein at all, perhaps because they were not raised by counsel in that case. The court in that case granted the relief sought by plaintiffs, however, Defendants herein assign error to that decision, for reasons argued herein.

4

Welfare Act as administered by USDA- APHIS, then that animal is no longer subject to a "take" under the Endangered Species Act, which is administered by the Department of Inland Fisheries and Wildlife, and which primarily concerns itself with preserving the natural habitat of wildlife, and with ensuring that endangered wildlife is not disturbed within that habitat.

Secondarily, the Defendants herein shall also raise questions related to standing, jurisdiction, and justiciability, since the relief sought by the Plaintiffs would seem to be speculative and conjectural at best, and since in the absence of the applicability of the Endangered Species Act, the Plaintiffs lack any standing to sue *ab initio*, and their only recourse is through the administrative processes of the USDA—APHIS.

## II.     DISCUSSION

### A.     The Animal Welfare Act and the Endangered Species Act

In the *PETA 2016* case, *supra*, the defendants argued that they had not "taken" the subject orca in violation of the Endangered Species Act, and emphasized that they maintained the animal under captive conditions that had been found by the Animal and Plant Health Inspection Service (APHIS) of the U.S. Department of Agriculture to be satisfactory. There is no allegation in the instant case that the Defendants herein are not properly licensed by the APHIS, or that the Defendants herein are not presently in compliance with that regulatory regime as established by APHIS. Instead, the Plaintiffs recite alleged past violations of the Animal Welfare Act, now remedied, as well as their own general opinions about the best way to keep the subject animals, but they identify no present and ongoing practices of the Defendants that are in violation of the AWA, as determined by

5

the only proper authority to determine such violations—the Animal and Plant Health Inspection Service.

While the Defendants are loathe to quote long sections of a Memorandum Opinion to which they might simply make reference, the words of Judge Ungaro in *People for the Ethical Treatment of Animals, Inc. [2016], supra,* are so precisely apposite to this topic, that to attempt only paraphrase would be to re-invent the wheel to no good end. The Court in that case writes as follows [with certain redactions between sections, for the sake of relative brevity], at 1351-1355:

> The Animal Welfare Act ("AWA"), first passed in 1966, Pub. L. No. 89-544, 80 Stat. 350, provides for the humane treatment of animals by persons who use them for exhibition and research purposes. 7 U.S.C. §§ 2131, et seq. In other words, unlike the ESA, it deals exclusively with captive animals, and specifically, animals that are exhibited in licensed facilities such as the Seaquarium. 7 U.S.C. §§ 2131, et seq. To this end, the AWA authorizes the Secretary of Agriculture to license exhibitors, see 7 U.S.C. § 2133, and promulgate standards for the proper care and treatment of animals in their care, see 7 U.S.C. § 2146, which the Secretary has delegated to the Administrator of APHIS. See *907 Whitehead St., Inc. v. Sec'y of U.S. Dep't of Agric.*, 701 F.3d 1345, 1347 (11th Cir. 2012). "[T]he supervisory goals of the [AWA] . . . [are] realized through a regime of administrative enforcement, with a right of judicial review for an aggrieved facility." *Int'l Primate Prot. League v. Inst. for Behavioral Research, Inc.*, 799 F.2d 934, 940 (4th Cir. 1986) (citing 7 U.S.C. §2149(b)). However, in contrast to the ESA, the AWA's goals are not advanced through private causes of action. Id.; see also *Moor–Jankowski v. The Board of Trustees of New York University*, 1998 WL 474084 *1, *8 (S.D.N.Y. 1998) ("Congress did not intend to extend beyond the administrative action by the Secretary of Agriculture to include a private cause of action; the main purpose of the Act is to confer authority to the Secretary of Agriculture to insure the proper care and treatment of animals and that the Secretary be the exclusive investigator and enforcer of the AWA."). . .

