## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
### –Northern Division–

PEOPLE FOR THE ETHICAL
TREATMENT OF ANIMALS, INC.

*Plaintiff*

–v–

TRI-STATE ZOOLOGICAL PARK OF
WESTERN MARYLAND, INC., *et al.*,

*Defendants.*

Case No. MJG 17-2148

## PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

Plaintiff filed this Endangered Species Act ("ESA") citizen suit against Defendants Tri-State Zoological Park of Western Maryland, Inc. ("Tri-State"), Animal Park, Care & Rescue, Inc., and Robert Candy ("Defendants") pursuant to 16 U.S.C. § 1540(g), due to Defendants' ongoing "harm" and "harassment" of two lemurs, five tigers, and a lion. The primary argument raised by Defendants' Motion to Dismiss ("Motion") is that the Animal Welfare Act ("AWA") purportedly "preempts, supersedes or nullifies" an action under the ESA for animals held in captivity. (ECF No. 15-1 at 4) This position flies in the face of the plain letter of the law as recognized by numerous federal courts and, most significantly, by the Fourth Circuit, which held in *Hill v. Coggins*, 867 F.3d 499 (4th Cir. 2017), that mere compliance with the AWA does not insulate a defendant from liability under the

ESA for "harassment" of a captive endangered animal.[1] In fact, Defendants'
argument so defies existing precedent that it goes beyond even the ESA-limiting
argument rejected by the Court in *Hill*: rather than asserting merely that the ESA's
"harassment" prohibition does not apply where an exhibitor complies with the
AWA, Defendants attempt to eliminate ESA protections for AWA-regulated captive
animals altogether. Such a contention simply has no basis in law. Defendants'
secondary argument, that Plaintiff lacks standing because the remedy sought is
purportedly "speculative" and "conjectural," is likewise without legal support.

Plaintiff has alleged facts sufficient under the plain language of the ESA and
its regulations, *Hill*, Supreme Court authority, the ESA's legislative history, and
agency guidance to establish that the grossly inhumane conditions in which
Defendants maintain the lion, tigers, and lemurs in their care constitute a
prohibited "take" under the ESA.  Accordingly, Defendants' Motion must be denied.

## I.   THE COMPLAINT'S FACTUAL ALLEGATIONS

Defendants deny the endangered and threatened animals at issue in this
action the most basic necessities, including wholesome food, potable water,
veterinary care, and daily care by staff experienced in animal husbandry. (ECF No.
1 at ¶ 25) Even if Defendants knew how, or wanted, to provide proper care to the

---

[1]      Because Defendants made no mention of *Hill* in their opening memorandum,
and to avoid wasting the Court's time addressing an argument foreclosed by Fourth
Circuit precedent, Plaintiff sent Defendants a copy of the *Hill* decision on
September 14, 2017. Plaintiff requested that Defendants withdraw their Motion and
answer the complaint. Defendants instead filed a supplemental brief, yet failed to
meaningfully distinguish *Hill,* and failed to show why *Hill* does not foreclose their
argument that the AWA preempts the ESA. (ECF No. 18)

lemurs, tigers, and lion at issue in this case, they would not be able to do so. Defendants are not financially viable and lack the resources and ability to adequately provide for the animals. (*Id*. ¶ 27) Defendants cannot purchase adequate, appropriate, and nutritious food for the animals, and instead rely, in large part, on substandard food donated by others to feed the animals. (*Id*.) Defendants, moreover, do not have the financial resources to hire trained and experienced employees to care for the animals; instead, they rely, in large part, on untrained and inexperienced volunteers. (*Id*. ¶ 28) Finally, Defendants' financial weakness precludes them from providing adequate and clean enclosures, sufficient enrichment, and necessary veterinary care to the animals. (*Id*. ¶ 29)

More specifically, Defendants confine two lemurs in a barren cage, devoid of adequate environmental enrichment, with only a single conspecific (*i.e.* companion of their own species)—conditions that deny them both the varied physical environment that they require and sufficient social interaction, which is "considered to be one of the most important factors influencing the psychological well-being of most nonhuman primates." (*Id*. ¶¶ 30-42 (internal citations omitted)) Further, Defendants fail to provide the lemurs with a clean, sanitary environment, and confine these Madagascar natives in a filthy non-temperature-controlled enclosure—even during Maryland winters. This exposes them to significant health risks and interferes with their ability to engage in species-typical olfactory communication. (*Id*. ¶¶ 43-49)

