IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| PEOPLE FOR THE ETHICAL TREATMENT OF ANIMALS, INC., | * | |
| | * | |
| Plaintiff, | * | |
| v. | * | Civil Action No. 1:17-cv-02148-PX |
| | * | |
| TRI-STATE ZOOLOGICAL PARK OF WESTERN MARYLAND, INC., *et al.*, | * | |
| Defendants. | * | |

\*\*\*

**MEMORANDUM OPINION**

Pending before the Court are Defendants Tri-State Zoological Park of Western Maryland, Inc., Animal Park, Care & Rescue, Inc., and Robert Candy's Motion for Judgment on the Pleadings, Motion for Sanctions, and Interim Motion to Seal Filed in Support of Defendants' Motion for Sanctions. ECF Nos. 55, 71, 72. The motions are fully briefed, and no hearing is necessary. *See* Local Rule 105.6. For the reasons that follow, the Court denies Defendants' motion for judgment on the pleadings, grants in part and denies in part Defendants' motion for sanctions, and grants the joint motion to redact a portion of the motion for sanctions.

**I. Background**

Defendants own and operate a zoological park in Cumberland, Maryland ("the Zoo"). ECF No. 1 ¶¶ 12–15. The Zoo houses many animals, including five tigers, one lion, and two lemurs.[1] ECF No. 1 ¶ 3. Plaintiff People for the Ethical Treatment of Animals, Inc. ("PETA") filed suit under the Endangered Species Act ("ESA"), seeking, *inter alia*, to enjoin the Zoo from

---

[1] After the pleadings closed, one lemur, Bandit, passed away and the other lemur, Alfredo, was transferred to the Maryland Zoo. ECF No. 55-1 at 24. For purposes of the motion for judgment on the pleadings brought pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, the Court, in its discretion, considers only the facts included in the pleadings. *See A.S. Abell Co. v. Balt. Typographical Union No. 12*, 338 F.2d 190, 193 (4th Cir. 1964).

owning or possessing endangered or threatened species. *Id.* at 38. According to the Complaint, the animals at the Zoo live in unsanitary and unsafe conditions, are not fed sufficiently, and are not provided adequate enrichment in the Zoo habitat . *Id.* ¶ 25.

PETA is a nonprofit organization "dedicated to protecting animals, including animals used in entertainment, from abuse, neglect, and cruelty." *Id.* ¶¶ 11, 110. To advance this mission, PETA educates the public on animal-welfare issues, rescues animals, advocates for protective animal-welfare legislation, and organizes mission-related protests and fundraisers. *Id.* ¶ 111. For purposes of standing, PETA avers that the Zoo's public mistreatment of animals has frustrated PETA's mission by contributing to the increasing population of animals in need of rescue and by "making it harder to persuade the public that it should not tolerate the use of animals in entertainment." *Id.* ¶¶ 112, 113. Similarly, PETA avers that it has diverted its resources toward investigating the Zoo and engaging in a public-relations campaign aimed at exposing the Zoo's adverse treatment of the animals. *Id.* ¶¶ 115–16. PETA contends that the effort expended in the name of protecting the Zoo's animals has diverted resources away from its other animal rescue missions and campaigns. ECF No. 1 ¶ 118.

PETA undertook this investigation at the direction of its counsel, and in anticipation of filing this lawsuit. ECF No. 71-3 at 1. Specifically PETA deployed undercover investigators who posed as volunteers offering their services to the Zoo. ECF No. 71-1 ¶ 10. PETA's volunteers gained entry to Zoo, and subsequently denied to Defendant Candy any affiliation with an animal-rights organization. *Id.* ¶ 11; ECF No. 87 at 4 n.4. The volunteers surreptitiously took over 300 photographs and 70 video recordings. ECF No. 71-1 ¶ 2; ECF No. 71-3 at 1. At least some of the video recordings also seem to include audio of conversations between PETA investigators and Defendant Candy. ECF No. 71-4 at 10.

