**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**–Northern Division–**

PEOPLE FOR THE ETHICAL
TREATMENT OF ANIMALS, INC.,

*Plaintiff*

–v–

TRI-STATE ZOOLOGICAL PARK OF
WESTERN MARYLAND, INC., *et al.*,

*Defendants.*

Case No. PX 17–2148

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT AND REPLY TO DEFENDANTS' OPPOSITION TO
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

# Table of Contents

I.   Introduction ..................................................................................... 1

II.  The Court Should Deny Defendants' Motion For Summary Judgment .......... 2

    A.   Statement of Facts Relevant to Standing ................................. 2

    B.   PETA Has Standing to Challenge Defendants' Take of Federally
        Protected Animals. ................................................................... 4

        1.   PETA has shown frustration of mission and diversion of
            resources sufficient to establish injury in fact under *Havens*. .... 5

        2.   PETA has established causation. ................................ 16

        3.   PETA also established redressability. ......................... 17

III. The Court Should Grant PETA's Motion for Summary Judgment ................ 20

    A.   PETA's Evidence Is Properly Before This Court. ................................. 21

        1.   PETA's experts are qualified to opine on the matters set
            forth in their reports. ................................................... 21

        2.   PETA's experts properly relied, in part, on audiovisual
            evidence that is properly before this Court. ................... 23

        3.   Defendants have admitted the genuineness of the USDA
            inspection reports. ..................................................... 24

        4.   Pre-January 2016 evidence of mistreatment of the lions is
            properly before the Court. ........................................... 27

    B.   The Eleventh Circuit's "Serious Threat" Standard Is Inconsistent
        with Fourth Circuit Law. ................................................................. 28

    C.   Undisputed Evidence Shows that Defendants Harass, Harm, and
        Killed Endangered and Threatened Species. ................................. 32

        1.   The admissible evidence remains undisputed that
            Defendants failed to provide lemurs with adequate
            shelter. ..................................................................... 34

2.    Defendants do not genuinely dispute that they fail to provide big cats and lemurs with appropriate enrichment and deny Peka appropriate companionship. ............................ 36

        (a)    The evidence remains undisputed that Defendants failed to provide lemurs with adequate environmental enrichment. ........................................................ 36

        (b)    The evidence remains undisputed that Defendants fail to provide Peka with a proper social group. ............. 39

        (c)    The evidence remains undisputed that Defendants deny big cats appropriate enrichment. ........................... 41

3.    PETA is also entitled to summary judgment on its other big-cat claims. ............................................................... 44

        (a)    Defendants "take" big cats by denying them appropriate veterinary care............................................. 45

        (b)    Defendants deny big cats adequate shelter from the elements. ................................................................. 46

        (c)    Defendants' "take" big cats by exposing them to disease hazards from free-roaming animals. .................. 47

D.    The Court Should Grant PETA's Requested Relief. ............................ 48

IV.    Conclusion ............................................................................................ 49

# Table of Authorities

**CASES**

*Action NC v. Strach,*
   216 F. Supp. 3d 597 (M.D.N.C. 2016) ......................................................... 6, 14, 15

*Animal Welfare Institute v. Beech Ridge Energy LLC,*
   675 F. Supp. 2d 540 (D. Md. 2009) ................................................................... 4

*Aransas Project v. Shaw,*
   835 F. Supp. 2d 251 (S.D. Tex. 2011) ............................................................... 18

*Babbitt v. Sweet Home Chapter of Communities for a Greater Oregon,*
   515 U.S. 687 (1995) ................................................................................... 30, 31

*Barwick v. Celotex Corp.,*
   736 F.2d 946 (4th Cir. 1984). .......................................................................... 34

*Bennett v. Spear,*
   520 U.S. 154 (1997) .............................................................................. 4, 19, 39

*Bishop v. Bartlett,*
   575 F.3d 419 (4th Cir. 2009) ........................................................................... 19

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.,*
   467 U.S. 837 (1984) ...................................................................................... 31

*Cooksey v. Futrell,*
   721 F.3d 226 (4th Cir. 2013) ............................................................................. 5

*Daubert v. Merrell Dow Pharmaceuticals, Inc.,*
   509 U.S. 579 (1993) ...................................................................................... 23

*Dean v. Chrysler Corp.,*
   38 F.3d 568,
   5681994 WL 574188 (5th Cir. 1994) .................................................................. 23

*Equal Rights Ctr. v. AvalonBay Communities, Inc.,*
   No. AW-05-2626,
   2009 WL 1153397 (D. Md. Mar. 23, 2009) ................................................. 6, 16, 17

*Equal Rights Ctr. v. Equity Residential,*
   798 F. Supp. 2d 707 (D. Md. 2011) ..................................................................... 6

*Equal Rights Ctr. v. Post Props., Inc.,*
   633 F.3d 1136 (D.C. Cir. 2011) ......................................................................... 13

*Evans v. Techs. Applications & Serv. Co.,*
    80 F.3d 954 (4th Cir. 1996) ............................................................. 37, 40

*Fair Emp't Council of Greater Wash., Inc. v. BMC Mktg. Corp.,*
    28 F.3d 1268 (D.C. Cir. 1994) ..................................................... 12, 13, 14

*Fox v. Vice,*
    563 U.S. 826 (2011) ............................................................................. 39

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.,*
    528 U.S. 167 (2000) .............................................................................. 4

*Graham v. San Antonio Zoological Soc'y,* 2
    61 F. Supp. 3d 711 (W.D. Tex. 2017) ............................................... 22, 39

*Havens Realty Corp. v. Coleman,*
    455 U.S. 363 (1982) ...................................................................... *passim*

*Hill v. Coggins,*
    867 F.3d 499 (4th Cir. 2017) ................................................. 21, 28, 29, 40

Hill v. Coggins,
    138 S. Ct. 1003 (2018) ........................................................................ 21

*Kuehl v. Sellner,*
    161 F. Supp. 3d 678 (N.D. Iowa 2016) (No. 6:14-CV-2034) ............ 22, 38, 40, 49

*Lane v. Holder,*
    703 F.3d 668 (4th Cir. 2012) ......................................................... *passim*

Leskinen v. Utz Quality Foods, Inc.,
    165 F.3d 911 (4th Cir. 1998) ................................................................ 37

*Leskinen v. Utz Quality Foods, Inc.,*
    30 F. Supp. 2d 530 (D. Md. Jul. 21, 1998) ......................................... 37, 40

*Libertarian Party of Va. v. Judd,*
    718 F.3d 308 (4th Cir. 2013) ................................................................ 16

*North Carolina State Conference of NAACP v. North Carolina State Board of*
    *Elections,*
    283 F. Supp. 3d 393 (M.D.N.C. 2017) ................................................. 6, 15

*Organic Consumers Ass'n v. Sanderson Farms, Inc.,*
    284 F. Supp. 3d 1005 (N.D. Cal. 2018) .................................................... 8

*People for Ethical Treatment of Animals, Inc. v. Miami Seaquarium*,
   879 F.3d 1142 (11th Cir. 2018) ................................................................... 28, 31, 32

*People for the Ethical Treatment of Animals, Inc. v. Miami Seaquarium*,
   905 F.3d 1307 (11th Cir. 2018) ......................................................................... 28, 32

*People for the Ethical Treatment of Animals, Inc. v. U.S. Dep't of Agric.*,
   194 F. Supp. 3d 404 (E.D.N.C. 2016) ........................................................................ 6

*People for the Ethical Treatment of Animals, Inc. v. U.S. Dep't of Agric.*,
   797 F.3d 1087 (D.C. Cir. 2015) .................................................................................. 6

*People for the Ethical Treatment of Animals, Inc.* v. *U.S. Dep't of Agric.*,
   861 F.3d 502 (4th Cir. 2017) ...................................................................................... 7

*Planned Parenthood of S.C. Inc. v. Rose*,
   361 F.3d 786 (4th Cir. 2004) ...................................................................................... 2

*POM Wonderful LLC v. Coca-Cola Co.*,
   134 S. Ct. 2228 (2014) .............................................................................................. 30

*Sierra Club v. Morton*,
   405 U.S. 727 (1972) .................................................................................................... 6

*Sierra Club v. U.S. Dep't of the Interior*,
   899 F.3d 260 (4th Cir. 2018) ........................................................................ 16, 17, 18

*Tenn. Valley Auth. v. Hill*,
   437 U.S. 153 (1978) .................................................................................................. 29

*Tri-State Zoological Park of W. Maryland, Inc.*,
   71 Agric. Dec. 915, 2012 WL 3877392
   (U.S.D.A. Aug. 1, 2012) (No. 11-0222) ...................................................................... 3

*Tri-State Zoological Park of W. Maryland, Inc.*,
   72 Agric. Dec. 128,
   2013 WL 8214620 (U.S.D.A. Mar. 22, 2013) .......................................................... 25

*United States v. $90,000 in U.S. Currency*,
   56 F. Supp. 3d 744 (D. Md. 2014) ............................................................................ 26

*United States v. $95,945.18, U.S. Currency*,
   913 F.2d 1106 (4th Cir. 1990) .................................................................................. 37

*White Tail Park, Inc. v. Stroube*,
   413 F.3d 451 (4th Cir. 2005) ...................................................................................... 4

**STATUTES**

7 U.S.C. § 2143(a)(2) .................................................................................... 29

16 U.S.C. §§ 1531-1544 .............................................................................. 1, 48

**RULES**

Fed. R. Civ. P. 26(a)(2)(A) ........................................................................... 44

Fed. R. Civ. P. 26(a)(2)(B)(i) ....................................................................... 44

Fed. R. Civ. P. 36(a)(1)(b) ........................................................................... 25

Fed. R. Civ. P. 36(a)(3) ................................................................................ 26

Fed. R. Evid. 404(b) ..................................................................................... 28

Fed. R. Evid. 406 .......................................................................................... 28

Fed. R. Evid. 702 .......................................................................................... 23

**REGULATIONS**

9 C.F.R. § 1.1 ................................................................................................ 45

9 C.F.R. § 3.81 ......................................................................................... 37, 38

50 C.F.R. § 17.3 ..................................................................................... *passim*

63 Fed. Reg. 48634 (Sept. 11, 1998) ............................................... 21, 22, 31

80 Fed. Reg. 7380-01 (Feb. 10, 2015) .......................................................... 31

80 Fed. Reg. 80000 (Dec. 23, 2015) ............................................................. 27

**OTHER AUTHORITIES**

10A Charles A. Wright, Arthur R. Miller & Mary K. Kane,
    *Federal Practice and Procedure* § 2738, (2d ed. 1983) ........................... 23

*Barren,* https://en.oxforddictionaries.com/definition/barren
    (last accessed Dec. 11, 2018) .................................................................. 41

S. Rep. No. 93-307 (1973) ............................................................................ 31

## OTHER MATERIALS

Appellants' Br. at 33,
    *Lane v. Holder*,
    703 F.3d 668 (4th Cir. 2012) (No. 11-1847).........................................10, 11

Appellants' Reply Br. at 19-20,
    *Lane v. Holder*,
    703 F.3d 668 (4th Cir. 2012) (No. 11-1847)...........................................10

First Am. Compl.,
    *Michelle Lane, et al. v. Holder, et al.*,
    No. 1:11-503 (E.D. Va. May 27, 2011) ...................................................10

USDA APHIS-Animal Care's website,
    https://acis.aphis.edc.usda.gov/ords/f?p=118:203:0..................................26

USDA, OIG Audit Report: APHIS Animal Care Program,
    Inspection and Enforcement Activities i-ii (Sept. 2005),
    http://www.usda.gov/oig/webdocs/33002-03-SF.pdf ................................30

USDA, OIG Audit Report: APHIS Animal Care Program,
    Inspections of Problematic Dealers 1-2 (2010),
    http://www.usda.gov/oig/webdocs/33002-4-SF.pdf ..................................30

USDA, OIG Report 33601-0001-31, APHIS:
    Animal Welfare Act-Marine Mammals (Cetaceans) (May 30, 2017) ....................30

USDA, OIG Report,
    APHIS Oversight and Research Facilities (December 2014),
    https://www.usda.gov/oig/webdocs/33601-0001-41.pdf ...................................25, 30

USDA, OIG, Animal and Plant Health Inspection Service
    Animal Care Program Inspections of Problematic Dog Dealers,
    Audit Report 33002-4-SF (May 2010),
    https://www.usda.gov/oig/webdocs/33002-4-SF.pdf ................................25

USDA, Tech Note, Inspection Report Appeals Process (Jun. 2017),
    https://www.aphis.usda.gov/publications/animal_welfare/2017/AC-Tech-Note-
    Inspection-Report-Appeals-Process.pdf.................................................25

## I.     INTRODUCTION

The endangered and threatened animals in the care of Tri-State Zoological Park of Western Maryland, Inc., Animal Park, Care & Rescue, Inc., and Robert Candy (collectively, "Defendants") are suffering and dying as a direct result of Defendants' ongoing violations of the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531-1544. The conditions at Tri-State are so egregious that Plaintiff People for the Ethical Treatment of Animals, Inc. ("PETA") has had to divert resources from its other programs to investigate and remedy Defendants' misconduct. PETA has also had to divert resources to counteract the public misperceptions that the deadly conditions at Tri-State, which wrongfully portrays itself as a sanctuary, constitute acceptable animal husbandry. Accordingly, PETA has standing, and Defendants' motion for summary judgment should be denied.