Thus, from a wide angle, the AWA deals with a subject similar to that addressed by the ESA: the protection of animals from people. But the ***AWA is sharply focused on the "humane treatment" of captive animals used for exhibition and research***, (emphasis added) see 7 U.S.C. § 2131(1). Indeed, the terminology "humane treatment" is employed repeatedly in no fewer than five different sections in the statutory scheme, and it is the overriding concern reflected in the implementing regulations. See 7 U.S.C. §§ 2131, et seq; 9 C.F.R. Ch. 1, Subch. A, Pt. 3, Subprt. E. ***By contrast, the ESA promotes a different congressional objective—the protection of endangered species from habitat destruction and predation.*** (Emphasis added) See 16 U.S.C. § 1531. . .

Careful review of the legislative history of both statutes shows that in the forty-plus years since their respective enactments, Congress has not disturbed this balance. The 91st Congress first addressed the humane treatment of animals by exhibitors in 1970 when it amended the 1966 version of the AWA. See H.R. Rep. No. 91-1651(1970) ("[T]his bill represents a continuing commitment by Congress to the ethic of kindness to … animals … [by] regulat[ing] more people who handle animals. It will bring into the regulatory framework of the Act for the first time exhibitors …"); Animal Welfare Act of 1970, Pub. L. No. 91-579, section 2, 84 Stat.1560 (1970) ("[I]n order to … insure that certain animals intended for exhibition purposes … are provided humane care and treatment, it is essential to regulate the transportation, purchase, sale, housing, care, handling, and treatment of such animals by person or organizations engaged in using them for . . . exhibition purposes."). At the same time Congress was formulating the AWA, and the subsequent amendment in 1970, it was also developing endangered species legislation, the first comprehensive attempt of which was the Endangered Species Preservation Act of 1966. *Safari Club Int'l v. Jewell*, 960 F. Supp. 2d 17, 26 (D.D.C. 2013), appeal docketed, (Oct. 18, 2013) (citing S. Rep. No. 97-418, at 1(1982)). "The 1966 Act was an important step toward conserving endangered species, [but] it had serious drawbacks[,] including its failure to prohibit the taking of endangered species." Id. To address these problems, the 91st Congress—the same Congress which amended the AWA in 1970— enacted the Endangered Species Conservation Act of 1969 to "correct[ ] several of the weaknesses of the 1966 Act." Id.; see also Pub. L. No. 91-135. That the same Congress addressed the humane treatment of animals by exhibitors and researchers while contemporaneously addressing shortcomings in the ESA's

7

predecessor statute is strong evidence that the ESA was not intended to serve as a surrogate for the AWA. *Bryan v. Itasca Cty., Minnesota*, 426 U.S. 373, 389, 96 S.Ct. 2102, 2111, 48 L.Ed.2d 710 (1976). . .

**The flaw in Plaintiffs' position is that their expansive interpretation of the words "harm" and "harass" in the ESA section 9(a)(1), if adopted by this Court, would bring the ESA into conflict with the AWA. It would displace a long established regulatory framework providing for licensing and oversight of exhibitors and researchers by APHIS, it would expose licensed exhibitors and researchers to liability to special interest groups despite their compliance with APHIS' captive care standards, and would substitute the judgment of a federal trial court judge for the technical expertise of the responsible agency.** (Emphasis added). *Marsh v. Oregon Nat. Res. Council*, 490 U.S. 360, 375-77, 109 S.Ct. 1851, 1860, 104 L.Ed.2d 377 (1989); see *Tug Allie-B, Inc. v. United States*, 273 F.3d 936, 941 (11th Cir. 2001) (holding courts should avoid a construction of two statutes that leads to a "dichomotous result").

B.    **The Plaintiffs' Complaint abuses the definition of a "take" or "taking" under the Endangered Species Act.**

A plain reading shows that the animals alleged to have been "taken" by the Defendants herein were not in fact subject to a "take", as a matter of law, under the Endangered Species Act.

The Endangered Species Act prohibits the "take" of any endangered species, 16 U.S.C. § 1538(a)(1)(B). To take an endangered species means to "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19).

Plaintiffs' Complaint repeatedly alleges actions said to have harmed or harassed the various animals set forth, and allege that such "harm" or "harassment" constitute a taking,

8

such as by allegedly not providing the animals with adequate enclosures and companionship.