Likewise, Defendants confine five tigers to a partitioned empty swimming pool, without enrichment capable of promoting the expression of a range of natural behaviors and, in the case of two of the three tiger enclosures, without adequate shade from the sun. (*Id.* ¶¶ 50-60) Defendants also confine three related animals— two sexually mature females and a sexually mature male—together, despite the likelihood of inbreeding and their apparent incompatibility. (*Id.* ¶¶ 61-65) The two female siblings are already known to exhibit stereotypic pacing behavior—a tell-tale sign of poor psychological welfare. (*Id.* ¶ 64) Further, Defendants' tiger enclosures are riddled with cracks and holes that make effective cleaning and sanitizing impossible and Defendants continually fail to timely remove animal and food waste from the enclosures. (*Id.* ¶¶ 68-74) Indeed, a small pool in one of the enclosures is constantly contaminated with urine and feces.  (*Id.* ¶ 57)

Defendants also keep a solitary lion, despite the fact that the animal is a member of a highly social species for whom appropriate social interaction is critical to her most basic psychological and physical needs. (*Id.* ¶ 89) Defendants fail to provide the lion with any source of meaningful enrichment, confining her to an unsanitary, unsafe, and barren enclosure that denies her visual privacy from the public and sufficient retreat space. (*Id.* ¶¶ 83-91, 95-100)

Further, Defendants fail to provide both the tigers and lion with veterinarian-approved and nutritionally sufficient diets and clean drinking water (*Id.* ¶¶ 67, 92-94), expose them to diseases from free-roaming animals (*Id.* ¶¶ 73, 99), and allow the public to make physical contact with the big cats by granting

— 4 —

access to the lion enclosure and to "off-exhibit" areas of the tiger enclosure—
something that is known to be extremely harmful to the well-being of these species.
(*Id.* ¶¶ 75-82, 101-105) The stress of these circumstances alone can compromise
immunity, impair coronary health, alter brain structure and function, stunt growth,
reduce body weight, shorten lifespan, and increase abnormal behavior. (*Id.* ¶¶ 77,
103)

The adverse physical and psychological impact on these animals is manifest
and, regrettably, not surprising. These actions cause the ring-tailed lemurs, tigers,
and lion physical and psychological injury and distress, and put their health and
welfare at risk by creating a likelihood of future injury (*e.g.*, *Id.* ¶¶ 31, 36, 41, 44,
48, 58, 59, 64, 67, 74, 82, 88, 90, 94, 96, 100, 105), and the conditions in which
Defendants maintain their animals fail to comply with even minimal animal
husbandry requirements (*e.g.*, *Id.* ¶¶ 31, 39, 49, 57–59, 61–62, 66–69, 72, 75–76, 82,
85–90, 92–95, 100, 105).

## II.  STANDARD OF REVIEW

To survive a motion to dismiss under Rule 12(b)(6), a plaintiff need only
establish "facial plausibility" by pleading "factual content that allows the court to
draw the reasonable inference that the defendant is liable for the misconduct
alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see also Bell Atlantic Corp. v.
Twombly*, 550 U.S. 544 (2007). The Court must "take the facts in the light most
favorable to the plaintiff," and draw all warranted and reasonable inferences,
conclusions and arguments in favor of the non-moving party. *Giarratano v.
Johnson*, 521 F.3d 298, 302 (4th Cir. 2008).

Similarly, under Rule 12(b)(1), "[w]hen a defendant makes a facial challenge to subject matter jurisdiction, the plaintiff, in effect, is afforded the same procedural protection as he would receive under a Rule 12(b)(6) consideration. In that situation, the facts alleged in the complaint are taken as true, and the motion must be denied if the complaint alleges sufficient facts to invoke subject matter jurisdiction." *Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009) (internal citations and quotations omitted).

## III.   ARGUMENT

The ESA authorizes a private right of action "to enjoin any person . . . who is alleged to be in violation of any provision of this chapter or regulation issued under the authority thereof." 16 U.S.C. § 1540(g)(1)(A). Under the statute and its associated regulations, it is unlawful to "take" any endangered animal, or any threatened animal unless otherwise provided by a Section 4(d) special rule. *Id.* § 1538(a)(1)(B), (G); 50 C.F.R. §§ 17.21, 17.31(a). Likewise, it is unlawful to "possess" an animal that has been unlawfully taken. *Id.* § 1538(a)(1)(D). Ring-tailed lemurs and tigers are listed as "endangered" under the ESA. 50 C.F.R. § 17.11(h). Lions are listed as either "endangered" or "threatened," depending upon their subspecies. *Id.* §§ 17.11(h), 17.40(r).

The ESA defines the term "take" to include "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19); *see also Babbitt v. Sweet Home Chapter of Communities for a Great Or.*, 515 U.S. 687, 698-700 (1995); S. Rep. No. 307, 93rd Cong., 1st Sess., p. 7 (1973), *reprinted in* 1973 U.S.C.C.A.N. 2989, 2995 ("[T]ake"

should be defined "in the broadest possible manner to include every conceivable way in which a person can 'take' or attempt to 'take' any fish or wildlife."); H.R. Rep. No. 93–412, p. 15 (1973) ("the broadest possible terms" were used to define restrictions on takings).