Defendants initially moved to dismiss the Complaint, arguing that the Animal Welfare Act preempted PETA's claims, that the treatment of the animals did not rise to the level of actionable harm, that the Complaint was vague, and that the Court did not have power to award the requested relief. ECF No. 15-1. The Court denied Defendants' motion in its entirety. ECF No. 23. Defendants now attempt to relitigate several of the same claims, which, for the reasons discussed below, will not be revisited. Defendants also now contend that PETA lacks standing to bring the claims and that dismissal is warranted as a sanction for PETA having "illegally obtain[ed] evidence." ECF No. 55; ECF No. 71-1 at 3.

## II.     Standard of Review

Under Federal Rule of Civil Procedure 12(c), a party may move for judgment on the pleadings after the pleadings are closed. Fed. R. C. P. 12(c). A motion under Rule 12(c) "is assessed under the same standards as a motion to dismiss under Rule 12(b)(6)." *Occupy Columbia v. Haley*, 738 F.3d 107, 115 (4th Cir. 2013). The well-pleaded allegations are accepted as true and viewed most favorably to the party pursuing the allegations. *ImpactOffice, LLC v. Siniavsky*, No. TDC-15-3481, 2017 WL 1410773, at *3 (D. Md. Apr. 19, 2017). The motion will not be granted unless "no genuine issues of material fact remain and the case can be decided as a matter of law." *Bell Atl.-Md., Inc. v. Prince George's Cty.*, 155 F. Supp. 2d 465, 473 (D. Md. 2011).

In resolving a motion brought pursuant to Rule 12(c), the court "considers the pleadings, which consist of the complaint, the answer, and any written instruments attached to those filings." *ImpactOffice*, 2017 WL 1410773, at *3. The court, may, in its discretion, also consider evidence beyond the four-corners of the pleadings. *A.S. Abell Co.*, 338 F.2d at 193. However, in that circumstance, "the motion must be treated as one for summary judgment" and "the parties

must be given a reasonable opportunity to present all the material pertinent to the motion."
*Jones v. Nucletron Corp.*, No. RDB-11-02953, 2013 WL 663304, at *4 (D. Md. Feb 20, 2013) (quoting Fed. R. Civ. P. 12(d)) (internal quotation marks omitted).

### III. Analysis

#### A. Motion for Judgment on the Pleadings

#### 1. Grounds for Dismissal Previously Decided

Defendants seek to re-litigate whether the ESA is preempted by the Animal Welfare Act and whether the harm to the tigers, as pleaded in the Complaint, is actionable. *Compare* ECF No. 55-1 at 4, 17; *with* ECF No. 15-1 at 5, 12, *and* ECF No. 23 at 15, 19. The Court will not allow Defendants a second bite at the dismissal apple. As a preliminary matter, the Court notes that Rule 12(g) prohibits the refiling of a motion already brought pursuant to Rule 12, absent limited exceptions set forth in Rule 12(h)(2) and (3). *Smith v. Integral Consulting Servs., Inc.*, No. DKC 14-3094, 2015 WL 4567317, at *1 (D. Md. July 27, 2015). Challenges to the Court's subject matter jurisdiction or a defense of failure to state a claim upon which relief can be granted are two such exceptions. Fed. R. Civ. P. 12(h)(2)–(3).

However, Defendants have previously sought dismissal on these grounds, which the Court rejected. Accordingly, the Court will only reconsider its previous decision based on: (1) a change in controlling law; (2) additional evidence that was not previously available; or (3) a showing that that the prior decision was clearly erroneous or manifestly unjust. *See Boyd v. Coventry Health Care Inc.*, 828 F. Supp. 2d 809, 814 (D. Md. 2011); *Paulone v. City of Frederick*, No. CIV. WDQ-09-2007, 2010 WL 3000989, at *2 (D. Md. July 26, 2010). The Court cannot discern any of the above-described bases that would support reconsideration. The Court will not revisit these claims, and so the motion for dismissal on these grounds is denied.