Further, Defendants' Opposition to Plaintiff's Motion for Summary Judgment does not create a genuine dispute of material fact to prevent the entry of summary judgment against Defendants. *See* Defs.' Mot. for Summ. J. and Opp'n to Pl.'s Mot. for Summ. J., ECF No. 114 ("Defendants Motion"); Defs.' Mem. in Supp. of Defs.' Mot., ECF No. 114-1 ("Defs.' SJ Mem."). Defendants ignore the mountain of undisputed evidence before this Court, and instead rely on (1) immaterial facts or arguments and (2) sham evidence from Defendant Candy and an untimely report from one of Defendants' experts that may not properly be considered and thus do not create genuine disputes of fact. Although there are some disputes about some facts, none are material, because the *undisputed* evidence entitles PETA to summary judgment on all claims raised in its Complaint.

## II.   THE COURT SHOULD DENY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Defendants' argument that PETA lacks standing ignores well-established law and contorts the holding in *Lane v. Holder*, 703 F.3d 668 (4th Cir. 2012), in a manner completely inconsistent with Supreme Court precedent. As detailed below, PETA has Article III standing to bring this suit because it is suffering a redressable frustration of its mission and diversion of its resources as a result of Defendants' unlawful harm and harassment of endangered and threatened animals. And although Defendants have not argued that PETA lacks prudential standing, PETA does in fact satisfy any prudential-standing requirements. Accordingly, Defendants' motion for summary judgment should be denied, and the Court should hold that Plaintiffs have standing as a matter of law.[1]

### A.   Statement of Facts Relevant to Standing

PETA is a charity dedicated to protecting animals, including those used in entertainment, from abuse, neglect, and cruelty. Decl. of Brittany Peet in Supp. of Pl.'s Opp. to Defs.' Mot. for Summ. J. ("Peet Decl.") ¶ 4. PETA's motto, which summarizes its mission, reads, in part, "Animals are not ours to . . . use for entertainment[] or abuse . . . ." *Id*. ¶ 5 & Ex. A. To achieve this objective, PETA

---

[1]     Defendants have identified no genuine issues of material fact that would preclude this Court from finding, as a matter of law, that Plaintiff has standing to bring its claim. Thus, although Plaintiff did not affirmatively move for summary judgment on standing, the Court can and should grant summary judgment in PETA's favor on standing. *See, e.g.*, *Planned Parenthood of S.C. Inc. v. Rose*, 361 F.3d 786 (4th Cir. 2004) (affirming the district court's holding that the plaintiffs— who had cross-moved for summary judgment on the merits, but not on the issue of standing—had standing and its order granting summary judgment for the plaintiffs).

pursues several programs, including public education, cruelty investigations, research, animal rescue, special events, celebrity involvement, and protest campaigns, and it also advocates for animal-welfare legislation. *Id*. ¶¶ 5, 6 & Exs. A, B.

Defendants frustrate and perceptibly impair PETA's ability to further its mission. As set forth below, Defendants harm animals that PETA's mission requires it to protect from abuse, neglect, and cruelty. *See* Peet Decl. ¶¶ 5, 10. Further, Defendants wrongfully portray Tri-State to the public as a "sanctuary" that rescues unwanted and abandoned animals, thus allegedly helping them, when in reality Tri-State is unlawfully harassing and harming animals protected under the ESA. *See* Peet Decl. ¶¶ 9, 10 & Exs. C, D; Suppl. Decl. of Caitlin Hawks ("Hawks Suppl. Dec.") ¶ 4 & Ex. A (Admin. Hearing Tr. (Feb. 8-9, 2012), *Tri-State Zoological Park of W. Maryland, Inc.*, 71 Agric. Dec. 915, 2012 WL 3877392 (U.S.D.A. Aug. 1, 2012) (No. 11-0222)) at 159:7-11, 693:3-4, 698:22-699:2, 699:14-16, 734:22-735:5, 774:9-12, 776:22-777:8 (Defendant Candy's prior testimony characterizing Tri-State as a rescue for unwanted animals); Hawks Decl., ECF NO. 99-11, ¶ 9 & Ex. E, Deposition Transcript of 30(b)(6) Designee ("Candy 30(b)(6) Tr.") 313:2, 401:12-16, 402:6-7. Defendants' false portrayal of Tri-State as an animal sanctuary makes it harder for PETA to persuade the public that it should not tolerate abusive, neglectful, or cruel treatment of animals. Peet Decl. ¶¶ 8, 10. Thus, since 2006, PETA has had to divert significant resources not only to stop Defendants' violations

of federal law, but also to counteract the public misperceptions created thereby. Peet Decl. ¶¶ 11-13, 16-18, 25-32 & Exs. E-K.

**B.     PETA Has Standing to Challenge Defendants' Take of Federally Protected Animals.**

To establish Article III standing, a plaintiff must demonstrate a cognizable "injury" that is "fairly traceable" to the defendants' conduct that would likely be "redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000). To determine whether an organizational plaintiff has standing to sue in its own right, a court "conduct[s] the same inquiry as in the case of an individual . . . ." *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378 (1982). *See also White Tail Park, Inc. v. Stroube*, 413 F.3d 451, 458 (4th Cir. 2005) ("An organizational plaintiff may establish standing to bring suit on its own behalf when it seeks redress for an injury suffered by the organization itself.").[2] In evaluating standing, "the court must . . . assume that on

---

[2]     To the extent Defendants argue that an organizational plaintiff may not sue in its own right, *see* Defs.' SJ Mem. at 17-18, that argument ignores longstanding precedent to the contrary, as this Court has already held. *See* Order Den. Defs.' Mot. for J. on the Pleadings, ECF No. 102, at 6 ("PETA, as an organization, may establish what is known as organizational standing on its own behalf."). *See also* Pl.'s Opp'n to Defs.' Mot. for J. on the Pleadings, ECF No. 59, at 30-31 (organizational standing argument). Defendants are also incorrect to the extent they argue that this Court relied on the holding in *Animal Welfare Institute v. Beech Ridge Energy LLC*, 675 F. Supp. 2d 540 (D. Md. 2009), to support its finding that an organizational plaintiff can have standing to sue in its own right. *Compare* Defs. SJ Mem. at 17, *with* Order Den. Defs.' Mot. for J. on the Pleadings, ECF No. 102, at 6. The Court simply cited *Animal Welfare Institute* to support the proposition that Congress has expanded the zone of interests under the ESA to the full extent permitted under Article III of the Constitution, *see* Order Den. Defs.' Motion for J. on the Pleadings, *id.*, a proposition that is beyond dispute. *See Bennett v. Spear*, 520 U.S. 154, 164 (1997).

the merits the plaintiffs would be successful in their claims." *Cooksey v. Futrell*, 721 F.3d 226, 239 (4th Cir. 2013) (quoting *City of Waukesha v. EPA*, 320 F.3d 228, 235 (D.C. Cir. 2003)).

PETA asserts a classic injury-in-fact under *Havens Realty* because Defendants' unlawful and public mistreatment of federally-protected animals directly frustrates PETA's mission, causes a drain on its resources, and requires it to divert resources away from other programs to protect animals in furtherance of its overall mission and toward Defendants' unlawful conduct. Defendants further impair PETA's mission and programs by creating an incorrect public impression that Defendants' treatment of animals is consistent with the ESA and good animal welfare, and by making false representations that they provide a refuge for abandoned and unwanted animals while violating the ESA. This further impairment of PETA's mission requires it to divert yet more resources to counteract the resulting harm. Peet Decl. ¶¶ 8-18.

### 1. PETA has shown frustration of mission and diversion of resources sufficient to establish injury in fact under *Havens*.

As firmly established under *Havens*, an organizational plaintiff has standing to sue on its own behalf if "the defendant's misconduct causes injury to the organization by frustrating [its] mission, thus requiring the organization to divert resources in response." Order Den. Defs.' Mot. for J. on the Pleadings, ECF No. 102, at 6. In *Havens*, plaintiff Housing Opportunities Made Equal ("HOME"), a nonprofit fair housing organization, alleged that its mission was to "assist equal access to housing through counseling and other referral services." 455 U.S. at 379. The

defendant's practice of racial steering, in violation of the Fair Housing Act, frustrated HOME's ability to provide those services and forced it to devote significant resources "to identify and counteract" the defendant's illegal practices. *Id.* The Supreme Court held there was "no question" that these allegations were sufficient to establish an injury-in-fact because they represented a "concrete and demonstrable injury to the organization's activities—with the consequent drain on the organization's resources—[that was] far more than simply a setback to the organization's abstract social interests." *Id.* (citing *Sierra Club v. Morton*, 405 U.S. 727, 739 (1972)).[3]

---

[3]    *See also, e.g.*, *Equal Rights Ctr. v. Equity Residential*, 798 F. Supp. 2d 707, 721-25 (D. Md. 2011) (finding an organization suffered an injury in fact based on diversion of resources when, pursuant to its mission, it expended resources to investigate and counteract defendant's allegedly unlawful practices); *Equal Rights Ctr. v. AvalonBay Communities, Inc.*, No. AW-05-2626, 2009 WL 1153397, at *5-6 (D. Md. Mar. 23, 2009) (organization sufficiently pleaded injury-in-fact by alleging that, because of the defendant's wrongful conduct, it had to "divert significant resources that [it] would have used to provide counseling, education and referral services"); *Action NC v. Strach*, 216 F. Supp. 3d 597, 631 (M.D.N.C. 2016) ("An organization can show that it has suffered an injury-in-fact if the defendant's practices have hampered its stated objectives, causing it to redirect its resources."); *N.C. State Conference of NAACP v. N.C. State Bd. of Elections*, 283 F. Supp. 3d 393, 402 (M.D.N.C. 2017) (finding organizational standing where the organization was "forced to divert its . . . resources away from its core mission and planned voter-mobilization, voter-protection, and voter-education activities . . . in order to investigate, respond to, mitigate, and address the concerns of its members resulting from Defendants' unlawful *en masse* voter challenge and purging practices"); *People for the Ethical Treatment of Animals, Inc. v. U.S. Dep't of Agric.*, 797 F.3d 1087, 1097 (D.C. Cir. 2015) (finding that PETA had organizational standing where it had expended resources due to the USDA's allegedly unlawful failure to apply the Animal Welfare Act's protections to birds, and holding that "if an organization expends resources 'in response to, and to counteract, the effects of the defendants' alleged [unlawful conduct] . . . it has suffered a 'concrete and demonstrable injury' that suffices for purposes of standing"); *People for the Ethical Treatment of Animals, Inc. v. U.S. Dep't of Agric.*, 194 F. Supp. 3d 404, 409 n.2 (E.D.N.C. 2016), *aff'd* 861

PETA's diversion-of-resources injury falls squarely within the rule of *Havens* and its progeny. Defendants confined ring-tailed lemurs, and currently confine four tigers and a lion, in conditions that "injure" them and "significantly disrupt" their "normal behavioral patterns," in violation of the ESA's "take" prohibition. *See* 50 C.F.R. § 17.3 (defining "harm" and "harass"). Defendants' illegal "take" of federally protected species has caused concrete injuries to PETA's mission to advocate for *all* animals by addressing the manner in which those animals are commonly and, in many instances, lawfully used,[4] and to instead divert substantial resources toward addressing the atypical, egregious, and unlawful treatment and abuse of protected animals occurring at the Tri-State facility. Peet Decl. ¶ 14. Every resource PETA is forced to expend to investigate and counteract Defendants' ESA violations diverts resources away from PETA's other educational and investigatory efforts, research, funding of animal rescues, special events, celebrity involvement, protest campaigns, and other types of efforts that otherwise form the basis of PETA's mission. *See* Order Den. Defs.' Mot. for J. on the Pleadings, ECF No. 102, at 7 ("[G]iven PETA's broad campaigns for public education and advocacy, the Court credits PETA's argument that [Defendants'] normalization and display of alleged mistreatment undermines PETA's educational programing") (citing *Organic Consumers Ass'n v.*

---

F.3d 502 (4th Cir. 2017) ("PETA has sufficiently alleged injury to support standing to sue.").