The determination of what constitutes a "take" depends upon whether the wildlife is in captivity or in the wild.[2] The U.S. Fish and Wildlife Service is the administrative agency with authority over the taking of land based wildlife under the ESA. The Fish and Wildlife Service has concluded that, because captivity disrupts key elements of the behavior of animals in the wild, but Congress decided not to prohibit keeping ESA-listed animals in captivity, Congress intended that the ESA "take" prohibition be applied in a manner that does not result in proper animal husbandry activities being found to be "take," even if normal behaviors in the wild are disrupted by captivity. The ESA itself specifically discusses captive members of endangered species, relaxes some ESA prohibitions for captive animals, and does not impose additional requirements for captive animals. See 16 U.S.C. § 1538(b)(1) (entitled "Species held in captivity or controlled environment"); see also § 1538(a)(1)(D) (prohibiting "possession" only if the animal was unlawfully taken). Endangered species thus live in zoos and aquariums across the United States. There is no allegation that any of the animals possessed by the Defendants herein were unlawfully taken or in any way directly acquired from the wild by the Defendants. Instead, the Plaintiffs' Complaint concerns itself with the circumstances under which the animals are kept in the actual confines of the Defendant Tri-State Zoological Park's facility, where the Plaintiffs allege that the animals are subjected to ongoing "harm" or "harassment" by the Defendant

---

[2] Wildlife, one might presume from the plain meaning of the word, either is presently in the wild, or originated in the wild.

captors such that it constitutes an unlawful "take" of the animals under the Endangered Species Act.

The Fish and Wildife Service does defines "harass" in its rules. See 50 C.F.R. § 17.3.7, in a two part inquiry, as follows: (1) conduct that creates a "likelihood of injury to wildlife by annoying it to such an extent as to significantly disrupt normal behavioral patterns" can be harassment, but (2**) care for captive animals that complies with "generally accepted … animal husbandry practices that meet or exceed the minimum standards for facilities and care under the [Animal Welfare Act]" is** *not harassment***.** See 50 C.F.R. § 17.3. (Emphasis added). It should be noted that there is no allegation by the Plaintiffs that the Defendants are not presently licensed by the USDA-APHIS or that the Defendants are presently in violation of any USDA—APHIS orders to correct defective conditions.

The Court in *People for the Ethical Treatment of Animals, Inc. [2016] supra,* treated the subject of a "take" as follows [Id. at 1344-1346]:

> In determining whether Congress intended the ESA to extend to the injuries Plaintiffs complain of, the starting point is to analyze the plain meaning of the text of the statute. *Warshauer v. Solis*, 577 F.3d 1330, 1335 (11th Cir. 2009) (internal citation omitted). However, in answering this question, the Court does not "interpret the relevant words . . . in a vacuum, but with reference to the statutory context, 'structure, history, and purpose.'" *Abramski v. United States*, 134 S.Ct. 2259, 2267, 189 L.Ed.2d 262 (2014) (quoting *Maracich v. Spears*, 570 U.S. ----, ----, 133 S.Ct. 2191, 2209, 186 L.Ed.2d 275 (2013)). Section 9(a)(1) reads in pertinent part: "it is unlawful for any person subject to the jurisdiction of the United States to[] take any such species within the United States or the territorial sea of the United States." 16 U.S.C. § 1538(a)(1)(B) (emphasis added). The statutory term "take" is defined in the ESA with ten (10) prohibited acts: "to harass, harm,

pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19)...