"Harass" is defined by regulation to include an "intentional or negligent act or omission which creates the likelihood of injury to wildlife by annoying it to such an extent as to significantly disrupt normal behavioral patterns which include, but are not limited to, breeding, feeding, or sheltering." 50 C.F.R. § 17.3. When applied to captive wildlife, such as the ring-tailed lemurs, tigers, and lion at Tri-State Zoo, the U.S. Fish and Wildlife Service ("FWS") exempts from the definition of "harass" "generally accepted . . . animal husbandry practices that meet or exceed the minimum standards for facilities and care under the [AWA] . . . when such practices . . . are not likely to result in injury to the wildlife." *Id.*

The FWS has made clear that, notwithstanding this narrow exemption, "maintaining animals in inadequate, unsafe or unsanitary conditions, feeding an improper or unhealthful diet, and physical mistreatment constitute harassment because such conditions might create the likelihood of injury or sickness of an animal." 58 Fed. Reg. 32632, 32637 (June 11, 1993); *see also* 63 Fed. Reg. 48634, 48638 (Sept. 11, 1998) (under this exemption, "[t]he Act continues to afford protection to listed species that are not being treated in a humane manner"); *Id.* at 48636 ("The purpose of amending the Service's definition of 'harass' is to exclude

*proper animal husbandry practices that are not likely to result in injury* from the prohibition against 'take.'").

The term "harm" is defined by regulation to include an act which "kills or injures" an endangered or threatened animal, and encompasses an "intentional or negligent act or omission which creates the likelihood of injury [to a protected animal] by annoying [him or her] to such an extent as to significantly disrupt normal behavioral patterns which include, but are not limited to, breeding, feeding, or sheltering." 50 C.F.R. § 17.3. The definition of "harm" contains no exemption even for AWA-compliant care that satisfies generally accepted husbandry practices.

As discussed in the sections that follow, Defendants' conduct is prohibited under the plain language of the ESA and its regulations, as understood by the Supreme Court and the Fourth Circuit, legislative history, and agency guidance.

## A.    The Fourth Circuit's Decision in *Hill v. Coggins* Forecloses Defendant's Argument.

Defendants contend that dismissal of Plaintiff's Complaint is warranted because "once an animal is in captivity and subject to the supervision and oversight of [Animal and Plant Health Inspection Service (APHIS)] under the Animal Welfare Act, then it is impossible to 'take' such an animal under the [ESA]"[2] (ECF No. 15-1 at 12; *see also* ECF No. 18   at 3), and that Defendants' lemurs, tigers, and lion therefore have not "been 'taken' as a matter of law." (ECF No. 15-1 at 11) In making

---

[2]    Defendants argue, in the alternative, that the harm alleged in the Complaint "falls short of any harm contemplated in the Endangered Species Act." (ECF No. 15-1 at 12) Yet Defendants do not articulate what the appropriate standard would be or otherwise attempt to support this argument.

this argument, Defendants rely almost exclusively on an out-of-circuit district court case, *People for the Ethical Treatment of Animals, Inc. v. Miami Seaquarium,* 189 F. Supp. 3d 1327 (S.D. Fla. 2016), which is currently on appeal to the Eleventh Circuit.[3]

Defendants' reliance on *Miami Seaquarium* is misplaced. *Miami Seaquarium* simply does not support Defendants' argument that captive endangered animals cannot be "taken" under the ESA as a matter of law once the animal is subject to the supervision and oversight of APHIS under the AWA. Even Defendants concede *Miami Seaquarium* does not actually stand for that proposition. Instead, they bemoan that *Miami Seaquarium should* have reached that conclusion, though, in their eyes, it inexplicably did not. (ECF No. 15-1 at 4, 11-12)

More pointedly, Defendants completely ignore the law of *this* Circuit set forth in *Hill v. Coggins*, 867 F.3d 499 (4th Cir. 2017), which unambiguously rejects the proposition Defendants attempt to advance here. In *Hill*, the plaintiffs—two elders of the Eastern Band of Cherokee Indians—filed a citizen suit against the Cherokee Bear Zoo ("the Zoo"), alleging that the manner in which the Zoo maintained grizzly bears "harmed" and "harassed" the animals, and thus constituted an unlawful "take" under the ESA. *Id.* at 503. At trial, the plaintiffs' experts testified that the Zoo's "virtually barren concrete pit enclosures, public feeding arrangements, and

---

[3]    *Miami Seaquarium* is the *only* ESA case to have created and applied a heightened "grave threat" standard to assess whether a captive endangered animal has been "harassed" under the ESA. As such, it is an outlier and inconsistent with Supreme Court precedent and cases interpreting and applying the ESA's provisions to captive endangered animals. *See further infra* at 15 n.9, 17 n.10. And, even as an outlier, it still makes clear that the ESA *does* apply to AWA-regulated entities.

apparent lack of meaningful enrichment programs fell short of generally accepted animal husbandry practices." *Id*. at 503-04. The district court determined—as Defendants argue here (ECF No. 15-1 at 10)—that, with respect to captive wildlife, an animal husbandry practice is exempt from the regulatory definition of "harass" anytime it complies with applicable AWA standards. Accordingly, the district court held that that the Zoo's maintenance of the bears did not constitute a "take" in violation of the ESA because its animal husbandry practices were deemed by APHIS to be AWA compliant. *Id*. at 504.