The Court next turns to Defendants' arguments not previously raised.

**2. Standing**

A court retains jurisdiction only where the plaintiff has standing to bring the claim. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). Pursuant to Article III of the United States Constitution, federal courts are of limited jurisdiction, hearing only live "Cases" and "Controversies." *Id.* at 559; U.S. Const. art. III, § 2. A legal action meets the case-or-controversy requirement where the "questions [are] presented in an adversary context." *Massachusetts v. E.P.A.*, 549 U.S. 497, 516 (2007) (quoting *Flast v. Cohen*, 392 U.S. 83, 95 (1968) (internal quotation marks omitted). For a case to satisfy the case-or-controversy requirement, the plaintiff must have "such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination." *Massachusetts*, 549 U.S. at 517. The plaintiff must demonstrate that "(1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000).

In addition to the constitutional standing requirements, courts impose prudential limitations on legal actions. *Lujan*, 504 U.S. at 560. Among the prudential considerations is the requirement that a plaintiff's grievance "fall within the zone of interests protected or regulated by the statutory provision." *Bennett v. Spear*, 520 U.S. 154, 162 (1997). However, prudential limits may be "modified or abrogated by Congress." *Id.* at 162. Congress enacted a citizen-suit provision of "remarkable breadth" in the ESA, which allows "any person" to file suit to enforce

ESA protections. *Id.* at 164; 16 U.S.C. § 1540(g)(1). Congress thus expanded the zone of interests "to the full extent permitted under Article III of the Constitution." *People for the Ethical Treatment of Animals, Inc. v. Miami Seaquarium*, 189 F. Supp. 3d 1327, 1338 (S.D. Fla. 2016), *aff'd*, 879 F.3d 1142, 1146 n.5 (11th Cir. 2018), *adhered to on denial of reh'g*, No. 16-14814-BB, 2018 WL 4903081 (11th Cir. Oct. 9, 2018); *see also Animal Welfare Inst. v. Beech Ridge Energy LLC*, 675 F. Supp. 2d 540, 559 (D. Md. 2009).

Defendants' standing challenge is confined to whether PETA has suffered a sufficiently concrete and particularized injury under the Constitution. ECF No. 55-1 at 4–14. Taking the alleged facts in the Complaint as true, *Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982), the Court disagrees.

PETA, as an organization, may establish what is known as organizational standing on its own behalf. *Equal Rights Ctr. v. Equity Residential*, 798 F. Supp. 2d 707, 719 (D. Md. 2011). Organizational standing is conferred where the defendants' misconduct causes injury to the organization by frustrating the organizational mission, thus requiring the organization to divert resources in response. *Id.* at 720; *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982). PETA contends that it has organizational standing because the Defendants' "take," as defined under the ESA, directly frustrates PETA's mission to reduce animal abuse. ECF No. 59 at 22. The ESA prohibits the unlawful taking of any endangered or threatened animal species. 16 U.S.C. § 1538(a)(1); 50 C.F.R. § 17.21(c); 50 C.F.R. § 17.31(a). To "take" an animal means to "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or attempt to engage in any such conduct." 16 U.S.C. § 1532(19); *see also* 50 C.F.R. § 17.3 (defining "harass" and "harm"). The Complaint particularly avers that the Zoo has taken animals that the ESA protects. As a result of the Defendants' unlawful taking, the number of abused animals has risen, as has

the public's tolerance for animal abuse, thereby frustrating PETA's mission to forestall the same. ECF No. 1 ¶¶ 112–13.