[4]    For example, raising turkeys for human consumption is lawful, but PETA believes it is unethical and inherently cruel to do so. In such scenarios, PETA has, for example, published literature promoting vegan diets, and distributed vegan starter kits as part of its public education and animal advocacy campaigns.

*Sanderson Farms, Inc.*, 284 F. Supp. 3d 1005, 1011 (N.D. Cal. 2018)). *See also* Peet Decl. ¶¶ 11-13, 16-18.

Defendants' unlawful actions also frustrate PETA's efforts to alleviate the suffering of other animals, including, for example, animals held in other roadside zoos and traveling animal exhibitors, which do not necessarily engage in the same degree of animal mistreatment as Defendants, but which likewise have records of significant animal neglect and abuse. Peet Decl. ¶ 15. The fact that Defendants are violating the ESA, falsely portraying Tri-State as a sanctuary and rescuer of unwanted and abandoned animals, and continuing to maintain threatened and endangered animals in unlawful conditions without legal sanction, suggests to the public that Tri-State is neither injuring them nor significantly disrupting their natural behavioral patterns, and that the care the animals receive is consistent with good animal welfare and the ESA. *Id.* ¶ 10

To address Defendants' unlawful "take" of the animals at issue and counteract the public impression that Defendants' practices are consistent with the ESA and good animal welfare, PETA has been diverting and continues to divert substantial monetary and staff time resources since at least April 2006. Peet Decl. ¶ 7, 11. These efforts include submitting complaints about Tri-State to government agencies, including the U.S. Department of Agriculture ("USDA"); drafting multiple posts for the PETA.org blog; reviewing and responding to complaints from the public about Tri-State; compiling and publishing information on PETA's website about Tri-State's history of animal-welfare abuses; distributing press releases on

– 8 –

Tri-State's Animal Welfare Act ("AWA") violations; filing and litigating a lawsuit over Tri-State's AWA license renewal; and sending an attorney to meet with Mr. Candy to offer to find and place the animals at reputable sanctuaries. Peet Decl. ¶¶ 11, 25-29, 32 & Exs. E-I.

In addition, to compile accurate information about Tri-State to share with the public and its members, as well as to counteract Tri-State's unlawful conduct and the public impression that Tri-State's practices are consistent with the ESA and animal welfare, PETA has expended, and continues to expend, considerable staff time tracking and gathering Tri-State's USDA inspection reports; arranging for staff and activists to visit Tri-State;[5] monitoring Tri-State's social media pages and website; and submitting multiple public records requests related to the facility and reviewing and analyzing numerous responsive documents. Peet Decl. ¶¶ 12, 16, 30, 31 & Exs. J, K. In addition to staff time, PETA has incurred, and continues to incur, numerous costs related to these efforts, including, but not limited to: attorneys' fees; Westlaw research expenses; filing fees; long-distance phone charges; fees for shipping and printing services; and travel expenses. Peet Decl. ¶ 17. All of these extensive expenditures are wholly apart from staff time expended on and costs incurred in the current litigation. Peet Decl. ¶ 12, 17.

Based on the record evidence, PETA has clearly established that it has suffered, and will continue to suffer, a concrete and demonstrable injury by mission

---

[5]     Other than the individuals who attended PETA's Court-ordered site inspection of Defendants' facility, PETA has not sent any staff or activists to visit Tri-State since the commencement of this litigation. Peet Decl. ¶ 16.

impairment and being required to divert resources away from its own programs to counteract Defendants' unlawful harming and harassment of threatened and endangered animals and the corresponding public misperception caused by Defendants' false portrayal of Tri-State as a sanctuary that provides good care to unwanted and abandoned animals.

In the face of this settled law and the record evidence, Defendants' argument that PETA lacks standing is based entirely upon a mischaracterization of *Lane,* 703 F.3d 668.[6] In *Lane,* the plaintiffs filed a pre-enforcement challenge to federal and state restrictions on interstate transfers of handguns. The organizational plaintiff, the Second Amendment Foundation ("SAF"), asserted that it suffered an injury in fact because its "resources [were] taxed by inquiries into the operation and consequences of interstate handgun transfer provisions." *Lane*, 703 F.3d at 675. This was SAF's only claim of organizational harm. Thus, SAF did not allege, for example, that the legislation at issue impeded its efforts to carry out its mission or programs. *See, e.g.*, Appellants' Br. at 33, *Lane v. Holder*, 703 F.3d 668 (4th Cir. 2012) (No. 11-1847); Appellants' Reply Br. at 19-20, *Lane v. Holder*, 703 F.3d 668 (4th Cir. 2012) (No. 11-1847); First Am. Compl., *Michelle Lane, et al. v. Holder, et al.*, No. 1:11-503 (E.D. Va. May 27, 2011) (never using words "divert", "diversion", "mission", "program" or "impair"). SAF made no showing that the challenged laws made fulfilling its mission more difficult, or required the organization to take any

---

[6]   The Court previously declined Defendants' request that, based on *Lane*, the Court reconsider its earlier decision that PETA had pleaded sufficient injury to its mission arising from Defendants' misconduct. Mem. Op., ECF No. 117, at 3 n.1.

action that it might otherwise not have had to take. *See* Appellants' Br. at 33, *Lane v. Holder*, 703 F.3d 668 (4th Cir. 2012) (No. 11-1847). Nor did it allege that it needed to divert resources to counteract any public misimpression that the challenged statute might have on its advocacy campaigns regarding the right to bear arms. *Id.* In contrast, PETA's mission was directly and perceptibly impaired by Tri-State's years-long violations of federal law, an injury that was compounded by Tri-State having falsely held itself out as an animal sanctuary, and the public misconceptions that the care the animals receive at Tri-State is consistent with good animal welfare and the ESA. Peet Decl. ¶ 8.

*Lane* is further distinguishable because the *Lane* plaintiffs' challenge essentially aimed at getting around a mere "inconvenience": the individual plaintiffs, and those allegedly burdening SAF with questions about obtaining handguns under the new regulatory regime, were not prevented from obtaining the handguns they desired. *Lane*, 703 F.3d at 673. They were, "[a]t worst . . . burdened by additional costs and logistic hurdles." *Id.* By contrast, the injury to PETA here is obviously not the result of an "inconvenience" or a "logistic hurdle[]." Indeed, PETA will inevitably see its core mission of animal protection impaired so long as Defendants continue to unlawfully mistreat protected species and as members of the public are misled into thinking that Defendants are providing an essential refuge for unwanted animals that provides care consistent with good animal welfare and the ESA. Peet Decl. ¶ 24. And, unlike the plaintiffs in *Lane*, at least one of whom was actually able to purchase a handgun, 703 F.3d at 673, PETA's injuries

will not be remedied absent a favorable order from this Court, because Defendants have demonstrated that they are unable and/or unwilling to comply with their obligations under the law.

Moreover, the "inconvenience[s]" at issue in *Lane* were not even caused by the challenged legislation itself, but rather by "third-parties not before the court" who voluntarily chose to charge fees for interstate gun transfers after passage of the legislation.[7] *Id.* at 673-74. Here, by contrast, the injuries PETA seeks to remedy were caused by Defendants themselves, who are obviously before this Court. Moreover, unlike SAF, which sued the government to challenge a statute itself, PETA asserts organizational standing based on injuries caused by private Defendants' illegal actions in *violation* of the ESA, which as this Court previously observed is of "remarkable breadth" and permits "any person" to file suit to enforce its provisions. ECF No. 102 at 5-6.

Although *Lane* cited the D.C. Circuit's language regarding an organization's "own budgetary choices," *Lane,* 703 F.3d at 675 (quoting *Fair Emp't Council of Greater Wash., Inc. v. BMC Mktg. Corp.*, 28 F.3d 1268, 1276 (D.C. Cir. 1994)), the court in no way invalidated standing based on a diversion-of-resource injury that, as here, directly and perceptibly frustrates an organization's mission. Nor could it, of course; *Havens* is a Supreme Court case that *Lane* obviously could not overrule.

---

[7]     The third-parties were Federal Firearm Licensees ("FFLs"), who began charging transfer fees to individuals who wished to purchase firearms transferred in interstate commerce. *Lane*, 703 F.3d at 670-71, 674. Individuals who had to pay the fees, in turn, approached SAF with "inquiries into the operation and consequences of interstate handgun transfer provisions." *Id.* at 675.

Thus, Defendants' reliance on *Lane* to suggest that "[v]oluntary diversion of resources to address a perceived problem or the disfavored activities of another, is not enough," Defs.' SJ Mem. at 11, mischaracterizes not only PETA's injuries, but the very rule set forth in *Havens*. PETA seeks to address Defendants' *unlawful* conduct under the ESA. And it is beside the point for Defendants to argue that PETA's expenditures in investigating and challenging Defendants' illegal conduct are "voluntary," because in some sense expenditures are always voluntary, including those of the fair-housing organization in *Havens*, 455 U.S. at 379.

The touchstone for the standing analysis is not whether a plaintiff's expenditures are "voluntary," but instead whether the expenditures are made to respond to and counteract a defendant's unlawful activity. *See Equal Rights Ctr. v. Post Props., Inc.*, 633 F.3d 1136, 1140 (D.C. Cir. 2011) (interpreting *Fair Employment Council* and explaining that the proper question for standing purposes is not "the voluntariness or involuntariness of the plaintiffs' expenditures" but whether the organization "undertook the expenditures in response to, and to counteract, the effects of the defendants' alleged [unlawful activity]"). That is precisely the case here: PETA's mission requires that it incur expenditures to respond to Defendants' violations of the ESA and the corresponding public misimpression caused by their conduct. The impetus of PETA's diversion of resources is thus completely distinguishable from the alleged injury in *Lane*, where the plaintiffs' expenditures and grievances were directed at counteracting the lawful actions of third parties not before the court, whose conduct caused the

− 13 −

Defendants to suffer—at most—mere inconvenience that could not, in any event, be remedied by challenging the legislation at issue. *See Lane*, 703 F.3d at 673.

Indeed, in holding that the plaintiff adequately pled standing, the D.C. Circuit explained in *Fair Employment Council*, 28 F.3d 1268, that "there c[ould] be *no question* that the organization ha[d] suffered injury in fact" if the challenged conduct "made the Council's overall task more difficult"—for example, by "reduc[ing] the effectiveness of any given level of outreach efforts." *Id.* at 1276 (emphases added) quoting *Havens*, 455 U.S. at 379). This is analogous to part of PETA's injury: Defendants' unlawful conduct, and the incorrect public impression that Defendants are providing an essential rescue service, frustrates PETA's programs by making it harder to persuade the public that no animal abuse, neglect, or cruelty should be tolerated. Peet Decl. ¶ 10. PETA continues to divert resources from other programs to counteract such harms. *See, e.g.*, *id.* ¶¶ 13, 18.