When a statute is broadly worded in order to prevent loopholes from being drilled in it by ingenious lawyers, there is a danger of its being applied to situations absurdly remote from the concerns of the statute's framers.") (internal citation omitted). In that regard, *noscitur a sociis* is the common sense principle that statutory terms, ambiguous when considered alone, should be given related meaning when grouped together. E.g., *S.D. Warren Co. v. Maine Bd. Of Env. Protection*, 547 U.S. 370, 378, 126 S.Ct. 1843, 164 L.Ed.2d 625 (2006) (citations omitted). Here, the common denominators among the terms are conduct that: constitutes seizure ("trap," "capture," "collect"); is gravely threatening ("kill," "shoot"); or, has the potential to seize or gravely threaten the life of ("pursue," "hunt," "wound") a member of a listed species. The remaining terms "harm" and "harass" should, therefore, have the same essential character as the eight associated terms. Or put another way, as Seaquarium argues, "harm" and "harass" should be interpreted with the same level of "impact" to the listed species as the other eight terms denote. And, indeed, by replicating the word "kill" in the definition of "harm" the NMFS's interpretation emphasizes the degree of harm the Act requires: "[A]n act which actually kills or injures fish or wildlife." 50 C.F.R. § 222.102.  [Id. at 1344-1346].

Again, for the sake of brevity, the Defendants herein have not included the entire text of the Court's decision in the Florida case. However, the Defendants do ask that the Court give full review to that highly persuasive decision, since ultimately, one is forced to the conclusion that the animals at Tri-State Zoological Park are not adequately alleged under the plain meaning of the Plaintiffs' Complaint to have been "taken" as a matter of law under the Endangered Species Act. Even the District Court of Florida seems to have applied too lax a legal standard to the plaintiffs in that case, perhaps giving the plaintiffs the benefit of the doubt on the law, in order to avoid

11

appellate review on those grounds, and instead finding that the factual allegations did not rise to an actionable level under the Endangered Species Act.

The Defendants submit that the Florida court both could and should have reached the conclusion toward which the law inexorably leads in the instant case— that once an animal is in captivity and subject to the supervision and oversight of APHIS under the Animal Welfare Act, then it is impossible to "take" such an animal under the Endangered Species Act, or, if it is in some way possible, then the harm alleged herein falls short of any harm contemplated in the Endangered Species Act, and that mere allegations of less than proper care by a licensee under the Animal Welfare Act will not be found to be "harm" or "harassment" sufficient to create a private cause of action under the Endangered Species Act.

### C. The specific allegations of Plaintiffs' Complaint fail in specificity and in showing that the relief requested is within the power of the Court

The Plaintiffs' Complaint alleges that a "take" has occurred through the harm or harassment of various captive animals, rather than through a taking from the wild. The Plaintiffs also state several times that the Defendant Zoological Park is "unaccredited" but make no allegation that accreditation is required, nor beneficial, nor even that it is common among zoological parks of this type. Neither do they inform us as to what the legal import of such status might be. In fact, the Plaintiffs make this claim repeatedly, apparently only attempting to conjure prejudice, without ever explaining or alleging

what the proper accrediting body might be, or whether there is any legal requirement of accreditation, which Defendants maintain there is not.

Pages 8 through 13 of Plaintiffs' Complaint alleges that the Defendants harm or harass, and therefore "take" two already captive ring tailed lemurs, by allegedly denying the lemurs adequate companionship, adequate environmental enrichment, and adequate enclosures. The Plaintiffs make much of the alleged "risk" to the animals from such alleged conditions, but cannot state that there is any imminent risk of serious injury to the animals other than what the Plaintiffs have stated by mere conjecture and preference. Again, there is no allegation that the Defendants are presently in violation of any orders issued by APHIS, which is the proper regulatory agency for inspections of zoos.

The remainder of the Complaint repeats similar allegations for the tigers at the facility, and for the lion at the facility. The Plaintiffs cite occasionally to outside authority, including the guidelines of the USDA as to certain topics, but do not explain that the Animal Welfare Act is administered only by the USDA-APHIS and that the AWA does not provide the Plaintiffs with a private cause of action due to alleged violations.

The Plaintiffs likewise complain of alleged past citations or violations but do not allege that there are any present violations that have been noted by APHIS. The Plaintiffs ask that this Court order the removal of animals from Defendants' facility, based upon alleged past citations by APHIS, rather than based upon active, non-remediated citations. Even when the Plaintiffs complain of the death of a lion at the

facility, there is no allegation that the lion would not have died regardless—there is only a bald and conclusory statement that because the lion became ill and died, that it must have been due to lack of veterinary care. Any person of common sense knows that animals (and people) sometimes die despite the best of care.