The Fourth Circuit rejected this reasoning, vacating the district court's order and holding that, in order for the Zoo's practices of keeping the grizzly bears to be exempt from the definition of "harass" in 50 C.F.R. § 17.3, they must be *both* (1) "generally accepted" *and* (2) AWA-complaint.[4] *Id*. at 511. Thus, the law in this Circuit clearly provides that an animal exhibitor cannot escape liability based solely upon the fact that it is USDA regulated and deemed by APHIS to comply with the AWA.

---

[4]     The regulation also contains a third important requirement, not addressed in *Hill* or by Defendants, that a facility's practices must not be "likely to result in injury to the wildlife." 50 C.F.R. § 17.3; *see also* Final Rule, Captive-bred Wildlife Regulation, 63 Fed. Reg. at 48636 ("The purpose of amending the Service's definition of 'harass' is to exclude proper animal husbandry *practices that are not likely to result in injury* from the prohibition against 'take.'" (emphasis added)); *Id*. at 48638 ("[T]he definition of 'harass' . . . is modified to exclude normal animal husbandry practices *that are not likely to result in injury* such as humane and healthful care when applied to captive wildlife. . . . However, maintaining animals in inadequate, unsafe or unsanitary conditions, physical mistreatment, and the like constitute harassment *because such conditions might create the likelihood of injury or sickness*." (emphases added)).

Plaintiff's Complaint demonstrates that the conditions in which Defendants maintain the endangered lion, tigers, and lemurs at their facility interferes with the animals' normal behavioral patterns in a manner that renders injury to the animals likely and, further, that Defendants *neither* comply with the AWA nor practice generally accepted husbandry.[5] *See* 50 C.F.R. § 17.3. In addition, because Defendants' conduct actually causes the animals to suffer injury, it rises to the level

---

[5]     Although Plaintiff's Complaint identifies several instances in which Defendants were cited for failure to comply with the AWA, and even a 2013 suspension of their AWA exhibitor's license, even a total absence of any citations would not disprove "harass[ment]" because (1) husbandry practices for endangered animals must also be "generally accepted," 50 C.F.R. § 17.3, and (2) the USDA's findings are not dispositive, *see Graham v. San Antonio Zoological Soc'y*, No. SA-15-CV-1054-XR, 2017 WL 2533531, at *27 (W.D. Tex. June 8, 2017) (holding that "APHIS determinations are evidence of AWA compliance, but are not necessarily conclusive"). The USDA's own Office of the Inspector General has repeatedly found that the agency fails to adequately enforce the AWA. *See* USDA, OIG Report, APHIS: Animal Welfare Act-Marine Mammals (Cetaceans) (May 30, 2017), http://www.usda.gov/oig/webdocs/33601-0001-31.pdf ("APHIS could make improvements in enforcement and inspection to ensure compliance with the AWA . . . Inspections are not always uniformly completed or adequately documented because of insufficient guidance; this reduces assurance that those exhibitors are in compliance with the AWA."); USDA, OIG Report, APHIS Oversight and Research Facilities (December 2014), https://www.usda.gov/oig/webdocs/33601-0001-41.pdf (USDA "did not follow its own criteria in closing at least 59 cases that involved grave (e.g., animal deaths) or repeat welfare violations" and issued penalties at an average 86% discount); USDA, OIG Audit Report: APHIS Animal Care Program, Inspection and Enf't Activities i-ii (Sept. 2005), http://www.usda.gov/oig/webdocs/33002-03-SF.pdf (the Eastern Region "is not aggressively pursuing enforcement actions against violators of the AWA"); USDA, OIG Audit Report: APHIS Animal Care Program, Inspections of Problematic Dealers 1-2 (2010), http://www.usda.gov/oig/webdocs/33002-4-SF.pdf (lack of appropriate enforcement "weakened the agency's ability to protect . . . animals").

of unlawful "harm"—a form of "take" for which there is no exemption for AWA-compliant care at all.[6] 50 C.F.R. § 17.3.