The Defendants contend, however, that PETA merely has an "inchoate ideological interest" in the animals. ECF No. 55-1 at 5. Although PETA had no prior involvement with the Zoo's individual animals, this fact alone does not eviscerate organizational standing. *See Equal Rights Ctr. v. AvalonBay Communities, Inc.*, No. AW-05-2626, 2009 WL 1153397, at *4 (D. Md. Mar. 23, 2009) (finding organizational standing for nonprofit that could not "identify any person that it had to counsel, refer, or educate as a result of the alleged . . . violations"). The Zoo's current unlawful take of the animals "is in direct conflict with PETA's mission of protecting animals." *Miami Seaquarium*, 189 F. Supp. 3d at1338. Additionally, given PETA's broad campaigns for public education and advocacy, the Court credits PETA's argument that the Zoo's normalization and display of alleged mistreatment undermines PETA's educational programming. *See Organic Consumers Assoc. v. Sanderson Farms, Inc.*, 284 F. Supp. 3d 1005, 1011 (N.D. Cal. 2018) (finding standing for organizations that promote organic consumption in suit against company that deceptively labeled products as "natural"). Taking all facts in the light most favorable to PETA, the Court finds that PETA has pleaded sufficient injury to PETA's mission arising from Defendants' alleged misconduct.

The Complaint also avers that PETA has devoted its limited resources toward investigating and uncovering the Zoo's ESA violations and thus away from funding other animal rescues and mission-related public campaigns. ECF No. 1 ¶ 118. The resources specifically diverted include those used to extensively investigate the Zoo, distribute press releases related to the Zoo's violations, and draft and submit formal complaints to government agencies. *Id.* ¶¶ 115–16. The Complaint, therefore, plausibly avers that this diversion of resources perceptibly

7

impaired PETA's ability to advance its mission. *See Equity Residential*, 798 F. Supp. 2d at 722; *AvalonBay*, 2009 WL 1153397, at *4, 6. Accordingly, these facts, accepted as true and most favorably to PETA, confer organizational standing.

### 3. Tigers' Protection under the ESA

Defendants next argue that PETA fails to state a claim with respect to the "take" of the Zoo's tigers because these tigers are captive-bred, "generic," and, thus, exempted from ESA protection. Defendants misapprehend the reach of the ESA as to tigers.

As a preliminary matter, the Court recognizes that the Secretary of the Interior maintains authority to determine which species are deemed endangered or threatened and thus protected under the ESA. 16 U.S.C. § 1533(a)(1). Further, the United States Fish and Wildlife Service ("the Service"), under the direction of the Secretary of the Interior, has promulgated regulations "to encourage responsible breeding efforts" with such species. Captive-bred Wildlife Regulation, 58 Fed. Reg. 68,323, 68,324 (Dec. 27, 1993). These regulations allow for the taking of captive-bred, endangered animals when the purpose of the take "is to enhance the propagation or survival of the affected species." 50 C.F.R. § 17.21(g)(1). Said differently, "taking" is permitted in limited circumstances when such taking increases the tiger population. Any such taking under this exception, however, requires the person taking the animals to be registered with the Service, unless the species falls within certain enumerated exemptions. 50 C.F.R. § 17.21(g)(2), (g)(6). However, between 1998 and 2016, the Service exempted from registration "inter-subspecific crossed or generic" tigers. Endangered and Threatened Wildlife and Plants; U.S. Captive-Bred Inter-subspecific Crossed or Generic Tigers, 81 Fed. Reg. 19,923, 19,923 (Apr. 6, 2016); *see also* 50 C.F.R. § 17.21(g)(6) (2005). "Crossed" and "generic" tigers are those who cannot be readily identified or identifiable as a particular subspecies. 81 Fed. Reg. at

8

19,923.[2]

Against this regulatory backdrop, Defendants argue that while the exemption was in place before 2016, the Service had effectively removed altogether the ESA protections as to the taking of generic tigers. ECF No. 55-1 at 16. This is incorrect. The pre-2016 exemption governed solely the requirement to register with the Service to take the generic tigers for reproductive purposes; it did not affect the underlying legal protections afforded to generic tigers more broadly. Indeed, the Service explicitly announced that "[e]ven with this exemption, inter-subspecific crossed or generic tigers *were still protected under the Act*" because the "regulations under the ESA prohibit[ed] the taking of any tiger, including generic tigers." 81 Fed. Reg. at 19,924 (emphasis added). Importantly, tigers are listed as an endangered species, which includes "any subspecies." 16 U.S.C. § 1532(16) (defining "species"); 50 C.F.R. § 17.11 (listing tigers as endangered); *see also United States v. Kapp*, 419 F. 3d 666, 672–73 (7th Cir. 2005). As an endangered species, taking of tigers—all tigers—is permitted only to promote responsible propagation, *see* 58 Fed. Reg. at 68,325, not simply for the display of wildlife.