PETA's injuries are likewise analogous to the injuries that courts in this circuit—both before and after *Lane*—have found to be cognizable. For example, the district court's post-*Lane* analysis in *Action NC v. Strach*, 216 F. Supp. 3d 597 (M.D. N.C. 2016), is instructive. There, nonprofit organizational plaintiffs had standing to sue under the National Voter Registration Act ("NVRA") because they suffered injury when—in accordance with their mission, and as a direct result of defendants' unlawful activity under the NVRA—the organizational plaintiffs had to divert time and resources to voter registration efforts, which they otherwise would have directed toward voter education and engagement efforts. *See Action NC*, 216 F.

Supp. 3d at 616-17. The court found that such allegations were "sufficient to show injury-in-fact under *Havens Realty* and its progeny." *Id.* at 618. Like the organizational plaintiffs in *Action NC*, to address Defendants' unlawful actions PETA has diverted, and continues to divert, limited resources away from specific programs and projects, including campaigns against other non-accredited roadside zoos and traveling animal shows, and from funding animal rescues. *See* Peet Decl. ¶¶ 11-13, 16-18.

PETA's diversion-of-resource injury is also similar to the injury suffered by the plaintiff in *North Carolina State Conference of NAACP v. North Carolina State Board of Elections*, 283 F. Supp. 3d 393 (M.D.N.C. 2017). In that post-*Lane* case, the organizational plaintiff alleged that it had been "forced to divert" its resources away from its "core mission and . . . activities" in order to "investigate, respond to, mitigate, and address the concerns of its members resulting from Defendants' unlawful [action]." *Id.* at 402. The organizational plaintiff "established a cognizable injury by alleging that Defendants' 'practices have hampered [its] stated objectives causing [it] to divert its resources as a result.'" *Id.* (citing *Action NC*, 216 F. Supp. 3d at 616). The injury in *North Carolina State Conference of NAACP* is indistinguishable from PETA's injury: PETA is compelled to divert resources away from programs and projects to investigate and counteract Tri-State's ongoing

unlawful "take" of federally protected animals, all of which has perceptibly impaired PETA's ability to advance its mission. Peet Decl. ¶¶ 8, 11-13, 16-18.[8]

In short, because an incorrect public impression caused by Defendants' unlawful actions, as well as the illegal acts themselves, cause injury to PETA by frustrating its mission and programs, thus requiring it to divert resources to counteract those illegal acts and incorrect public impressions, PETA has suffered an injury-in-fact under *Havens*.

### 2. PETA has established causation.

To establish causation for standing purposes, a plaintiff need only demonstrate that the alleged injury is "'fairly traceable' to the complained-of action." *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 315 (4th Cir. 2013). "[T]he causation element of standing does not require the challenged action to be the sole or even immediate cause of the injury." *Sierra Club v. U.S. Dep't of the Interior*, 899 F.3d 260, 284 (4th Cir. 2018).

In *Equal Rights Center v. AvalonBay Communities, Inc.*, the court considered whether frustration of the organization's mission and diversion of its resources in response to the defendant's unlawful conduct was "fairly traceable" to the defendant's allegedly discriminatory activities. No. AW-05-2626, 2009 WL 1153397, at *4-6 (D. Md. Mar. 23, 2009). The court held that:

> [T]he existence of non-compliant properties is what caused the [plaintiff] to begin its investigation. Confirmation of non-compliance

---

[8]   For additional examples of pre-*Lane* cases where courts have found injuries analogous to PETA's injuries to be cognizable injuries-in-fact, *see* Pl.'s Opp'n to Defs.' Mot. for J. on the Pleadings, ECF No. 59, at 22-28.

upon investigating some buildings caused the [plaintiff] to investigate more properties and further suffer injury. Those injuries are fairly traceable to [defendant]. Nothing more is required.

*Id.* at *6. Causation is similarly established here. PETA's injuries, including its frustration of mission and diversion of resources to counteract Defendants' unlawful "take" of federally protected animals, directly flow from the complained-of action, namely Defendants' actions that harm, harass, and kill tigers, lions, and lemurs. The frustration of PETA's mission and diversion of resources also directly flows from Defendants' false portrayal of Tri-State as a sanctuary that provides care for unwanted animals consistent with their good animal welfare and the ESA, when in fact the opposite is true.

### 3.    PETA also established redressability.

To establish redressability, PETA "'need not show that a favorable decision will relieve [its] every injury,'" but rather only that it "'personally would benefit in a tangible way from the court's intervention.'" *Sierra Club*, 899 F.3d at 284 (internal citations omitted). PETA seeks, among other things, a declaration that Defendants are violating the ESA by unlawfully taking federally protected animals and possessing animals who have been illegally taken. Compl., ECF No. 1, at 37. PETA also seeks to "[e]njoin Defendants from continuing to violate the ESA and its implementing regulations" and from "owning or possessing endangered or threatened species," including the animals at issue. *Id.* at 37-38. If this relief is granted, Defendants will no longer be able to maintain ESA-protected animals in unlawful conditions or easily misrepresent that the conditions in which endangered and threatened species live are consistent with the ESA and animal welfare. PETA

– 17 –

thus will no longer have to divert resources to counteract Defendants' ESA violations or the misimpression created by Defendants. Peet Decl. ¶¶ 24. In short, a favorable decision would likely redress PETA's injuries.

Defendants' sole argument to the contrary is that PETA "does not claim to have located sanctuaries that are . . . willing to 'take custody' of the animals." Defs.' Mem. at 19. That argument fails for three reasons.

First, PETA *has* identified such a sanctuary. *See* Thies Decl. ¶ 7 (describing a Global Federation of Animal Sanctuaries ("GFAS")-accredited sanctuary that is willing and able to "accept and provide rehabilitation and lifetime placement to" the surviving animals at issue).

Second, even if PETA had not identified such a sanctuary, that would be irrelevant, both to standing and the merits, because a plaintiff does not have to show that each potential form of requested relief would, standing alone, afford it complete relief from its injuries in order to establish redressability under Article III. *See Sierra Club*, 899 F.3d at 284. Rather, courts have found redressability even where a plaintiff pleads several equitable remedies in order to provide a range of options for the court. *See, e.g.*, *Aransas Project v. Shaw*, 835 F. Supp. 2d 251, 260 (S.D. Tex. 2011) (denying defendant's motion for summary judgment under the ESA and finding sufficient showing of redressability where "Plaintiff states that the list of equitable remedies in its Complaint is neither mandatory nor exhaustive, but rather a 'range of options'"). Here, as explained above, PETA seeks declaratory relief and an injunction.

Third, even if identifying a sanctuary were relevant to the merits, the argument is, at most, premature. Reputable facilities do not "hold" space for an unknown amount of time. Peet Decl. ¶ 20. Instead, once the transfer of wildlife becomes imminent, PETA has always been able to relocate animals in need of sanctuary. *Id.* The process of placing tigers and lions in reputable facilities is not particularly difficult, due to the capacity and number of U.S.-based GFAS-accredited facilities that work with big cats. *Id.* ¶ 21. Indeed, in the past six years, PETA has facilitated, without issue, the transfer and rescue of more than 120 wild animals, including 39 tigers, from traveling exhibitors, private owners, and roadside zoos. Peet Decl. ¶ 22.

Accordingly, the evidence establishes that PETA's injuries are redressable by a favorable decision in this case.

\*     \*     \*

For the foregoing reasons, PETA has suffered an injury in fact that is directly traceable to Defendants' challenged conduct, and is redressable by the requested relief. Accordingly, it has Article III standing to litigate its claims.[9]

---

[9]   In addition, although Defendants do not challenge PETA's prudential standing, PETA notes that it is "assert[ing its] own legal rights and interests" rather than "the legal rights and interests of third parties." *Bishop v. Bartlett*, 575 F.3d 419, 423 (4th Cir. 2009). In *Havens Realty*, the Supreme Court found that organizations "are entitled to sue on their own behalf for injuries they have sustained . . . in their own right." 455 U.S. at 378-79. Moreover, the ESA's citizen-suit provision "negates the zone-of-interests test." *Bennett v. Spear*, 520 U.S. 154, 164 (1997). As this Court has recognized, "Congress has enacted a citizen-suit provision of remarkable breadth in the ESA, which allows 'any person' to file suit to enforce ESA protections. Congress thus expanded the zone of interests to the full

### III.   THE COURT SHOULD GRANT PETA'S MOTION FOR SUMMARY JUDGMENT.

PETA is entitled to summary judgment because, as explained in its Motion, the undisputed evidence establishes that Tri-State violated the ESA in three independent ways with respect to the lemurs (inadequate shelter, veterinary care, and environmental enrichment), in four independent ways with respect to the tigers (inadequate veterinary care, shelter, and environmental enrichment; and exposure to disease from free-roaming animals), and in five independent ways with respect to the lions (denial of a social group for the lion Peka; inadequate veterinary care, shelter, and environmental enrichment; and exposure to disease from free-roaming animals). *See* Pl.'s Mot. for Summ. J., ECF Nos. 99 ("Plaintiff's Motion" or "PETA's Motion"); Pl.'s Mem. in Supp. of Mot. for Summ. J., ECF No. 99-2 ("Pl.'s SJ Mem."). In response, Defendants (a) argue that PETA's evidence should not be considered, (b) rely on an out-of-Circuit, distinguishable case that was explicitly confined by the court to its unique facts, which involved a geriatric orca for whom no sanctuary yet even existed, and (c) submit new evidence, including a new affidavit from Defendant Candy and a supplemental expert report from Dr. Gale Duncan, which are designed to improperly manufacture disputed issues of material fact where none exist and which PETA accordingly seeks, by separate motion, to strike. ECF No. 119.

---

extent permitted under Article III of the Constitution." Order Den. Defs.' Mot. for J. on the Pleadings, ECF No. 102, at 5-6 (citations and quotation marks omitted).

### A.     PETA's Evidence Is Properly Before This Court.

As an initial matter, Defendants argue that swaths of PETA's evidence are "inadmissible." Defs.' SJ Mem. at 20-24. Those arguments ignore or mischaracterize the applicable legal standards and should be rejected.

### 1.     PETA's experts are qualified to opine on the matters set forth in their reports.

Defendants attempt to discredit PETA's experts by suggesting that they must be licensed in the State of Maryland to opine on the issues before this Court. Defs.' SJ Mem. at 20-21. But this is not a state law veterinary malpractice suit; it is a challenge to Defendants' violations of federal law. In addition to having to comply with applicable state law standards, Defendants and their AWA-required "attending veterinarians" are obligated to comply with both the ESA and the complementary standards of care in the AWA—neither of which depends on "local[]" practice, as Defendants suggest. *See id.*

Defendants attempt to distort the narrow exemption in the ESA's definition of "harass" into a broad exemption for all conduct that meets their "local" standard of care. This exemption, however, provides only that conduct does not constitute "harassment" if it (a) meets or exceeds the minimum standards for facilities and care under the [AWA]," (b) is "generally accepted" *and* (c) does not pose a "likelihood of injury." 50 C.F.R. § 17.3. *See also Hill v. Coggins*, 867 F.3d 499, 509 (4th Cir. 2017), *cert. denied*, 138 S. Ct. 1003 (2018). *See also* 63 Fed. Reg. 48634, 48636 (Sept. 11, 1998) ("The purpose of amending the Service's definition of 'harass' is to exclude proper animal husbandry practices that are not likely to result in injury from the

prohibition against 'take.'"). The exemption not only omits any reference to local standards whatsoever, but even compliance with the "generally accepted" husbandry standards that it *does* mention is not, standing alone, sufficient to excuse liability. Rather, under the exemption, a defendant's conduct must also be AWA-compliant and not likely to result in injury. *Id*. Further, contrary to Defendants' argument, experts in ESA cases routinely look to nationwide animal husbandry standards to determine whether a practice pertaining to captive members of a listed species violates the statute. *See, e.g.*, *Graham v. San Antonio Zoological Soc'y*, 261 F. Supp. 3d 711, 733 (W.D. Tex. 2017) (holding that an expert referring to nationwide Association of Zoos & Aquariums standards "speak[s] precisely" to the issue of whether an elephant's enclosure is adequately sized). *See also* Hawks Suppl. Decl. ¶ 5 & Ex. B, Trial Tr. Oct. 6, 2015, 137:8-10, 12, *Kuehl v. Sellner*, 161 F. Supp. 3d 678 (N.D. Iowa 2016) (No. 6:14-CV-2034) (plaintiffs' lemur expert determined whether certain practices pertaining to lemurs were "generally accepted" by finding "a consensus among those who work with lemurs as to what is acceptable," a consensus to be found among "the institutions that have lemurs.").