In short, the gravamen of Plaintiffs' Complaint would seem to be that the animals are kept in a small zoo facility rather than in an extremely expansive—perhaps nonexistent—wildlife refuge, or in their native habitat. In fact, the Plaintiffs do not allege that any other facilities presently exist anywhere within the jurisdiction of the Animal Welfare Act or the Endangered Species Act, that would provide a remedy for the conditions alleged by the Plaintiffs, nor do the Plaintiffs identify with particularity any facilities that differ, how those facilities differ, whether those facilities are superior, or whether those facilities would even be ready, willing, or able to take the animals that are the subject of the Plaintiffs' Complaint. And despite reciting allegations of past citations at the Defendant facility, the Plaintiffs cannot allege that the Defendant facility has had more citations from APHIS than any other facility of its type or size, given the sort of animals that are kept there.

Plaintiffs have not alleged that what they are seeking is even remotely feasible, since that is not their end goal. The end goal is simply to stop zookeeping as we know it. The Plaintiffs do not acknowledge that even if the relief they seek is granted, if no other suitable facilities are found, then one option available, and perhaps forced upon a trustee appointed by a Court, would be to euthanize the animals.

The Plaintiffs claim that the Court has authority to order the forfeiture of the animals and the placement of said animals in a different facility pursuant to 16 U.S.C. 1540(g)(1)(a). However, the statute cited by the Plaintiffs provides for no such relief, instead, only providing that a private citizen may sue to enjoin another person from violating the Endangered Species Act, or to compel the Secretary to enforce the provisions of the Endangered Species Act. No language appears in that section mandating or even allowing the relief sought by the Plaintiffs, which is at best conjectural even were the law to authorize such forfeiture in an action brought by a citizen.

The only relief authorized by law under the Endangered Species Act (which is the only Act under which an individual plaintiff may proceed against an individual, non-governmental defendant), is to enjoin prohibited conduct and an award of attorneys' fees and costs to the prevailing party in the discretion of the court. The complaints of the Plaintiffs herein are best left to administrative or legislative remedies.

> **D.     The Plaintiffs' Complaint must be dismissed because they seek relief that is not authorized by the Endangered Species Act, and is purely conjectural even if found to be authorized, and therefore the Plaintiffs lack standing both due to the inapplicability of the ESA to animals held in captivity under the AWA, and because the relief sought by the Plaintiffs is not authorized by statute and the success of such relief, even if granted, is conjectural.**

A plaintiff suing for an injunction must establish standing to sue by showing it (a) is presently suffering a concrete and particularized injury (b) caused by the

Defendant, (c) which it is likely (rather than speculative) that the Court can effectively remedy if the plaintiff prevails. *Lujan v. Defenders of Wildlife*, 504 U.S. 55, 560-61 (1992). As explained above, the Plaintiffs have not shown that it is at all likely, rather than merely speculative or conjectural, that the Court could enter an order resulting in the placement of any of the animals in a superior facility to the one that now houses them, even if a trustee or examiner were to be appointed to search for such a facility.

Even if one rejects the eminently reasonable argument that the Animal Welfare Act governs all animals in captivity that are lawfully in captivity, to the exclusion of the authority of the Court to act under the Endangered Species Act where licensure under the Animal Welfare Act has been invoked, the Endangered Species Act does not provide for specific compulsory relief or specific performance of the sort imagined by the Plaintiffs, but only for an injunction preventing violators from committing acts that violate the Endangered Species Act. The only entity authorized to seek the forfeiture of animals "taken" under 16 U.S.C. 1540 is the executive branch of the United States government, which gives even more weight to the reading that excludes captive animals from the purview of the Endangered Species Act.

### III. CONCLUSION

The Plaintiffs' Complaint is rife with fatal legal flaws, even if all of the factual allegations made in that Complaint are accepted as true, which this Court must do for the purposes of this Motion.