Specifically, Defendants harm and harass endangered ring-tailed lemurs by confining them with only a single companion; depriving them of appropriate environmental enrichment; failing to protect them from inclement weather; and denying them a clean, sanitary environment, all of which cause the animals physical and psychological injury, and interfere with their behavior in such a way that puts them at risk for further injury. (ECF No. 1 at ¶¶ 30-49). Such conduct violates the AWA, contravenes generally accepted husbandry standards, and causes or is likely to cause injuries to the animals. (*Id.*)

Similarly, Defendants harm and harass their five endangered tigers by confining them to a pit and denying them a natural and complex enclosure with adequate enrichment; denying them adequate shelter from the elements; housing three incompatible tigers together; denying them adequate nutrition and potable water; failing to provide them with clean and sanitary environments and exposing them to disease hazards from free-roaming animals; and granting members of the public access to "off-exhibit" areas of the tiger enclosures and forcing the solitary predators to interact with the public. (*Id.* ¶¶ 50-82) These practices cause physical and psychological injuries to the animals and interfere with their natural behaviors in such a way that they are placed at risk for further injury. (*Id.*) In addition, these

---

[6]     *Hill* did not address the standard applicable to "harm" under the definition of "take" because it determined that it would be prudent to give the lower court the opportunity to address the proper application of the less stringent regulatory definition of "harass" before doing so. 867 F.3d at 511.

practices fall well below both AWA requirements and generally accepted standards of animal husbandry. (*Id.*)

Last, Defendants harm and harass a federally protected lion by confining her in social isolation to a barren enclosure that denies her sufficient retreat space and adequate enrichment; denying her adequate nutrition and fresh water; denying her shelter from the elements; failing to provide her with a sanitary environment and exposing her to disease hazards from free-roaming animals; and by granting the public access to her primary enclosure and facilitating and encouraging the public to make physical contact with her. (*Id.* ¶¶ 83-109) As with Defendants' lemurs and tigers, these practices cause physical and psychological injuries to the lion and interfere with her natural behaviors in such a way that she is placed at risk for further injury. (*Id.*) Likewise, these practices fall well below both AWA requirements and generally accepted standards of animal husbandry. (*Id.*)

For these reasons, Plaintiff has adequately alleged that Defendants "harm" and "harass" these endangered animals in violation of the ESA. Defendants' Motion must therefore be denied.

**B.   The AWA and ESA Apply Concurrently and in Full to Captive Endangered Animals.**

Defendants' attempt to slash the reach of the ESA contravenes not only binding Fourth Circuit authority, but also flies in the face of the statute's purpose as understood and articulated by the Supreme Court, Congress, and the agencies charged with administering it. Indeed, Plaintiff is aware of no authority—and Defendants cite none—supporting the contention that "once an animal is in

captivity and subject to the supervision and oversight of APHIS under the Animal Welfare Act, then it is impossible to 'take' such an animal under the ESA."[7] (ECF 15-1 at 12) Rather, the governing law requires precisely the opposite conclusion: That the ESA and AWA can and do apply concurrently and in full to captive members of endangered species. The statutes are entirely distinct, but complementary, each with its own scope, purpose, and enforcement mechanism, and the availability of a remedy for animal mistreatment under one statute in no way precludes a remedy under the other. *See POM Wonderful LLC v. Coca-Cola Co.*, 134 S. Ct. 2228, 2238-40 (2014) (plaintiff's Lanham Act claim was not precluded by the Federal Food, Drug, and Cosmetic Act ("FDCA") despite the fact that the statutes addressed similar subject matter).

On the one hand, the ESA is "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 180 (1978). It is the manifestation of Congress' intent that endangered species "be afforded the highest of priorities." *Id.* at 174. In construing the definition of "take," the Supreme Court and Congress have unambiguously stated that the terms defining it must be given their broadest possible meanings in order to afford endangered species the full protection intended by the statute.[8]

---

[7]     Defendants are correct that Tri-State Zoo's lack of accreditation does not, on its own, establish a "take." (ECF No. 15-1 at 12) Rather, the absence of accreditation is evidence that the facility is less likely to apply generally accepted husbandry practices in caring for the animals in its custody.

[8]     Unlike the AWA, which is enforced solely by the USDA, Congress provided that the ESA would not just be enforced by the National Marine Fisheries Service

*Sweet Home*, 515 U.S. at 698-700 (these terms must be construed in a way that effectuates the "broad purpose of the ESA"); *see also* S. Rep. No. 307, 93rd Cong., 1st Sess., p. 7 (1973) ("[T]ake' should be defined "in the broadest possible manner to include every conceivable way in which a person can 'take' or attempt to 'take' any fish or wildlife."). Further, it is absolutely clear that the "take" prohibition remains applicable to both wild and captive endangered animals.[9] *See, e.g.*, 63 Fed. Reg. at 48636 ("take" was defined by Congress to apply to endangered or threatened wildlife "whether wild or captive"); 80 Fed. Reg. 7380-01, 7388 (Feb. 10, 2015) ("Section 9(a)(1)(A)-(G) of the ESA applies to endangered species regardless of their captive status").

Accordingly, the FWS, the agency charged with enforcing the ESA with respect to the captive animals at issue here, has noted that "[c]ertain provisions in sections 9 and 10 of the Act show that Congress anticipated that captive animals would have the same legal status," and therefore the same protections, "as their

---

and FWS, but also by citizen suits such as this one. *See* 16 U.S.C. § 1540. This ensures that the protections available to endangered animals are maximized.