No facts averred in the Complaint allow the plausible inference that the Defendants' taking of the tigers was designed for the propagation of the species. Rather, the Complaint alleges that the take of the tigers was for exhibition purposes only. Because if true, these facts support an ESA violation, judgment on the pleadings is denied as to the tigers.

**4. Lions' Protection under the ESA**

Defendants assert that the ESA only protects two subspecies of lions, neither of which are the lions kept in captivity at the Zoo. ECF No. 55-1 at 23.[3] Historically, classification of lion

---

[2] There are four subspecies of tigers: Bengal (P*anthera tigris tigris*), Sumatran (*P. t. sumatrae*), Siberian (*P. t. altaica*), and Indochinese (*P. t. corbetti*). *Id.*

[3] Defendants argue that two lions, Peka and Mbube, are not protected by the ESA. *Id.* However, PETA

9

subspecies for ESA protection purposes has been difficult. Endangered and Threatened Wildlife and Plants; Listing Two Lion Subspecies, 80 Fed. Reg. 80,000, 80,001 (Dec. 23, 2015) ("[T]raditional classifications recognize anywhere from zero subspecies (classifying lions as one monotypic species) up to nine subspecies."). In 2015, the Service adopted for lion classification the International Union for Conservation of Nature ("IUCN")'s taxonomy, which recognizes that all lions fall into one of two lion subspecies: *Panthera leo leo* and *Panthera leo melanochaita*. *Id.* at 80,000. Thus, under ESA regulations, all lions are classified as either *P. l. leo* or *P. l. melanochaita*, and most important for this case, all enjoy ESA protection. 50 C.F.R. § 17.11.[4]

Defendants contend that because their lions are both in captivity and in the United States, their lions do not fall into either of the protected subspecies. This is so, say Defendants, because the classification of a lion as belonging to a particular subspecies is not determined by "genetics or appearance, but by *what country on the African continent*" in which the lion is currently located. ECF No. 55-1 at 19 (emphasis in original). In support of this contention, Defendants primarily point to the Service's description of the countries where each subspecies of lion is found in the wild—a fact integral to the Service's inquiry of whether a particular subspecies is in danger of extinction. *See* 80 Fed. Reg. at 80,004. But Defendants apparently missed where the Service states that IUCN taxonomy is based on "recent genetic research." *Id.* at 80,001. And nowhere in the fifty-six page publication does the Service suggest that a lion "could in theory change his or her subspecies daily just in the normal course of travel" between countries. *See* ECF No. 55-1 at 19 n.2. Most significantly, the Service itself has noted that "captive-held specimens are not eligible for separate consideration for listing," and that effectively all lions,

---

appears to only allege the unlawful taking of Peka, and discusses Mbube solely as evidence of the alleged inadequacy of Defendants' veterinary care. ECF No. 1 ¶¶ 83–109. For the purposes of this motion, the Court will address Defendants' argument about both lions, rather than focusing solely on Peka.

[4] *P. l. leo* is listed as endangered and *P. l. melanochaita* is listed as threatened. *Id.*

captive or wild, enjoy ESA protection. 80 Fed. Reg. at 80,055.[5] The prohibitions on taking endangered and threatened species thus apply to all lions, including the lions at Defendants' Zoo. *See* 50 C.F.R. §§ 17.21(c)(1), 17.40(r), 17.31(a)–(c). Judgment on the pleadings as to the lions is denied.