Further, "harass[ment]" is not the sole form of "take" at issue in this case. Plaintiffs also allege that Defendants "harm" the animals at issue. The definition of "harm" (i.e. "kills or injures") in 50 C.F.R. § 17.3 does not even contain an exemption at all and, thus, is not dependent upon whether a particular practice constitutes generally accepted husbandry—on a national level *or* locally.

Defendants also take issue with PETA's use of its experts' reports in support of its Motion. *See, e.g.*, Defs.' SJ Mem. at 5.[10] That criticism misses the mark. "Although opinion testimony is usually evaluated by the factfinder as to credibility of the expert and the weight it should be given, 'if the only issue is one of the kind on which expert testimony must be presented, and nothing is presented to challenge the affidavit of the expert, summary judgment may be proper.'" *Dean v. Chrysler Corp.*, 38 F.3d 568, 5681994 WL 574188, at *5 (5th Cir. 1994) (unpublished) (quoting 10A Charles A. Wright, Arthur R. Miller & Mary K. Kane, *Federal Practice and Procedure* § 2738, at 503-04 and n. 50 (2d ed. 1983)). Thus, to the extent PETA uses its experts' testimony to support its Motion, and those opinions are undisputed or, as detailed in Section III.C, *infra*, improperly rebutted, the Court should find summary judgment in PETA's favor.

> **2.    PETA's experts properly relied, in part, on audiovisual evidence that is properly before this Court.**

Defendants next argue that even if PETA's experts are qualified, their opinions lack a factual basis because they relied, in part, on recordings some of which were the subject of Defendants' motion for sanctions, ECF No. 71. As an initial matter, Dr. Haddad and Mr. Pratte relied on far more evidence than just

---

[10]    Plaintiffs' opposition to summary judgment is not the appropriate procedural mechanism by which to seek to exclude PETA's experts. If Defendants wished to exclude PETAs' experts or limit the scope of their testimony, Defendants were required, as PETA did, to file separate motions *in limine* pursuant to the Federal Rules of Evidence and Local Rules. *See* Fed. R. Evid. 702; *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).*See, e.g.*, Pl.'s Mot. to Exclude Improper Op. Test. of Dr. Gale Duncan, DVM, ECF No. 94; Pl.'s Mot. to Exclude Improper Op. Test. of Dr. Lisa Simms, Ph.D., ECF No. 95; Pl.'s Mot. to Exclude Improper Op. Test. of Darcey Bowen, ECF. No 96.

those audiovisual recordings, including their direct observations made during the Court-ordered March 3, 2018 site inspection of Tri-State, and substantial portions of the evidentiary record—including evidence from all parties as well as non-parties such as the USDA. *See* Pratte Decl., ECF 99-47 at 2-3 (detailing review of productions from PETA, Defendants, and third parties, USDA inspection reports, and deposition transcripts of Defendants, Defendants' veterinarians, and Defendants' volunteers); Haddad Decl., ECF No. 99-10 at 1-2 (same).

Moreover, although Defendants argue that the experts' reports should not have been filed without "redaction in light of the Court's November 1, 2018 Order excluding certain videos from evidence," Defs.' SJ Mem. at 22, the Court has since clarified that its "Orders do not bar the use of openly recorded video with audio, nor do they bar surreptitiously recorded video without oral communications." ECF No. 117 at 4. There is no dispute that PETA did not surreptitiously record any oral communications at Tri-State. *See, e.g.*, Decl. of Colin Henstock, ECF No. 79-2, ¶¶ 4-6; Pl.'s Surreply in Further Opp'n to Defs.' Mot. to Compel, ECF No. 79-1, at 1-2; Pl.'s Opp'n to Defs.' Mot. to Compel, ECF No. 61, at 7. Accordingly, all of PETA's audiovisual evidence was appropriately considered by PETA's experts and is otherwise properly before this court.

### 3. Defendants have admitted the genuineness of the USDA inspection reports.

Defendants complain that the USDA inspection reports PETA has offered as evidence are not adequately authenticated. But Defendants have already admitted their authenticity by having failed to respond to requests for admission that those

documents, including Tri-State's citations[11] from 2005 through 2017 and copies of the inspection reports, are authentic. *See* Hawks Suppl. Decl. ¶ 6 & Ex. C (PETA's April 9, 2018 Requests for Admission); Fed. R. Civ. P. 36(a)(1)(b) (permitting a party to request that her opponent admit the genuineness of documents). By failing to

---

[11]    Defendants' issue with PETA's use of the word "citation" to describe AWA violations documented in USDA inspection reports is without merit. The terms "cited," "citations," and "violations" are commonly used in this same manner by USDA inspectors, administrative law judges, and the courts. *See, e.g.*, USDA, OIG, Animal and Plant Health Inspection Service Animal Care Program Inspections of Problematic Dog Dealers, Audit Report 33002-4-SF, at 1 n. 5 (May 2010), available at  https://www.usda.gov/oig/webdocs/33002-4-SF.pdf ("APHIS synonymously used the terms violations, alleged violations, and noncompliant items in its documents. For simplicity, we used the term violations in this report."). *See also Tri-State Zoological Park of W. Maryland, Inc.*, 72 Agric. Dec. 128, 164, 2013 WL 8214620, at *164 (U.S.D.A. Mar. 22, 2013) (noting that during twelve USDA inspections over the course of five years, "[USDA] inspectors cited Tri-State and Mr. Candy for violations of the Regulations" at each inspection.).

Moreover, contrary to Defendants' assertion, USDA inspection reports are appealable. *Compare* Defs. SJ Mem. at 23 *with* USDA, Tech Note, Inspection Report Appeals Process (Jun. 2017),  https://www.aphis.usda.gov/publications/animal welfare/2017/AC-Tech-Note-Inspection-Report-Appeals-Process.pdf.    Defendants' attempt to compare USDA inspection reports to police reports is also misguided. *See* Defs.' SJ Mem. at 23. As the OIG has explained, the USDA's inspection and enforcement processes are bifurcated:

> If an inspection discovers violations of AWA standards, [Animal Care] requires the facility to correct the problems within a given timeframe. Moderate repeat violations (e.g., incomplete records) may be settled with an official warning, while more serious violations (e.g., animal deaths due to negligence and lack of veterinary care) are referred to APHIS' Investigative and Enforcement Services (IES) unit for a formal investigation, which includes gathering documentary evidence, interviewing witnesses, and other actions.

> After the completion of an investigation, IES national office staff review the evidence and determine, with the concurrence of AC, whether to take an enforcement action against the violator.

USDA, OIG Report, APHIS Oversight and Research Facilities at 1 (December 2014), https://www.usda.gov/oig/webdocs/33601-0001-41.pdf.

respond to PETA's properly-served requests, Defendants admitted the genuineness of the above-mentioned citations and inspection reports. *See* Fed. R. Civ. P. 36(a)(3); *United States v. $90,000 in U.S. Currency*, 56 F. Supp. 3d 744, 749 (D. Md. 2014) ("Under Federal Rule of Civil Procedure 36(a)(3), a matter is deemed admitted if the party to whom the request for admission is directed does not respond within 30 days of service.").

Moreover, as confirmed in PETA's counsel Ms. Hawks' prior Declaration, ECF No. 99-11, PETA has USDA-sealed, certified copies of Tri-State's non-complaint USDA inspection reports from 2005-2016, which PETA has offered to provide to the Court upon the Court's request. *See* Hawks Decl., ECF No. 99-11, ¶ 5. A certification request for the remaining non-compliant inspection report from October 5, 2017, *see* ECF No. 99-12 at 84, is pending with the USDA.

Last, Defendants' presumption that the redactions in the proffered inspection reports were not in the original documents is incorrect. *See* Defs.' SJ Mem. at 22. The redactions all appeared in the original documents that PETA compiled from the USDA APHIS-Animal Care's website, https://acis.aphis.edc.usda.gov/ords/f?p=118:203:0:, and received through Freedom of Information Act ("FOIA") requests. *See* Peet Decl. ¶ 33.[12]

---

[12]     All but one of Defendants' non-compliant USDA inspection reports are clearly labeled with the facility's name and USDA license number (51-C-0064). *See* Hawks Dec. ¶ 5 & Ex. A, ECF No. 99-12, at 1-83. The facility name and license number is redacted from Tri-State's October 5, 2017, inspection report, but there can be no genuine dispute that this report belongs to Tri-State because Tri-State is the only AWA-licensed exhibitor in Cumberland, Maryland. *See* Peet Decl. ¶ 34 & Ex. L.

### 4. Pre-January 2016 evidence of mistreatment of the lions is properly before the Court.

Defendants' last effort to exclude a portion of Plaintiffs' evidence is their argument that, because lions were not listed as an endangered species until January 2016, the Court should ignore the evidence of Defendants' mistreatment of the lions before that date. *See* Defs.' SJ Mem. at 23-24.[13] This argument is misplaced for two reasons.

First, PETA's undisputed evidence, discussed below, establishes that the lions *were* unlawfully "take[n]" after January 22, 2016. *See, e.g.*, Pls.' SJ Mem. at 18 (Defendants "take" Peka by denying her a proper social group); *id.* at 19-25 (Defendants "take" Peka and Mbube by failing, and having failed, to secure proper veterinary care); *id.* at 25-27 (Defendants "take" Peka by failing to provide her with adequate shelter from the elements); *id.* at 27-30 (Defendants "take" Peka by failing to provide her with adequate environmental enrichment); *id.* at 30-31 (Defendants "take" Peka by exposing her to disease hazards from free-roaming animals). *See also* Section III.C, *infra*.

Second, the Court can and should take into account even pre-January 2016 evidence because Defendants' treatment of lions before that date is relevant to show their pattern and practice of harming, harassing, and killing federally-protected

---

[13]    Actually, Defendants point to April 2016 as the relevant date, but in fact the final rule listing lions under the ESA went into effect on January 22, 2016. *See* Final Rule, Endangered and Threatened Wildlife and Plants; Listing Two Lion Subspecies, 80 Fed. Reg. 80000, 80000 (Dec. 23, 2015) ("This rule is effective January 22, 2016.").

lions since January 22, 2016, and to show that their conduct is not based on mistake or accident. *See* Fed. R. Evid. 404(b) & 406.

### B.   The Eleventh Circuit's "Serious Threat" Standard Is Inconsistent with Fourth Circuit Law.

After attempting to exclude PETA's properly-presented evidence, Defendants' next gambit to avoid summary judgment is to ignore controlling law and instead import a legal standard from an out-of-Circuit case that simply does not apply and that would not excuse Defendants' liability even if it did. *See People for Ethical Treatment of Animals, Inc. v. Miami Seaquarium*, 879 F.3d 1142, 1148 (11th Cir. 2018), *adhered to on denial of reh'g sub nom. People for the Ethical Treatment of Animals, Inc. v. Miami Seaquarium*, 905 F.3d 1307 (11th Cir. 2018). *Hill v. Coggins*, 867 F.3d 499 (4th Cir. 2017) is, however—whether Defendants like it or not—the law of the Fourth Circuit. This Court has twice reminded Defendants of that fact. *See* Order Den. Defs.' Mot. to Dismiss, ECF No. 23; Order Den. Defs.' Mot. for J. on the Pleadings, ECF No. 102, at 4-5. And three times, Defendants appear to have selectively forgotten it.[14] *Hill* forecloses any conclusion that the AWA "preempts or nullifies the ESA for captive animals." Order Den. Defs.' Mot. to Dismiss, ECF No. 23, at 14-15.