The Animal Welfare Act is the controlling statute for animals lawfully kept in a zoo. The notion that two different Federal agencies, acting pursuant to two different Federal

statutes and two different sets of Federal regulations, should share power and potentially come into conflict in such a scheme, is not contemplated in the statutory regimes as implemented by the United States Congress, which clearly intended that if an animal was lawfully held in a zoo, the conditions of its treatment would be monitored by the agency with expertise in the actual care and keeping of animals, that is, the United States Department of Agriculture's Animal and Plant Health Inspection Service. The Department of Inland Fisheries and Wildlife certainly has little experience or expertise as to the care of captive animals in a zoo setting, and even less experience with the long term proper care of exotic species from areas outside of the United States.

It is obvious that PETA has promulgated various litigations in various jurisdictions, hoping to find the most favorable reading of the law for its own ends, which is to end all forms of zookeeping as it is presently practiced. It is telling that Plaintiffs complain bitterly about the conditions in which the animals at Defendants' facility are kept, but cannot offer even a bare allegation that the animals would be better off at another facility—instead, we are to believe that there is, not yet identified, a suitable wildlife refuge somewhere over the rainbow (or at least, somewhere beyond the summary judgment rainbow), where these animals will not only be received with open arms, but will receive perfect habitat and care, and where there will never be a citation issued by the USDA. However, if that place exists and is willing to take the animals, the Plaintiffs do not deign to inform the Defendants or the Court of its name or location. Instead, they ask that animals presently kept in a facility regularly inspected by the USDA's Animal and Plant Health Inspection Service, be removed from that facility and forfeited to a Court trustee (a relief not authorized by statute)

and then placed in some different wildlife facility not yet named or located, and which might not in fact exist, or, if it exists, may have no interest in providing care for the animals that are the subject of this suit.

Because the Animal Welfare Act is the sole relief contemplated by Congress for those who complain about the welfare of zoo animals, and because the relief sought by the Plaintiffs is conjectural, not authorized by statute, and beyond the power of the Court to grant to a private litigant under the Endangered Species Act, the Plaintiffs herein lack standing to sue and therefore this controversy is not justiciable before this Court.

The Plaintiffs, however, hope to accomplish their ends by a confusing intermingling of two separate statutory and regulatory regimes. The District Court in Florida has recognized the problems presented in a case such as this. The District Courts in Texas and Iowa have taken other approaches that seem to accept the intermingling of the powers of two different Federal agencies. However, this other approach seems to neglect an obvious resolution that logically derives from a plain reading of the relevant statutes: First, that the Animal Welfare Act and the USDA Animal and Plant Health Inspection Service regulate lawfully *captive* animals in zoos. Second, that the Endangered Species Act and the Department of Inland Fisheries and Wildlife regulate the taking and preservation of wild animals not under the jurisdiction of the AWA, as set forth under the definitions set forth in the Endangered Species Act. If it is true that no man can have two masters, then in cases like these, neither should a monkey.

WHEREFORE, the Defendants pray:

A.   That the Plaintiffs' Complaint be dismissed with prejudice it its entirety.

      B.      That the Court award to the Defendants reasonable attorneys' fees pursuant to 16 USC 1540(g) et seq.

      C.      For whatever other relief the is merited by the justice of the cause.

Respectfully Submitted,

s/Nevin L. Young
_____
Nevin L. Young
Maryland Fed Bar. ID No. 28604
170 West Street
Annapolis, Maryland 21401
(t) 410-353-9210
(f) 410-510-1208
nyoung@burlingtonyounglaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on this 12th day of September, 2017, a copy of the foregoing was served via the Court's ECF filing system, or, if such system was not available, by both first class mail, postage prepaid, and by direct email, to:

Conor O'Croinon, Esquire
Zuckerman Spaeder LLP
100 East Pratt Street
Suite 2440
Baltimore, Maryland 21202

Marcos E. Hasbun, Esquire
Justin Cochran, Esquire
Zuckerman Spaeder, LLP
101 E. Kennedy Blvd.
Suite 1200
Tampa, Florida 33602

s/Nevin Young
_____
Nevin L. Young
Maryland Fed. Bar ID No. 28604