[9]       District courts around the country have followed this directive. In *Kuehl v. Sellner*, 161 F. Supp. 3d 678, 709 (N.D. Iowa 2016), for example, the plaintiffs alleged that lemurs and tigers held at Iowa's Cricket Hollow Zoo were being subjected to a "take" in violation of the ESA. Following a bench trial, the court held that maintaining lemurs without appropriate companionship (for which the defendants had not been cited by the USDA), without appropriate environmental enrichment, and without sanitary enclosures "constitutes 'harassment' within the 'taking' provision of the [ESA]," and that failing to provide tigers with appropriate veterinary care and adequate sanitation constituted harm and harassment, respectively. *Id.* at 713, 718. Similarly, in *Graham*, 2017 WL 2533531, at *1, the court found that the defendant zoo's argument that the AWA exclusively governs the treatment of endangered animals in captivity at USDA licensed facilities, to the exclusion of the ESA, failed as a matter of law.

— 15 —

wild counterparts by providing certain exceptions for animals held in captivity." 80 Fed. Reg. at 34502. More specifically, FWS recognized that, where Congress intended to exempt captive animals from specific protections of the ESA, it did so explicitly. *See, e.g.*, 16 U.S.C. § 1538(b)(1) (exempting from certain prohibitions animals held in captivity on December 28, 1973, or the date of the publication in the Federal Register of a final regulation adding listing animal as protected, provided that they are not held in the course of commercial activity); *id.* § 1538(b)(2)(A) (exempting legally held captive raptors from the "take" prohibition). Congress provided no exemption for captive endangered animals with respect to the application of the prohibition against "take(s)." Similarly, it in no way limited the application of the ESA to animals "directly acquired from the wild." (*See* ECF No. 15-1 at 9) "This demonstrates that Congress . . . intended that such [captive] specimens would be protected under the Act, with these activities generally regulated by permit." 80 Fed. Reg. at 34502; *see also* 63 Fed. Reg. at 48636 (explaining that "take" was defined by Congress to apply to endangered or threatened wildlife "whether wild or captive" and conceding that "[i]t is true that the Act applies to all specimens that comprise a 'species'" and "does not distinguish between wild and captive specimens thereof"); 77 Fed. Reg. 431, 434 (Jan. 5, 2012) (the ESA "specifically covers any species that is listed as endangered or threatened, whether it is native to the United States or non-native and whether it is in captivity or in the wild.").

In numerous instances, both the FWS and the National Marine Fisheries Service (which enforces the ESA as to other animals not at issue here) have therefore rejected the Defendants' contention that "take" prohibitions should not apply to captive animals. *See*, *e.g.*, 77 Fed. Reg. 431-01 (Jan. 5, 2012) (removing the exclusion of captive-bred and sport-hunted endangered antelopes from the prohibition of certain activities); 78 Fed. Reg. 33790-01 (June 5, 2013) (rejecting petitions to remove captive antelopes from the species' listings); 80 Fed. Reg. 34500-01 (June 16, 2015) (ending separate classification of captive and wild chimpanzees).[10]

In contrast to the ESA's broad protections, the AWA sets forth only the "*minimum* requirements," 7 U.S.C. § 2143(a)(2) (emphasis added), for *all* regulated species—not just endangered species—in the care of an exhibitor such as Tri-State. The AWA is enforced solely by the USDA and does not have a citizen suit provision. It is less stringent than, but can be implemented in full alongside, the ESA, which offers greater protections, but does not impose conflicting requirements. The AWA's

---

[10]    To the extent that Defendants alternatively attempt to suggest, via reliance on *People for the Ethical Treatment of Animals, Inc., v. Miami Seaquarium*, 189 F. Supp. 3d 1327 (S.D. Fla. 2016), that the definition of "harm" or "harass" should be narrowed to apply only to "grave threats" to life, the argument again fails. There is nothing in the Fourth Circuit that would support such a construction, and the statute's legislative history, which emphasizes Congress' intent to create expansive protections, militates heavily against it. Further, the canon of *noscitur a sociis* (ECF No. 15-1 at 11) should not be applied to support such a definition—rather, requiring that the terms be limited to "gravely threatening" conduct causes them to be "submerged by [their] association" with other terms in the definition, *Sweet Home,* 515 U.S. at 702, 115 S. Ct. at 2415, and, more importantly, denies the terms the flexibility they must retain to ensure that the ESA has the "broadest possible" reach, as Congress intended.

regulations in no way purport, explicitly or implicitly, to displace remedies available under the ESA. *See POM Wonderful LLC*, 134 S. Ct. at 2241 (declining to preclude private parties from suing under the Lanham Act where the FDCA addressed similar subject matter but did not purport to displace other statutory remedies). Likewise, a finding that an entity violates the ESA in no way limits the authority of the USDA to make findings of compliance or non-compliance with the AWA.