### B. Motion for Sanctions

Defendants also seek to dismiss the Complaint as a sanction for "illegally obtain[ing] evidence." ECF No. 71-1 at 3. Courts retain inherent authority to sanction bad-faith conduct, including "wrongfully obtaining the property or confidential information of an opposing party." *Glynn v. EDO Corp.*, No. JFM-07-01660, 2010 WL 3294347, at *3 (D. Md. Aug 20, 2010). However, the Court must only exercise this authority "with restraint and discretion." *Victor Stanley, Inc. v. Creative Pipe, Inc.*, 269 F.R.D. 497, 518 (D. Md. 2010). A court must reserve the "extraordinary sanction of dismissal" for only those instances where the misconduct caused prejudice to the movant sufficiently severe to outweigh the public policy in favor of resolving claims on the merits. *Glynn*, 2010 WL 3294347, at *6. Dismissal is warranted where the wrongdoing "deceives a court or abuses the process at a level that is utterly inconsistent with the orderly administration of justice or undermines the integrity of the process." *Glynn*, 2010 WL 3294347, at *3 (quoting *United States v. Shaffer Equip. Co.*, 11 F.3d 450, 462 (4th Cir. 1993)) (internal quotation marks omitted). The court considers the following factors:

> (1) the degree of the wrongdoer's culpability; (2) the extent of the client's blameworthiness if the wrongful conduct is committed by its attorney, recognizing that we seldom dismiss claims against blameless clients; (3) the prejudice to the judicial process and the administration of justice; (4) the prejudice to the victim; (5) the availability of other sanctions to rectify the wrong by punishing culpable persons, compensating harmed persons, and deterring similar conduct in the future; and (6) the public interest.

---

[5] Defendants' stray line suggesting that their lions are hybrid lion subspecies, and thus unprotected by the ESA, is also unavailing. *See Kapp*, 419 F.3d at 673.

11

*Glynn*, 2010 WL 3294347, at *3 (quoting *Shaffer Equip.*, 11 F.3d at 462–63) (internal quotation marks omitted). The movant must demonstrate by clear and convincing evidence the propriety of the requested sanctions. *Steves & Sons, Inc. v. JELD-WEN, Inc.*, No. 3:16-CV-545, 2018 WL 2023128, at *5 (E.D. Va. May 1, 2018).

Defendants argue that PETA illegally obtained evidence outside the bounds of court-supervised discovery. ECF No. 71-1 at 3. Specifically, Defendants assert that PETA gained access to the Zoo by posing as volunteers, surreptitiously took photographs and video recordings, and illegally recorded audio of unconsenting persons in violation of the Maryland Wiretap Act. *Id.* at 2–3. Defendants also allege that PETA's counsel participated in this misconduct. *Id.* at 16. The Court considers each allegation in turn.

First with respect to PETA's presence on Zoo property, Defendants contend that access was obtained by fraud and thus constituted a trespass. A civil trespass is "an intentional or negligent intrusion upon or to the possessory interest in property of another." *Litz v. Md. Dep't of Env't*, 446 Md. 254, 276–77 (2016) (quoting *Schuman v. Greenbelt Homes, Inc.*, 212 Md. App. 451, 475 (2013)). Courts across the country are split on whether consent is a viable defense to trespass when such consent was obtained through fraud. *Food Lion, Inc. v. Capital Cities/ABC, Inc.*, 194 F.3d 505, 517 (4th Cir. 1999). Neither this Court nor the parties unearthed any Maryland controlling law. Because the law in this respect is unsettled, the Court is hard-pressed to find that obtaining evidence in this manner warrants the sanction of dismissal.