Yet here again, Defendants contend—without even attempting to distinguish *Hill*—that the ESA and AWA somehow conflict, and that the AWA therefore either nullifies the ESA entirely or drastically narrows its protections for AWA-regulated

---

[14]   Defendants reference *Hill* in support of their incorrect standing argument, but ignore it when making their ESA-based arguments.  *See* Defs.' SJ Mem. at 12.

captive animals by imposing a heightened "serious" harm standard nowhere mentioned in the statute, its regulations, or in *Hill*. *See* Defs.' SJ Mem. at 24-28. Defendants' argument must be rejected for the reasons articulated in PETA's prior briefs and the Court's orders on this issue.[15] *See* Pl.'s Opp'n to Defs.' Mot. for J. on the Pleadings, ECF No. 59, at 5-6, 13-16; Pl.'s Opp'n to Defs.' Mot. to Dismiss, ECF No. 20, at 8-19; Order Den. Mot. to Dismiss, ECF No. 23; Order Den. Mot. for J. on the Pleadings, ECF No. 102, at 4.

First, as this Court has already held, "the ESA and AWA *do not pursue conflicting objectives*." Order Den. Mot. to Dismiss, ECF No. 23, at 15 (emphasis added). "Rather, the ESA provides for separate and heightened protections for the subset of captive animals that are endangered or threatened." *Id.* Indeed, these statutes created entirely distinct schemes, each with its own scope, purpose, and enforcement mechanism, and the availability of a remedy for animal mistreatment under one statute in no way precludes a remedy under the other. The ESA is "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 180 (1978). The AWA, by contrast, sets forth only the "*minimum* requirements," 7 U.S.C. § 2143(a)(2) (emphasis added), for *all* regulated species—not just endangered and

---

[15]     In denying Defendants' motion to dismiss, the Court held that the facts alleged in the Complaint stated an ESA claim, such that, if proven, Defendants' conduct would constitute an unlawful "take," *i.e.*, they are "acts or omissions which 'create[] the likelihood of injury' to the subject animals by 'significantly disrupt[ing] normal behavioral patterns [including] . . . breeding, feeding, or sheltering.' 50 C.F.R. § 17.3." ECF No. 23 at 18. Now, PETA has offered undisputed evidence in support of the Complaint's allegations.

threatened species—in the care of an exhibitor such as Tri-State.[16] It is less stringent than, and can be implemented in full alongside, the ESA, which offers greater protections, but does not impose conflicting requirements. *See POM Wonderful LLC v. Coca-Cola Co.*, 134 S. Ct. 2228, 2238-40 (2014) (declining to preclude private parties from suing under the Lanham Act where the FDCA addressed similar subject matter but did not purport to displace other statutory remedies). *See also* Pl.'s Opp'n to Defs' Mot. to Dismiss, ECF No. 20, at 13-19. Any attempt to "reconcile" these statutes by imposing a "serious" harm standard under the ESA is both unnecessary and unsupported by Fourth Circuit and Supreme Court case law.

Second, as the Supreme Court recognized in *Babbitt v. Sweet Home Chapter of Communities for a Greater Oregon*, Congress intended "take" to be interpreted in "the broadest possible manner to include every conceivable way in which a person

---

[16]    The AWA is enforced solely by the USDA and does not have a citizen suit provision. Moreover, the USDA's own Office of the Inspector General has repeatedly found that the agency fails to adequately enforce the AWA. *See* USDA, OIG Report 33601-0001-31, APHIS: Animal Welfare Act-Marine Mammals (Cetaceans) (May 30, 2017) ("APHIS could make improvements in enforcement and inspection to ensure compliance with the AWA . . . Inspections are not always adequately documented because of insufficient guidance; this reduces assurance that those exhibitors are in compliance with the AWA."); USDA, OIG Report, APHIS Oversight and Research Facilities (December 2014), https://www.usda.gov/oig/webdocs/33601-0001-41.pdf (USDA "did not follow its own criteria in closing at least 59 cases that involved grave (e.g., animal deaths) or repeat welfare violations" and issued penalties at an average 86% discount); USDA, OIG Audit Report: APHIS Animal Care Program, Inspection and Enforcement Activities i-ii (Sept. 2005), http://www.usda.gov/oig/webdocs/33002-03-SF.pdf (the Eastern Region "is not aggressively pursuing enforcement actions against violators of the AWA"); USDA, OIG Audit Report: APHIS Animal Care Program, Inspections of Problematic Dealers 1-2 (2010), http://www.usda.gov/oig/webdocs/33002-4-SF.pdf (lack of appropriate enforcement "weakened the agency's ability to protect . . . animals").

can 'take' or attempt to 'take' any fish or wildlife." 515 U.S. 687, 704-05 (1995) (quoting S. Rep. No. 93-307, p. 7 (1973)). The statute's broad reach extends to wild and captive animals alike. *See, e.g.*, 63 Fed. Reg. 48634, 48638 (Sept. 11, 1998) ("maintaining animals in inadequate, unsafe or unsanitary conditions, physical mistreatment, and the like constitute harassment because such conditions might create the likelihood of injury or sickness"); 80 Fed. Reg. 7380-01, 7388 (Feb. 10, 2015) ("Section 9(a)(1)(A)-(G) of the ESA applies to endangered species regardless of their captive status."). Imposing a "seriousness" requirement as to captive animals would thus improperly contravene the intent of Congress to extend expansive ESA protections to the animals at issue in this case.

Finally, imposing a "serious" harm requirement as to captive animals would contravene the plain language of the definition of "harass," which explicitly references "significant," rather than "serious," disruption or impairment of behavioral patterns in a manner resulting or likely to result in injury. *See* 50 C.F.R. § 17.3. It would therefore be improper to read into the regulations unstated language regarding the degree of harm required when the definitions themselves already articulate the threshold. *See Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 844 (1984).

Even if this case had arisen in the Eleventh Circuit, however, and the *Miami Seaquarium* case were somehow relevant to this Court's inquiry, the more stringent legal standard articulated in that case would not insulate Defendants from liability. The *Seaquarium* court made clear that its holding was limited to the unique facts of

that case, *i.e.*, "take" claims involving a geriatric orca who could not necessarily be released into the wild and for whom no sanctuary yet existed. *See Miami Seaquarium*, 905 F.3d at 1308-09 (denying petition for panel rehearing, based upon "the unique circumstances of this case"). The evidence here, however, more than satisfies the "serious" harm threshold articulated in *Seaquarium*. As discussed below, the undisputed evidence establishes that Defendants' acts and omissions not only pose a "serious" threat to protected species, but have in fact repeatedly resulted in the deaths of the animals in Defendants' care. *See* Pl.'s SJ Mem. at 10-13 (evidence relating to death of lemur), 19-20 (evidence relating to death of lion and tiger). Moreover, although irrelevant to Defendants' liability, an appropriate sanctuary stands ready to accept the animals at issue here. *See* Thies Decl. ¶ 7. Accordingly, the facts here are entirely distinguishable from those in *Seaquarium*. Nothing in *Seaquarium* supports a finding that a plaintiff challenging a zoo's neglect and mistreatment of protected animals cannot find a remedy in the ESA.

### C. Undisputed Evidence Shows that Defendants Harass, Harm, and Killed Endangered and Threatened Species.

As noted above, the undisputed evidence as set forth in PETA's Motion established PETA's entitlement to summary judgment on both counts of the Complaint, based on twelve independent violations of the ESA. In response, Tri-State has identified disputed facts as to only the violation involving the lemurs' inadequate veterinary care. Tri-State has failed to identify a material dispute of fact as to other violations, or in some cases, sought to evade summary judgment by manufacturing new "evidence" to create disputes of fact where none previously

existed, by way of Mr. Candy's sham affidavit and Dr. Duncan's improper supplemental declaration, both of which PETA has moved to strike. ECF No. 119.

As set forth below, PETA remains entitled to summary judgment on the following eleven of the twelve ESA violations as to which Plaintiffs originally sought summary judgment: [1] the failure to provide lemurs with adequate shelter; [2] the failure to provide the lemurs with adequate enrichment; [3] the isolation of, and corresponding failure to provide, Peka the lion with a proper social companion; the denial of adequate environmental enrichment for [4] the lions and [5] the tigers; the denial of adequate veterinary care for [6] the lions and [7] the tigers; the failure to provide [8] the lions and [9] the tigers with adequate shelter from the elements; and the exposure of [10] the lions and [11] the tigers to disease hazards from free-roaming animals.[17]

---

[17]   As noted above, Plaintiffs concede there is now a dispute of fact as to the inadequacy of the lemurs' veterinary care (although the evidence of that additional "take" is overwhelming, *see* Pl.'s SJ Mem. at 10-11; Hawks Decl., ECF No. 99-11, ¶¶ 8, 10 & Ex. D (ECF No. 99-15) at 3-6, Ex. F (ECF No. 99-17), at 358:1-12 & 357:11-17). Moreover, although there are disputes of fact as to whether the reason for Defendants' ESA violations is tied to their financial wherewithal, *compare* Pl.'s SJ Mem. at 32-34 *with* Defs.' SJ Mem. at 43-44, those disputes are immaterial because, for current purposes, the Court need not decide the reasons for Defendants' "take." Evidence of Defendants' finances is relevant to crafting the ultimate injunction in this case (since it goes to whether Defendants would even be capable of complying with the statute if they retained possession of any protected animals), but it is unnecessary to assess liability. Further, even if such evidence were necessary to the Court's inquiry at this stage, the Defendants' refusal to proffer it in response to PETA's discovery requests, *see* Ans., ECF No. 26, ¶ 27; Defs.' Ltr. re Discovery Disputes, ECF No. 63, at 2, should bar them from doing so now or at trial. PETA will file a motion *in limine* to exclude the admission of any evidence on this subject to the extent that this case is not fully disposed of on summary judgment.

### 1. The admissible evidence remains undisputed that Defendants failed to provide lemurs with adequate shelter.

PETA's Motion identified the undisputed facts establishing that Tri-State failed to provide two lemurs with adequate shelter from the elements, including Maryland's sub-freezing temperatures. Pl. SJ Mem. at 8-10 (citing evidence). In response, Tri-State failed to cite to any previously-established record evidence to identify what material facts as to this violation are in dispute; instead, Tri-State relies exclusively on Robert Candy's affidavit, which expressly contradicts his previous sworn testimony about the heat sources for the lemur enclosures. *See* Defs.' SJ Mem. at 29 and Exhibit A thereto, Affidavit of Robert Candy ("Candy Aff."), ECF No 114-3, ¶¶ 94-96. Summary judgment in PETA's favor is proper here.

As argued more fully in PETA's motion to strike, a party cannot survive summary judgment by submitting an affidavit from a witness that flatly contradicts, without explanation, a material fact contained in that witness's own prior sworn testimony. *Barwick v. Celotex Corp.*, 736 F.2d 946, 959-60 (4th Cir. 1984). This is because a genuine issue of material fact is not created when the only issue of fact is which of two conflicting versions of a witness's testimony is correct. *Id.* at 960.

Here, paragraph 94 of Mr. Candy's Affidavit on the lemurs' shelter expressly conflicts with his prior sworn testimony on the subject—without even an attempt to reconcile the two:

> The lemur enclosure had electric heaters, and Mr. Pratte appears not to understand that most electric heaters, like **the heaters in the lemur enclosure, have an internal thermostatic control** and will

start operating when the temperature is below a certain present temperature on the dial, and will cease operating if the temperature rises above a certain present temperature on the dial. These are the types of heaters the lemurs had. A separate thermometer was not necessary because **the thermostatic control on the heater dictated that it turn on at a set temperature**.

Candy Aff. ¶ 94 (emphases added).