Put simply, the ESA provides separate, *heightened* protections for the limited subset of captive animals—such as the lion, tigers, and lemurs in Defendants' custody—who are covered by the AWA and also listed as endangered or threatened. FWS' regulatory definition of "harass" in 50 C.F.R. § 17.3 does not, as Defendants suggest (ECF No. 15-1 at 10), require any other conclusion. Quite the contrary, it serves only to emphasize the heightened standard imposed by the ESA with respect to captive endangered animals. The regulatory definition's limited exemption provides that conduct toward a captive endangered animal is not included in the definition of "harass" *only if* it (1) meets the minimum standards of the AWA, (2) constitutes generally accepted husbandry, and (3) does not cause injury. If the AWA were the sole source of protection for captive endangered animals, then the reference to "generally accepted animal husbandry practices" would be meaningless, as would its prohibition against causing injury. Since conduct can both comply with the AWA *and* still constitute unlawful "harass[ment]" if it is not generally accepted husbandry or if it causes injury to an animal, it is clear that ESA protections

exceed, and are not meant to be subsumed by, the protections available under the AWA.

Contrary to Defendants' apparent belief (ECF. No. 15-1 at 10), mere USDA licensure plainly is not, under this definition, sufficient to escape liability under the ESA.[11] Moreover, the definition of "harm," which is also at issue here, does not contain *any* exemption referencing AWA-compliant care at all, and thus covers harmful conduct *regardless* of whether such conduct violates the AWA.

Defendants' contention that the application of the AWA somehow precludes the availability of a remedy under the more stringent ESA is thus entirely illogical and wrong as a matter of law. Indeed, given that the two statutes are complementary and capable of coexistence, "it would show disregard for the congressional design to hold that Congress nonetheless intended one federal statute to preclude the operation of the other." *POM Wonderful LLC*, 134 S. Ct. at 2238.

### C.   Although Forfeiture Is Warranted in this Matter, Evidence Relating to Available Remedies for Defendants' Ongoing Take of Endangered Animals Is Not Required at the Pleadings Stage.

Defendants attempt to escape liability for their ongoing "take" of endangered animals by pointing out that Plaintiff has not, at the pleadings stage of this case, provided evidence relating to reputable sanctuaries that will be able to provide the ESA-compliant care that Defendants now withhold. (ECF No. 15-1 at 17-18) But Plaintiff is not required to provide in its Complaint evidence relating to its requested remedies. Rather, Plaintiff will be prepared to present ample evidence

---

[11]    Even if AWA compliance alone were somehow sufficient to establish ESA compliance, a lack of APHIS citations is not dispositive. *See supra* 11, n.5.

regarding qualified facilities at the appropriate time—*i.e.*, upon a finding of liability, when this Court must craft a remedy for Defendants' "take."

Defendants further contend that Plaintiff's Complaint should be dismissed because forfeiture to such qualified facilities is somehow unavailable as a remedy under the ESA. This contention is not only premature, as it relates again to remedy and not to liability, *see also infra* Section III(D), but it ignores the broad powers granted under the statute. Plaintiff requests injunctive relief pursuant to 16 U.S.C. § 1540(g) as a remedy for its claims relating to Defendants' ongoing violations of the ESA. Plaintiff's proposed injunctive relief includes, but is not limited to, an order barring Defendants from continuing to violate the ESA, barring ownership or possession of endangered or threatened species, and directing Defendants to forfeit possession of the animals subject to this suit. (*See* ECF No. 1. at "Relief Requested") These remedies fall within the scope of this Court's remedial power pursuant to the ESA and, indeed, also within its broader equitable powers beyond the ESA. "[S]tatutes providing for particular grants of jurisdiction should be read against the backdrop of the courts' general ability to provide equitable relief." *Aransas Project v. Shaw*, 835 F. Supp. 2d 251, 272 (S.D. Tex. 2011) (*citing Weinberger v. Romero-Barcelo*, 456 U.S. 305, 306-07 (1982); *see also Strahan v. Coxe*, 127 F.3d 155, 170 (1st Cir. 1997) ("The ESA does not limit the injunctive power available in a citizen suit, and, thus, we understand the Act to grant a district court the full scope of its traditional equitable injunctive powers. *Equitable injunction includes the power to provide complete relief in light of the statutory purpose.*" (internal citations and

quotations omitted) (emphasis added)). "Thus, if Defendants are found to have violated the provisions of the ESA, the Court can impose affirmative obligations upon Defendants to ensure their compliance with federal law." *Aransas Project*, 835 F. Supp. 2d at 272.