Defendants next contend that, once on the property, PETA gathered evidence by surreptitious recordings in violation of the Maryland Wiretap Act, thus warranting sanctions. The court recognizes that merely taking photographs and videos without audio does not constitute a Wiretap Act violation. *See Holmes v. State*, 236 Md. App. 636, 654 (2018) ("[A]

video recording without audio or oral communication is not prohibited under the wiretap statute."); *cf. Furman v. Sheppard*, 130 Md. App. 67, 73 (2000) (noting, in context of tort law, that "[i]f surveillance is 'conducted in a reasonable and non-obtrusive manner, it is not actionable'") (quoting *Pemberton v. Bethlehem Steel Corp.*, 66 Md. App. 133, 164 (1986)). Under Maryland's Wiretap Act, a person must obtain all parties' consent before recording oral communications. Md. Code, Cts. & Jud. Proc. § 10-402. Indeed, "the use of a cell phone by a private citizen to secretly record a face-to-face oral conversation without the consent of all participants is . . . a presumptive violation of Maryland's wiretap law." *Holmes*, 236 Md. App. at 649.

PETA's own internal memorandum and deposition testimony strongly suggest that certain of its video recordings also include audio. ECF No. 71-4 at 10; ECF No. 71-9 at 27:5–6. Further PETA appears to have unlawfully recorded audio without first obtaining consent of those who were recorded. *See* ECF No. 71-9 at 27:20–21 (stating, in deposition of PETA, that agents "would not have asked [for] permission" to record audio). Such recordings violate the Wiretap Act and will be excluded entirely from this case.

Defendants further contend that the recordings were made with counsel's knowledge and endorsement. ECF No. 71-1 at 17. In support, Defendants attach a privilege log, which notes that videos were "prepared pursuant to attorney direction." ECF No. 71-3 at 1. However, little evidence links specific "attorney direction" to the PETA agents having obtained recordings in violation of the Wiretap Act. Defendants do not show what direction counsel gave PETA, whether the videos taken on those dates included audio, or even a single concrete example of counsel using the video recordings.

In light of the strong public policy in favor of deciding cases on the merits and the

13

availability of lesser sanctions, the Court declines to dismiss the case.  The Court recognizes, however, that as to any video recorded with audio, those videos will not be accepted as evidence for any and all purposes in future court proceedings.  *See* Md. Code, Cts. & Jud. Proc. § 10-405.  Exclusion of such evidence, in the Court's view, cures any prejudice that otherwise would have been visited on Defendants.  At this stage in the litigation, and now that PETA has been specifically put on notice regarding the lawful limits of its investigative techniques, the Court does not believe additional sanction is warranted.  *See Victor Stanley*, 269 F.R.D. at 536.  Any future similar violations, however, will be viewed as knowing, willful and contemptuous, and will be sanctioned accordingly.

### C. Motion to Seal

Defendants and PETA jointly request that the Court allow the parties to redact the name of PETA's undercover investigator.  ECF Nos. 72, 88, 53.  Before granting a motion to seal, the parties must rebut the general presumption that the public enjoys free and unfettered access to court records.  *Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 597 (1978).  The presumption of access may be rebutted to protect individual privacy concerns or corporate confidential, proprietary information.  *Interstate Fire & Cas. Co. v. Dimensions Assur. Ltd.*, No. GJH-13-3908, 2014 WL 6388334, at *1 (D. Md. Nov. 13, 2014).  PETA contends that preserving the investigator's anonymity will, in turn, preserve the investigator's future ability to investigate instances of animal abuse in an undercover capacity.  ECF No. 88 at 7.  PETA's concern is legitimate, and the redaction request is narrowly circumscribed to meet this concern.  The Court, therefore, grants the request.  The Defendants shall file a public version of the motion for sanctions (ECF No. 71) with the investigator's name redacted.

## IV. Conclusion

For the foregoing reasons, Defendants' motion for judgment on the pleadings is denied, Defendants' motion for sanctions is granted in part and denied in part, and Defendants' motion to seal is granted. A separate Order follows.

November 1, 2018　　　　　　　　　　　　　　　　　　　　　/S/　　　　　　　　　
Date　　　　　　　　　　　　　　　　　　　　　　　　　　　Paula Xinis
　　　　　　　　　　　　　　　　　　　　　　　　　　　　　United States District Judge