But when asked about this same subject during deposition, Candy claimed

that the temperature in the lemurs' enclosures was monitored solely "by feel" and

"checking on the water to make sure it's not frozen":

> Q. Okay.  So that has a heating source; is that right?
> A. It has heating sources in it, yes.
> Q. What are the heating sources?
> A. Electrical heaters and heat lamps.
> Q. How many heaters?
> A. There were two heaters in there and the heat lamp.
> Q. And a heat lamp.  So three sources?
> A. Correct. .  . .
> **Q. And are the -- is the temperature monitored?**
> **A. Yes.**
> **Q. How is it monitored?**
> **A. Just by feel and checking the water to make sure it's not frozen.**
> **Q. All right. But there's no thermometer?**
> **A. No.**
> Q. So there's no one going in and saying lemur enclosure today 82 degrees? There's nothing like that happening?
> A. No.
> Q. The water that's provided for the lemurs in their enclosure, does that also have a heating element?
> A. No, it's water bottle.
> Q. Okay.  How often is it checked to make sure it's not frozen?
> A. Every day.
> Q. Is that something that the volunteers, the staff –
> A. It's done as part of the normal feeding process.
> Q.  Check and make sure the water is not frozen?
> A. Yes."

*See* Hawks Decl., ECF No. 99-11, ¶ 10 & Ex. F (Candy Tr.) 150:7-152:6 (emphasis

added).

And as also set forth in PETA's separate motion, Mr. Candy's other averments that relate to the lemurs' shelter (¶¶ 19.d ("there was heat readily available") and 96 ("We never violated any of [the AWA's temperature] standards")) should also be stricken as impermissibly conclusory.

With Defendant Candy's affidavit excluded insofar as it contradicts his prior testimony and is impermissibly conclusory, the evidence of the inadequacy of the lemurs' shelter remains undisputed. *Compare* Pl.'s SJ Mem. at 8-10, *with* Defs.' SJ Mem. at 28-31. The Court should thus enter summary judgment in PETA's favor as to this violation.

> ### 2.  Defendants do not genuinely dispute that they fail to provide big cats and lemurs with appropriate enrichment and deny Peka appropriate companionship.

As to both the big cats and the lemurs, the material evidence remains undisputed that Defendants denied them appropriate enrichment and companionship.

> #### (a)  The evidence remains undisputed that Defendants failed to provide lemurs with adequate environmental enrichment.

In addition to providing captive lemurs with appropriate social groups, captive lemurs require environmental enrichment plans that are tailored to encourage a wide range of species-specific behaviors such a scent marking, foraging, grooming, exploring, vigilance, and learning. *See* Pl.'s SJ Mem. at 13-16 (citing evidence). Those plans, and their implementations, also must be assessed. *See id.* at 16 (citing evidence). Plaintiff's Motion explained how Defendants had violated those minimum standards. *Id.* at 13-18. Defendants' response is Mr. Candy's Affidavit, in

which he summarily asserts that "[w]e had a very well developed enrichment plan for the lemurs." *See* Defs.' SJ Mem. at 35-36 (citing Candy Aff. ¶¶ 100-102). Beyond claiming in conclusory fashion that the enrichment plan was "well developed," he does not dispute—because he cannot—that it had remained the same for years. Mr. Candy's affidavit does not create a genuine dispute of material fact on the adequacy of the lemurs' enrichment plan for two reasons.

First, the affidavit is conclusory. "[C]onclusory allegations in an affidavit do not create a genuine issue of material fact." *Leskinen v. Utz Quality Foods, Inc.*, 30 F. Supp. 2d 530, 533 (D. Md. Jul. 21, 1998), *aff'd*, 165 F.3d 911 (4th Cir. 1998). *See also, e.g.*, *United States v. $95,945.18, U.S. Currency*, 913 F.2d 1106, 1111 (4th Cir. 1990) (explaining that a party opposing summary judgment may not rest on mere denials of the adverse party's pleadings, but must "come forward with specific facts showing that there is a genuine issue for trial" (citation omitted)); *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 962 (4th Cir. 1996) (upholding district court's decision to strike and disregard portions of plaintiff's affidavit, in part on the ground that courts will "generally consider self-serving opinions without objective corroboration not significantly probative").

Second, even insofar as Mr. Candy's affidavit is not conclusory, it fails to rebut most of the extensive—and undisputed—record of Defendants' unlawful failure to provide the lemurs with adequate enrichment:

- The AWA mandates that exhibitors like Tri-State develop, document, and follow environmental enhancement plans adequate to promote the psychological well-being of primates. 9 C.F.R. § 3.81. "Not only must an exhibitor develop an environmental enhancement plan, it is required to

*follow the plan and document its implementation.*" *Kuehl*, 161 F. Supp. 3d at 711 (citing 9 C.F.R. § 3.81) (emphasis added). Defendants undisputedly failed to document the enrichment plan's implementation and the frequency at which the enrichment was changed or varied. *See* Pl.'s SJ Mem. at 16.

- Tri-State's one-page lemur enrichment plan had not been updated since at least 2011, is divorced from current generally accepted professional standards, and does not allow or encourage lemurs to engage in a full-range of species-appropriate, non-injurious behaviors as required by the AWA. Pl.'s SJ Mem. at 14. For example, the two plastic toys that were left in the outdoor portion of the lemur exhibit for more than three years did not promote any species-typical behaviors. *Id.* at 15. And all but one of the "activities" detailed in the plan also failed to promote any species-typical non-injurious behaviors. *Id.* at 14-15.

- Tri-State's enrichment plan did not account for both lemurs at Tri-State and therefore deprived the lemurs of an enrichment plan that accounted for their social needs as well as the differences between the individuals. Pl.'s SJ Mem. at 15-16. This practice alone is not generally accepted and falls short of meeting the AWA's minimum regulatory requirements. *Id.* at 16.

- The USDA repeatedly has cited Defendants for their failure to maintain adequate environmental enrichment plans. Pl.'s SJ Mem. at 14.

- A lack of appropriate enrichment significantly interferes with normal lemur behavioral patterns, and results in psychological injury and stress. Pl.'s SJ Mem. at 16-17.

- Confinement without adequate enrichment "harms" and "harasses" ring-tailed lemurs (as those terms are used in the ESA and implementing regulations). *See* Pl.'s SJ Mem. at 16-17.

*Compare* Pl.'s SJ Mem. at 13-18, *with* Defs.' SJ Mem. at 35-36.

Thus, it remains undisputed that Defendants failed to provide the lemurs at Tri-State with species-appropriate environmental enrichment that encouraged expression of species-typical non-injurious behaviors, and that such failures

– 38 –

harassed the animals in a manner that was likely to lead to psychological and physical harm. *Id.*[18]

### (b)    The evidence remains undisputed that Defendants fail to provide Peka with a proper social group.

As detailed in PETA's Motion, the undisputed evidence is clear: Peka, a member of a highly social species, has been denied the companionship of even a single female lion for her entire life, and has lived in social isolation since the death of Mbube in December 2016. *Compare* Pl.'s SJ Mem. at 18, *with* Defs. SJ Mem. at 37. Defendants' purported former plan to obtain a female lion as a companion for Peka, Defs.' SJ Mem. at 37, does not change this fact, and actually buttresses PETA's position.

In apparent recognition that lions are highly social creatures, Defendants acknowledge that "a female lion should have the company of another lion," Defs. SJ Mem. at 37, but in the same breath summarily dismiss that social isolation causes lions any harm. Beyond this conclusory dismissal, however, Defendants fail to rebut the undisputed evidence presented by PETA that social isolation of a female lion

---

[18]     Plaintiff notes that it is not attempting to "simply step into the shoes of APHIS and enforce the AWA," Defs.' SJ Mem. at 35. On the contrary, it acts as a "private attorney general" in seeking to vindicate important Congressional policies and to advance the public interest in protecting endangered and threatened animals from mistreatment and death. *See Bennett*, 520 U.S. at 165 (noting that the "obvious purpose" of the ESA's citizen suit provision "is to encourage enforcement by so-called 'private attorneys general'"). *See also Fox v. Vice*, 563 U.S. 826, 832–33 (2011) (noting that a private attorney general provision is to allow citizens to "vindicat[e] a policy that Congress considered of the highest priority"). Plaintiff also seeks to aid the court in its independent duty to assess AWA compliance for ESA purposes, as it is required to do when determining whether a practice falls within the narrow exemption for practices that "harass" captive wildlife. *See Graham*, 261 F. Supp. 3d at 744.

thwarts natural social behaviors, risks physical and psychological injury, and is not a commonly accepted husbandry practice. *Compare* Pl.'s SJ Mem. at 18, *with* Defs. SJ Mem. at 37. Defendant Candy's bald assertion that there is "no reliable literature showing that it creates undue stress in them to lack another female lion for company," Candy Aff., ECF No. 114-3, ¶ 105, in conjunction with his lack of qualifications to opine on such matters, does not create a genuine issue of material fact. *See Leskinen*, 30 F. Supp. 2d at 533 ("conclusory allegations in an affidavit do not create a genuine issue of material fact."); *Evans*, 80 F.3d at 962 (upholding district court's decision to strike and disregard portions of plaintiff's affidavit, in part on the ground that courts will "generally consider self-serving opinions without objective corroboration not significantly probative").

The undisputed evidence establishes that isolation of a social species, like lions, constitutes "harassment," and therefore, an unlawful "taking" within the meaning of the ESA. *See Kuehl*, 161 F. Supp. 3d at 713. Defendants' argument that providing an adequate social group to a solitary lion is not "required by the Animal Welfare Act," Defs.' SJ Mem. at 37, does not absolve them of their responsibility under the ESA. As discussed previously and above, only practices that are generally accepted, AWA complaint, *and* not likely to result in injury, are exempt from the ESA's harassment prohibition. *See* Pl.'s SJ Mem. at 6-7; 50 C.F.R. § 17.3; *Hill*, 867 F.3d at 509. *See also* Order Den. Mot. to Dismiss, ECF No. 23, at 15 ("[T]he ESA provides for separate and heightened protections for the subset of captive animals

that are endangered or threatened.").[19] Defendants' failure to provide an adequate

social group for Peka constitutes an independent "take" under the ESA.

> **(c)    The evidence remains undisputed that Defendants deny big cats appropriate enrichment.**

Based on the record evidence, it is undisputed that:

- Defendants do not have a documented enrichment plan for the big cats at Tri-State that involves planning and setting behavioral goals, implementing appropriate enrichment options, assessing the success of the enrichment in reaching behavioral goals, and restructuring the program based on regular assessments, Pl.'s SJ Mem. at 27;

- placing a few items into a big cat's enclosure does not constitute environmental enrichment, Pl.'s SJ Mem. at 28;

- items placed in big cat enclosures are meaningless unless they promote a suitable range of species-appropriate behaviors and meet the captive animals' cognitive needs, Pl.'s SJ Mem. at 28;

- there is no evidence to support Defendants' contention that the items purportedly placed in the big cat enclosures are provided regularly, Pl.'s SJ Mem. at 28;

- the outdoor portions of the big cat enclosures at Tri-State do not provide any retreat space from the gaze of the public or other animals, Pl.'s SJ Mem. at 28;

---

[19]    In Defendants' opposition to PETA's Motion, Defendants accuse Plaintiff's expert Dr. Haddad of "wholesale perjury" twice because they dislike her word choice and opinions. *See* Defs.' SJ Mem. at 38, 40. Their accusations are brazen, unsupported, and improper. Their first accusation concerns Dr. Haddad's description of Peka's living space. *Id.* at 38. She described it as a "barren enclosure[ ] with little, if any, vegetation" and cited to a picture immediately above her opinion. Haddad Decl. at 39, ECF No. 99-10. Defendants apparently believe that is perjury because an enclosure cannot be "barren" if it has some grass, a bare tree, and platform. Def.'s SJ Mem. at 38. But Dr. Haddad was spot-on: the enclosure is "bleak and lifeless" or "too poor to produce much or any vegetation." *Barren*, https://en.oxforddictionaries.com/definition/barren (last accessed Dec. 11, 2018). Defendants also claim that Dr. Haddad's opinions must be perjury because Defendants provide "adequate" shelter and water sources to the Big Cats. *See* Def.'s SJ Mem. at 40. It is not perjury to disagree with Defendants' purported experts.

- failure to provide appropriate enrichment and complex environments impairs big cats' ability to express a wide range of species-typical behaviors leading to frustration, psychological distress, and even physical injury, Pl.'s SJ Mem. at 29;

- failure to provide big cats with species-appropriate options to express a normal repertoire of behaviors leads to psychological distress and creates permanent, irreparable physiological injury, Pl.'s SJ Mem. at 29-30; and

- confinement that fails to meet a big cat's basic physiological and behavioral needs can harm and harass big cats, Pl.'s SJ Mem. at 30.