The fact that the statute does not specifically enumerate all forms of injunctive relief available does not bar the Court from ordering forfeiture of the endangered animals at issue as a remedy for Plaintiff's claims.[12] In any event, the ESA itself envisions that if Defendants are deemed to have "taken" these animals, they are thereafter precluded from "possessing" them. *See* 16 U.S.C. § 1538(a)(1)(D). Accordingly, by logical implication, once Defendants have engaged in a "take" of these animals, they must forfeit them, since they would be statutorily proscribed from "possessing" them.

### D.    Plaintiff Has Standing under the ESA.

Defendants try to repackage their argument in standing terms, contending that Plaintiff "lack[s] standing both due to the inapplicability of the ESA to animals held in captivity under the AWA, and because the relief sought by [Plaintiff] is not authorized by statute and the success of relief . . . is conjectural." (ECF No. 15-1 at

---

[12]    Indeed, at least one court has found, at the motion to dismiss stage, that a plaintiff's injury under the ESA could be redressable based in part upon his request for forfeiture of an endangered animal. In *Am. Soc'y for Prevention of Cruelty to Animals v. Ringling Bros. & Barnum & Bailey Circus*, 317 F.3d 334, 338 (D.C. Cir. 2003), the plaintiff former Ringling Brothers employee sought "two forms of relief— an injunction that would stop Ringling Bros. from continuing to mistreat the elephants in violation of the Endangered Species Act and its regulations and *an order directing Ringling Bros. to forfeit possession of the elephants*." 317 F.3d at 338. (emphasis added). Based upon these requests for relief, the court held that, "[i]f [the plaintiff] wins the case, we must assume—because the case is at the pleading stage—that his injury will be resolved." *Id.*

15) For all the reasons discussed above, this argument is without merit. In addition, to the extent that Defendants imply that the alleged unavailability of a forfeiture remedy is appropriately addressed on a motion to dismiss because, without it, Plaintiff somehow cannot establish redressability for standing purposes, they are again mistaken.

Standing doctrine does not obligate Plaintiff to allege that each potential form of requested injunctive relief would afford them complete relief from their injuries. *See, e.g.*, *Los Angeles Haven Hospice, Inc. v. Sebelius*, 638 F.3d 644, 655 (9th Cir. 2011) (finding that even at the summary judgment stage "[a] plaintiff must demonstrate *standing* separately for *each form* of *relief* sought, but is *not* required to demonstrate that a favorable decision will relieve 'his every injury'" (internal citations omitted)); *see also Lujan*, 504 U.S. at 561 (explaining how the "degree of evidence" required of plaintiffs varies at each "successive stage[] of litigation"). Accordingly, courts have found redressability where a plaintiff pleads several potential equitable remedies in order to provide a range of options for the court. *Aransas Project v. Shaw*, 835 F. Supp. 2d 251, 260 (S.D. Tex. 2011) (denying defendant's motion for summary judgment and finding sufficient showing of redressability where "Plaintiff states that the list of equitable remedies in its Complaint is neither mandatory nor exhaustive, but rather a 'range of options,' all meant to ensure that the Defendants take the Cranes' need for fresh water into account."). Here, forfeiture is one of several forms of relief that Plaintiff seeks. (*See* ECF No. 1. at "Relief Requested.")

Even if it somehow were unavailable as a remedy (which is not the case), Plaintiff's claims would be partially redressable if its other requested relief were granted. Thus, the possibility that the Court may modify or grant only a portion of Plaintiff's requested relief does not rob Plaintiff of standing as to *any* of its claims.

## E.    CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss must be denied.

Date    October 2, 2017                          Respectfully submitted,
        Baltimore, Maryland

                                          */s/ Conor O' Croinin*
                                    Conor B. O'Croinin (#28099)
                                    ZUCKERMAN SPAEDER LLP
                                    100 East Pratt Street, Suite 2440
                                    Baltimore, Maryland 21202
                                    (410) 332–0444; (410) 659–0436 (fax)
                                    cocroinin@zuckerman.com

                                    Marcos E. Hasbun (Admitted *Pro Hac Vice*)
                                    Justin Cochran (Admitted *Pro Hac Vice*)
                                    ZUCKERMAN SPAEDER LLP
                                    101 East Kennedy Boulevard, Suite 1200
                                    Tampa, Florida 33602–5838
                                    (813) 221–1010; (813) 223–7961
                                    mhasbun@zuckerman.com
                                    jcochran@zuckerman.com

                                    *Counsel for Plaintiff People for the Ethical Treatment of Animals*

## CERTIFICATE OF SERVICE

I certify that on October 2, 2017, I caused copies of Plaintiff's Opposition to

Defendants' Motion to Dismiss to be sent by CM/ECF to the following parties:


Nevin L. Young
170 West Street
Annapolis, Maryland 21401
nyoung@burlingtonyounglaw.com
*Counsel for Defendants Tri-State*
*Zoological Park of Western Maryland, Inc.,*
*Animal Park, Care & Rescue, Inc., and*
*Robert L. Candy*


   */s/ Conor B. O'Croinin*
Conor B. O'Croinin