*Compare* Pl.'s SJ Mem. at 27-30 *with* Defs.' SJ Mem. at 40-41.

Defendants' three arguments do not create any genuine disputes of fact that they have failed to provide adequate enrichment to any of the big cats.

First, Defendants argue that Peka is adequately enriched because she "has a stuffed bear that she has had since she was a cub" and that, to her, "that is enriching." Defs. SJ Mem. at 41 (citing Candy Aff. ¶¶ 113-14). Defendants have provided no evidence, however, to support their bald assertion that a stuffed bear apparently left in Peka's enclosure for several years is "enriching." Nor do they suggest that Peka, or any of the other big cats for that matter, regularly engage with the items in their enclosures in a manner that encourages the expression of a suitable *range* of species-typical non-injurious behaviors that meet the animals' cognitive needs. Defs.' SJ Mem. at 40-41.

Second, Defendants respond to PETA's big-cat failure-to-enrich claim with a self-serving affidavit from Defendant Candy that the big cats have "NEVER been observed to pace," Candy Aff., ECF No. 114-3, ¶ 117. While that averment admittedly creates a dispute of fact on whether the big cats did in fact pace, that

dispute is immaterial, because Defendants fail to proffer any evidence in response to PETA's other evidence, listed above.

Third, Defendants argue that the "USDA and the AWA do not require a written enrichment plan for large cats." Defs.' SJ Mem. at 41. But again, that does not relieve them of their responsibilities under the ESA. As stated above, and detailed at length in PETA's Motion, *see* Pl.'s SJ Mem. at 6-7, only practices that are generally accepted, AWA complaint, *and* not likely to result in injury, are exempt from the ESA's harassment prohibition.

Fourth, Defendants rely on Mr. Candy's pronouncement that he is "well aware of what large cats require psychologically." Candy Aff. ¶ 113. But that statement is conclusory and should be disregarded too.

Thus, it remains undisputed that Defendants fail to provide the big cats at Tri-State with species-appropriate environmental enrichment that encourages an expression of species-typical non-injurious behaviors, and that such failure harasses the animals in a manner that is likely to lead to psychological and physical harm. *Compare* Pl.'s SJ Mem. at 27-30 *with* Defs.' SJ Mem. at 40-41.

\*   \*   \*

In sum, even without reaching the question of the propriety of Defendants' post-discovery and new expert report from Dr. Duncan, there is no genuine dispute of fact, and PETA is entitled to summary judgment, on its claims that Defendants harmed and harassed lemurs by denying them adequate shelter and environmental

enrichment; and continue to harm and harass tigers and a lion by failing to provide adequate enrichment and social groups.[20]

### 3.  PETA is also entitled to summary judgment on its other big-cat claims.

That leaves Plaintiffs' three remaining big-cat claims: that they were denied proper veterinary care and adequate shelter, and were exposed to disease hazards from free-roaming animals (corresponding to sections I.B.2, .3 and .5 of Plaintiffs' original memorandum).  On those claims, Defendants' principal response was to offer a brand-new "Supplemental Affidavit of Gale Duncan," ECF No. 114-8. As set forth in PETA's separate motion to strike, the supplemental report should be excluded—and disregarded for purposes of summary judgment (and trial if necessary)—because it was disclosed well after the close of expert discovery and in clear violation of the Federal Rules of Civil Procedure. *See* Fed. R. Civ. P. 26(a)(2)(A), (B)(i) (requiring disclosure of expert witness identities and reports, including "a complete statement of all opinions the witness will express and the basis and reasons for them"). As set forth below, Plaintiffs are entitled to summary judgment on these additional big-cat claims regardless of whether the supplemental Duncan affidavit is stricken, but that conclusion is even clearer if the affidavit is stricken, as it should be.

---

[20]   These claims correspond to sections I.A.1 and .3, and I.B.1 and .4, of Plaintiffs' original memorandum, ECF No. 99-2.

### (a)   Defendants "take" big cats by denying them appropriate veterinary care.

As to PETA's big-cat veterinary care claim, Defendants have now presented evidence that superficially has created some disputes of fact, such as the adequacy of the tigers' anti-parasite treatment, and the death of Mbube. *See* Defs.' SJ Mem. at 39 (citing Candy Aff. ¶¶ 28-40 & 111). But as to several other aspects of this claim, the material facts remain undisputed and PETA is entitled to judgment as a matter of law.

First, Defendants entirely fail to dispute a central part of PETA's veterinary care claim: their failure to employ veterinarians with specialized training or experience in providing medical care to big cats. Federal regulations mandate that Defendants have an "attending veterinarian" who has "received training and/or experience in the care and management *of the species being attended.*" 9 C.F.R. § 1.1 (emphasis added). Defendants do not—and cannot—dispute that they have persistently failed to secure an attending veterinarian with *any* prior experience in the care of big cats (or primates for that matter). *Compare* Pl.'s SJ Mem. at 12-13, 19, *with* Defs.' SJ Mem. at 20-21, 31-35, 38-39.

Second, Defendants offer no evidence to dispute their failure to implement any standard preventative program, a failure that inhibits timely detection of disease before it has progressed. *Compare* Pl.'s SJ Mem. at 23-24, *with* Defs.' SJ Mem. at 38-40. Specifically, Defendants undisputedly fail to: secure a proper diagnosis before the death of every animal at Tri-State; regularly weigh any of the animals; conduct any routine fecal exams, blood draws, or dental exams; or

implement a routine deworming protocol. *Compare* Pl.'s SJ Mem. at 22-24, *with* Defs.' SJ Mem. at 38-40.

Third, if the Court excludes Dr. Duncan's noncompliant Supplemental Affidavit and a few inadmissible portions of Mr. Candy's affidavit (per PETA's separate motion to strike), PETA is entitled to summary judgment on other aspects of this claim too: Cayenne's death (*compare* Pl.'s SJ Mem. at 19-20 *with* Defs.' SJ Mem. at 38); the problems with Peka's gait (*compare* Pl.'s SJ Mem. at 21-23 *with* Defs.' SJ Mem. at 39); and Mowgli's ringworm (*compare* Pl.'s SJ Mem. at 20-21 *with* Defs.' SJ Mem. at 39).

These persistent failures have harmed and killed big cats at Tri-State, and invariably "create[] the likelihood of injury" and death to animals that remain at Tri-State by interfering with their natural behaviors. *See* 50 C.F.R. § 17.3. *See also* Pl.'s SJ Mem. at 19-25. Thus, PETA is entitled to summary judgment on Defendants' ESA violations for having failed to provide adequate veterinary care to the lions and tigers.

> **(b)   Defendants deny big cats adequate shelter from the elements.**

Ignoring the abundant record evidence of Defendants' blatant disregard for the big cats' basic shelter needs, *see* Pl.'s SJ Mem. at 25-27, Defendants simply assert that those claims are "fully rebutted" by portions of Dr. Duncan and Defendant Candy's affidavits, and that "[t]he enclosures contain adequate shelter from the elements, shade, and enrichment items." Defs.' SJ Mem. at 40.

If Dr. Duncan's untimely supplemental report is stricken, the only evidence Defendants offer are Defendant Candy's general descriptions of the big cat enclosures, and his bare allegations that the big cats have adequate shelter from the sun. *See* Defs.' SJ Mem. at 40; Candy Aff., ECF No. 114-3, ¶ 19 (describing the lion enclosure and stating that there are "shade trees on both sides"); *id.* ¶ 116 ("There is plenty of shade for the big cats. The tigers have very high walls in their enclosures. Not only can they find shade in the indoor enclosures, but the walls of the enclosures provide shade."). Despite these alleged minimal sources of potential shade, Defendants do not dispute that the indoor holding areas of the big cat enclosures—which are not temperature controlled—do not provide respite from the heat. Pl.'s SJ Mem. at 25-26. Nor do they dispute any of PETA's evidence of Defendants' harassment of the big cats due to their failure to provide them adequate shelter from heat or cold variations. *See* Pl.'s SJ Mem. at 25-27.

Thus, Defendant Candy's bare allegations do not create a genuine issue of material fact with regard to Defendants' failure to provide endangered and threatened animals adequate shelter from the elements.

### (c)     Defendants' "take" big cats by exposing them to disease hazards from free-roaming animals.

Even if Dr. Duncan's new expert report is not stricken from the record, it is undisputed that the free-roaming animals at Tri-State, some of whom had "obvious diseases on visual exam," Supp. Aff. of Gale Duncan, ECF No. 114-8, ¶ 26, have access to the big cat enclosures. It is also undisputed that these free-roaming animals have the potential to create psychological distress to the big cats because

the inability to prevent ingress into their territory frustrates the big cats by interfering with genetically evolved territorial and defensive behaviors. *See* Pl.'s SJ Mem. at 31. The free-roaming animals at Tri-State also cause behavioral frustrations due to the presence of domestic cats and wildlife across barriers that the big cats could see, but not catch. *Compare id. with* Defs.' SJ Mem. at 42-43.

If Dr. Duncan's new report is stricken, it is further undisputed that Defendants' failure to implement basic vaccination and disease screening protocols unnecessarily exposes the big cats to conditions that create a likelihood of injury or sickness, and harasses them by interfering and frustrating natural behaviors. *Compare* Pl.'s SJ Mem. at 31 *with* Defs.' SJ Mem. at 42-43.

### D.    The Court Should Grant PETA's Requested Relief.

For the foregoing reasons, PETA is entitled to summary judgment on eleven of the twelve independent "takes" set forth in its original motion (the only exceptions being the claims regarding inadequate veterinary care for the lemurs) The Court should enter an order granting PETA's requested injunctive and declaratory relief, including directing Defendants to forfeit possession of the animals subject to this suit and enjoining them from owning or possessing endangered or threatened species of animals (as expressly authorized by 16 U.S.C. § 1540(g)). *See also* Pl.'s Opp. to Defs.' Mot. to Dismiss, ECF No. 20 (discussing the remedies available under the ESA). As this Court has explained, in reference to 16 U.S.C. § 1540, "There is no limit in the statute regarding the type of injunction that may be sought, which is consistent with Congress's intention to afford broad and heightened protections to endangered and threatened species." Order Den. Defs.'

Mot. to Dismiss, ECF No. 23, at 19. *See also Kuehl*, 161 F. Supp. 3d at 719 (ordering defendants to transfer lemurs and tigers to an appropriate facility and enjoining the same from acquiring any ESA-listed animals without, among other things, prior court approval).[21]

## IV.   CONCLUSION

For the reasons set forth above, Defendants' Motion for Summary Judgment should be denied, and Plaintiff's Motion for Summary Judgment should be granted.

Date   December 20, 2018
       Baltimore, Maryland

Respectfully submitted,

*/s/ Adam B. Abelson*
Adam B. Abelson (#29532)
ZUCKERMAN SPAEDER LLP
100 East Pratt Street, Suite 2440
Baltimore, Maryland 21202
(410) 332–0444; (410) 659–0436 (fax)
aabelson@zuckerman.com

Marcos E. Hasbun (Admitted *Pro Hac Vice*)
ZUCKERMAN SPAEDER LLP
101 East Kennedy Boulevard, Suite 1200
Tampa, Florida 33602–5838
(813) 221–1010; (813) 223–7961
mhasbun@zuckerman.com

*Counsel for Plaintiff People for the Ethical Treatment of Animals, Inc.*

---

[21]    Insofar as Defendants suggest that "[t]here is nothing to inform the Court that any [appropriate] sanctuaries" are available to take the animals, Defs.' SJ Mem. at 19, as noted above, early in the case PETA identified, and communicated to Defendants' counsel, reputable sanctuaries that were willing and able to take the lemurs, lion, and tigers at issue in this case. Peet Decl. ¶ 19. PETA has *again* identified a GFAS accredited sanctuary that "has the space and resources available to accept and provide rehabilitation and lifetime placement to" the surviving lion and four tigers in this case. Thies Decl. ¶ 2, 7. *See also* Peet Decl. ¶ 25.