## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

PEOPLE FOR THE ETHICAL       *
TREATMENT OF ANIMALS, INC.,
                                       *

      Plaintiff,
                                       *

  v.                             *          Civil Action No. 1:17-cv-02148-PX
                                     *

TRI-STATE ZOOLOGICAL PARK OF
WESTERN MARYLAND, INC., *et al.*,     *

      Defendants.            *
                                 ***

## MEMORANDUM OPINION

Pending before the Court is Plaintiff People for the Ethical Treatment of Animals, Inc. ("PETA")'s Motion for Summary Judgment.  ECF No. 99.  The motion is fully briefed, and a hearing was held on June 28, 2019, during which time the Court ruled orally on all but this motion.  *See* Loc. R. 105.6.  After thorough review of the pleadings, and based on additional information learned at the hearing, the Court grants in part and denies in part summary judgment in PETA's favor and will schedule trial on the remaining matters.

The gravamen of PETA's claims is that Tri-State Zoological Park of Western Maryland, Inc., Animal Park, Care & Rescue, Inc., and Robert Candy (collectively, "the Zoo") harassed and harmed the lions, tigers, and lemurs by providing inadequate veterinary care, shelter, and environmental enrichment.  On July 31, 2017, PETA filed suit against the Zoo, alleging violations of the Endangered Species Act, 16 U.S.C. § 1531 *et seq.*  ECF No. 1.  At the close of discovery, the parties filed cross-motions for summary judgment.  ECF Nos. 99 & 114. The Zoo moved to strike a supplemental affidavit filed by PETA.  ECF No. 130.  PETA moved to exclude or strike three of the Zoo's experts, portions of Candy's affidavit, and the Zoo's reply, arguing that it functioned as an impermissible surreply.  ECF Nos. 94, 95, 96, 119, 125.  PETA, however,

did not move to exclude Candy as an expert witness in the relevant areas of zookeeping, animal husbandry and care of the lemurs and big cats.

At the June 28, 2019 hearing, the Court granted PETA's motions to exclude the Zoo's experts, denied the motion to strike the reply, and granted in part and denied in part the motion to strike portions of Candy's affidavit. The Court also denied the Zoo's motion to strike and motion for summary judgment. The sole remaining motion for resolution is PETA's motion for summary judgment. ECF No. 99.

## I.      Background

Defendants own and operate a zoological park in Cumberland, Maryland. ECF No. 26 ¶¶ 12–14. The Zoo currently holds approximately 50 animals. ECF No. 99-20 at 35. Those protected under the ESA—the lions, tigers, and lemurs—are the subject of this lawsuit. ECF No. 1 ¶¶ 2–3.

The Zoo was home to two lemurs, Bandit and Alfredo; five tigers, Cheyenne, Cayenne, India, Kumar, and Mowgli, and two lions, Peka and Mbube. ECF No. 99-17 at 35–36. Since 2016, three of the nine animals, or a full one-third of the protected species, have died at the Zoo. According to PETA, the Defendants are squarely to blame for these deaths. PETA alleges that Defendants violated the ESA as to each category of protected species (lions, tigers, and lemurs), and grounds its theory of liability in the Zoo's provision of inadequate shelter, enrichment and veterinary care. The Court first summarizes the pertinent facts as to each liability theory and then discusses whether summary judgment is warranted as to the claimed deficiencies.

## A.      Shelter at the Zoo

The lions and tigers (collectively, "big cats") live in enclosures that allow travel between outdoor and indoor portions. ECF No. 114-3 at 7–8. None of the big cat enclosures are heated

or have insulation in the walls or ceiling. ECF No. 99-17 at 119–20, 135. Rather, the Zoo provides hay or straw in the enclosures for warmth and heats Peka's drinking water to prevent it from freezing. ECF No. 99-21 at 15; ECF No. 99-17 at 135. The Zoo annually experiences snow, ice, and subfreezing temperatures, but has not installed thermometers to measure the ambient air temperature or humidity. ECF No. 99-21 at 15; ECF No. 99-17 at 120, 135. Instead, the Zoo gauges air by "feel" and by noting if the drinking water is frozen. ECF No. 99-17 at 135.

Lions and most subspecies of tigers have not evolved a thick, insulating coat to maintain appropriate internal body temperatures in the cold. ECF No. 99-47 at 9, 35. Amur tigers, however, can grow a thick, insulating coat. *Id.* at 35. Although it is unclear what subspecies of tigers are at the Zoo, some evidence suggests that Mowgli is a Bengal, not an Amur. *Id.* Exposing big cats to inappropriately cold temperatures can lead to hypothermia, dehydration, and damage to the cats' pads and mucous membranes. *Id.* at 9, 36.

The enclosures provide the big cats some limited shade from the walls and the indoor portions of their enclosures. ECF No. 114-3 at 33. However, lack of climate control or insulation in the structure causes the enclosed areas of the lion shelter to be hotter than the outdoor, ambient temperature. ECF No. 99-47 at 9. Exposing big cats to inappropriately hot temperatures can lead to overheating, dehydration, heat sickness, and stroke. *Id.* at 9, 36. For lions, this exposure is likely to result in tissue injuries, psychological distress, and eventually death. *Id.* at 9. Candy contends, however, that the big cats were not exposed to such inappropriate temperatures at the Zoo. *See* ECF No. 114-3 at 23, 34.

Peka has lived alone in her enclosure since 2011. ECF No. 99-17 at 127; ECF No. 99-16 at 356. Peka could previously view, hear, and smell Mbube, prior to his death in 2016. ECF No.

114-3 at 31.  Although the Zoo planned to find another lion to keep Peka company, the Zoo has decided not to pursue such plans.  *Id.*

Lions are a highly social species.  ECF No. 99-47 at 22.  Lion prides can reach up to 40 lions, and lions frequently communicate, stalk, hunt, play, and rear young together.  *Id.*; ECF No. 99-10 at 38.  PETA's experts opine that keeping a lion in solitude does not meet commonly accepted zoological practices.  ECF No. 99-10 at 38; ECF No. 99-47 at 23.  Solitude is extremely stressful for lions and disrupts natural social behaviors.  ECF No. 99-10 at 38; ECF No. 99-47 at 23.  Some evidence suggests that Peka is in distress as displayed through her abnormal interactions with Candy.  ECF No. 99-10 at 38.  Candy, however, who has cared for Peka since infancy, disputes that Peka shows signs of stress.  ECF No. 114-3 at 22.

The lemurs were housed in a small enclosure that only provided shade inside the shelter and at the top of the cage, despite the risks of heat sickness and dehydration.  ECF No. 99-47 at 61.  The appropriate temperature for lemurs is above 70 degrees Fahrenheit.  *Id.*  When temperatures dip below 65 degrees, lemurs must be provided shelter with adequate heat.  ECF No. 99-10 at 9.  If the temperature falls below 48 degrees, lemurs must be kept indoors.  *Id.*  The indoor portion of the lemur enclosure is not insulated and has two electric heaters and one heat lamp.  ECF No. 99-47 at 61; ECF No. 99-17 at 151.  The record is not clear as to whether the heaters are temperature controlled.  *Compare* ECF No. 99-17 at 152, *with* ECF No. 99-29 at 68.  Zoo staff monitored the temperature by checking whether the lemurs' drinking water had frozen.  ECF No. 99-17 at 152.  At least once, the lemurs were permitted outside with snow on the ground.  ECF No. 99-40.  And on the day Bandit died in January, his body was at a subnormal temperature.  ECF No. 99-20 at 197.  In fact, the Zoo's treating veterinarian at the time, Dr. Timothy Fox, described Bandit as "freezing" when presented for treatment on the day of his

death.  *Id.* at 262.

**B.  Environmental Enrichment**

The Zoo does not employ a formal written enrichment plan for the big cats because

Candy believes the big cats "make their own fun."  ECF No. 99-17 at 367.   Peka has a stuffed

bear that she has carried around for years, which Candy attests is enriching.  ECF No. 114-3 at

32.  The tigers have old tires and bowling balls, which are not offered at accredited facilities

because of the risk of injury to the animals.  ECF No. 99-47 at 31.  The big cats also receive

Christmas trees, carcasses, barrels, and cardboard containers.  ECF No. 114-3 at 32.  No

evidence suggests that the Zoo frequently alternates or rotates out the items.  The Zoo is largely a

static environment except for visitors who pass by the animal enclosures.

It is generally accepted that big cat enrichment tools and techniques must be changed

frequently because the enrichment value of any given item dissipates over time, and after five

days, offers no value all.  ECF No. 99-47 at 101.  Lack of adequate enrichment for big cats can

cause frustration and distress, which can, in turn, manifest as stress, hypertension, respiratory and

cardiac distress, suppression of the immune system, atrophy of the hippocampus, myopathy,

injury, and ultimately death.  ECF No. 99-47 at 26, 55–56; ECF No. 99-10 at 17.

As for the lemurs, Bandit lived alone for years before the Zoo acquired Alfredo.  ECF

No. 99-17 at 192, 194.  In captivity, lemurs should be housed in groups of four to seven, and

their counterparts in the wild live in troops of 7 to 30.  ECF No. 99-47 at 72–73.  For additional

enrichment, the Zoo hid the lemurs' food and treats once a week to encourage foraging.  ECF

No. 99-17 at 215.  Once every two weeks, the Zoo rolled hard-boiled eggs through the lemur

cage.  ECF No. 99-29 at 70.  Once every two months, the Zoo hand-fed the lemurs grapes and

gummi bears.  *Id.* at 69.  At an unknown frequency, the Zoo held a cup for the lemurs to drink.

ECF No. 99-15 at 89. The lemurs were provided with firehoses, a mirror, tree branches, weathered children's toys, and barrels hung at a height too high for terrestrial, ring-tailed lemurs. *Id.*; ECF No. 99-47 at 59; *see also* ECF No. 99-17 at 217 (noting that "[m]ost time lemurs have no interest in toys"). Nothing new was added to the lemurs' enrichment plan between 2011 and 2017, despite Alfredo joining the Zoo in 2012. ECF No. 99-17 at 223, 194.

A lack of enrichment for lemurs leads to frustration, boredom, depression, lethargy, aggression, and impaired learning and coping. ECF No. 99-47 at 74–75. These experiences disrupt lemurs' species-typical behaviors, which include marking, foraging, grooming, exploring, and vigilance. *Id.* at 75. At least one of the Zoo's lemurs was observed abnormally rubbing his face and forearm. ECF No. 99-10 at 7. The Zoo also admitted that Bandit had damaged his own genitals in an act of self- mutilation shortly before his death. ECF 99-34 at 14; ECF No. 99-20 at 282, 376. A lack of enrichment also disrupts homeostasis and the functioning of the kidney, liver, heart, and skin, leading to increased rates of disease, suffering, and death. ECF No. 99-10 at 8.

### C. Veterinary Care

Between 2009 and 2018, Dr. Timothy Fox acted as the Zoo's veterinarian, and Dr. Gale Duncan replaced him on April 3, 2018. ECF No. 99-20 at 8–9; ECF No. 99-24 at 16. Neither Fox nor Duncan had acquired any formal or informal training, education or experience working with big cats or primates outside caring for the animals at the Zoo. ECF No. 99-20 at 28 (Fox) ("I'm just a regular old veterinarian. I'm not a specialty in any of those zoo animals."); ECF No. 99-24 at 33–34 (Duncan) ("I did not have any past experience beyond what we are taught in vet school.").

Fox and Duncan adopted a Program of Veterinary Care ("PVC") that required veterinary

visits every three months. ECF No. 99-15 at 92. However, in practice, the Zoo often did not comply with its own plan. See *id.* at 101–04 (showing gaps of approximately 5, 6, 8, 9, 11, and 12 months between veterinary visits). Further the PVC did not call for any vaccinations of the big cats, nor any regular weight, fecal, blood, or dental examinations. *Id.* at 94. The PVC in this respect contravened generally accepted practices for providing care to the big cats, which require vaccinating big cats for rabies, panleukopenia, calicivirus, herpesvirus, and high-risk big cats for distemper and feline leukemia virus. ECF No. 99-10 at 32. Generally accepted husbandry practices also entail annual examinations of young and healthy animals, and semi-annual examinations of senior animals or animals with health issues. *Id.* at 26. Such preventative screening remains particularly important for wild animals like the big cats because they typically do not manifest their illnesses until the disease is well-progressed. ECF No. 99-20 at 48; ECF No. 99-24 at 98.

Big cats are put at risk of contracting potentially life-threatening diseases if they come into contact with free-roaming animals, including domestic cats, chickens, ducks, and peacocks—all of which roam the Zoo grounds. ECF No. 99-16 at 328, 330; ECF No. 99-17 at 377. At least one of the Zoo's domestic cats suffers feline immunodeficiency virus, which puts the big cats in jeopardy of contracting the virus. ECF No. 99-38 at 8; ECF No. 99-10 at 33. In addition to spreading disease, free-roaming animals frustrate the big cats who cannot prevent the entry of these animals into their enclosures and cannot catch the animals when they are outside the perimeter. ECF No. 99-47 at 21, 48.

One instance involving substandard veterinary care at the Zoo deserves special attention. In May 2018, Cayenne began to suffer from poor appetite and lethargy. ECF No. 99-24 at 10. Duncan anesthetized Cayenne to take x-rays and draw blood. ECF No. 99-30 at 191–92. While

under anesthesia, Cayenne went into respiratory arrest.  ECF No. 19-19 at 4.  Duncan injected

epinephrine and performed chest compressions, which resuscitated the tiger.  *Id.*  As a result,

however, Cayenne remained at a heightened risk of injury or death while sedated.  ECF No. 99-

10 at 30.  Generally accepted standards of veterinary care required immediately providing

Cayenne with intravenous fluids and respiratory support.  *Id.* at 84.  If these options were not

available, proper protocol dictated that Duncan reverse the anesthesia administration.  *Id.*

Tragically for Cayenne, Duncan lacked the skills or equipment to do either.  She had no

supplemental oxygen, intubation tubes, bags to help Cayenne breathe, an intravenous catheter,

fluids, or a written emergency plan.  ECF No. 99-30 at 204–07.  Nor did Duncan have a pulse

oximeter to measure tissue perfusion or oxygenation, a doppler to measure blood pressure, or

ECG to measure the heart.  *Id.* at 205.  Duncan had only a thermometer and stethoscope.  *Id.* at

204.  Yet Duncan kept Cayenne under anesthesia and proceeded with the examination.  *Id.* at

191–92.  After Cayenne had been under anesthesia for about sixty minutes, Duncan left the room

for five to ten minutes to vaccinate one of the domestic cats at the Zoo.  *Id.* at 213.  Alone and

unattended, Cayenne had a heart attack and died.  ECF No. 19-19 at 4.

Other big cats died or suffer from chronic illness at the Zoo.  One lion, Mbube, died from

disputed causes after significant weight loss and mane thinning.  *Compare* ECF No. 19-15 at 9

(diagnosing Mbube with cancer), *with* ECF No. 99-10 at 59 (describing a range of conditions

that Mbube could have experienced); *see also* ECF No. 114-3 at 14–16 (disputing PETA's

allegations of inadequate veterinary care for Mbube).  Peka, the surviving lion, has been

diagnosed with an abnormal gait of unknown origin.  ECF No. 99-47 at 16.  The ears of another

tiger, India, are repeatedly bit by flies.  ECF No. 99-17 at 307.  To combat the flies, the Zoo

implemented a pest-control program of disputed effectiveness.  ECF No. 114-3 at 31.  The white

tiger, Mowgli, annually experiences ringworm, a fungal infection that typically occurs in immunocompromised felines or those housed in damp, unsanitary conditions.  ECF No. 99-17 at 297; ECF No. 99-10 at 81.

## II.      Standard of Review

Summary judgment is appropriate when the Court, construing all evidence and drawing all reasonable inferences in the light most favorable to the non-moving party, finds no genuine dispute exists as to any material fact, thereby entitling the movant to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see In re Family Dollar FLSA Litig.*, 637 F.3d 508, 512 (4th Cir. 2011). Summary judgment must be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

"In responding to a proper motion for summary judgment," the opposing party "must present evidence of specific facts from which the finder of fact could reasonably find for him or her." *Venugopal v. Shire Labs.*, 334 F. Supp. 2d 835, 840 (D. Md. 2004), *aff'd sub nom. Venugopal v. Shire Labs., Inc.*, 134 F. App'x 627 (4th Cir. 2005) (citing *Anderson v. Liberty Lobby*, 477 U.S. 242, 252 (1986); *Celotex*, 477 U.S. at 322–23)).  Genuine disputes of material fact are not created "through mere speculation or the building of one inference upon another." *Othentec Ltd. v. Phelan*, 526 F.3d 135, 140 (4th Cir. 2008) (quoting *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985)).  Where a party's statement of a fact is "blatantly contradicted by the record, so that no reasonable jury could believe it," the Court credits the record.  *Scott v. Harris*, 550 U.S. 372, 380 (2007).

## III.     Analysis

PETA contends that summary judgment is warranted for each category of endangered

species at the Zoo under the Endangered Species Act.  Apart from a single, narrow, ground involving veterinary care as to Cayenne, the Court cannot agree.

The Endangered Species Act ("ESA") protects such covered animals as lions, tigers, and lemurs from an unlawful taking.  16 U.S.C. § 1538(a)(1)(B); 50 C.F.R. §§ 17.11, 17.21(c), 17.31(a).  The ESA also prohibits possession of unlawfully taken lions, tigers, and lemurs.  16 U.S.C. § 1538(a)(1)(D).  To "take" a species means to "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or attempt to engage in any such conduct."  16 U.S.C. § 1532(19).  A "take" must be construed in the "'broadest possible manner'" to provide maximum protection under the Act.  *Babbitt v. Sweet Home Chapter of Communities for a Great Or.*, 515 U.S. 687, 704 (1995) (quoting S. Rep. No. 93-307, at 7 (1973), reprinted in 1973 U.S.C.C.A.N. 2989, 2995).

One manner in which an animal is subject to a take under the ESA is if the animal is harassed.  To "harass" a covered animal means to intentionally or negligently "create[] the likelihood of injury to wildlife by annoying it to such an extent as to significantly disrupt normal behavioral patterns."  50 C.F.R. § 17.3.  Excluded from the definition of harassment are practices that fall within generally accepted animal husbandry standards and that comply with the Animal Welfare Act ("AWA").  *Hill v. Coggins*, 867 F.3d 499, 509 (4th Cir. 2017), *cert. denied*, 138 S. Ct. 1003 (2018); *see also* Captive-bred Wildlife Regulation, 63 Fed. Reg. 48,634-02, 48,638 (Sept. 11, 1998) (noting that the exception was intended to exclude "normal husbandry practices that are not likely to result in injury").[1]

An animal is also "taken" if he is harmed.  Harm "means an act which actually kills or injures wildlife."  50 C.F.R. § 17.3.  To establish harm, a plaintiff must prove, by a

---

[1] The Animal Welfare Act is a separate animal protection statute that can only be enforced by the Secretary of Agriculture.  7 U.S.C. §§ 2131, 2146.

preponderance of the evidence, that the act is "reasonably certain to imminently harm, kill, or wound" the species. *Animal Welfare Inst. v. Beech Ridge Energy LLC*, 675 F. Supp. 2d 540, 563 (D. Md. 2009), *judgment amended*, No. 09-1519 (RWT), 2010 WL 11484179 (D. Md. Jan. 26, 2010).[2]  To demonstrate an animal was "harmed," therefore, demands more than showing the animal was "harassed." *Hill*, 867 F.3d at 511.

With these definitions in mind, PETA advances three primary theories of liability as to the Zoo and asks the Court to grant summary judgment as to each.  First, that the Zoo's provision of substandard shelter harassed the big cats and lemurs; second that the lack of any meaningful enrichment plan for the protected animals amounted to harassment; and third, the provision of inadequate veterinary harmed Cayenne in that it caused her death and resulted in ongoing harm or harassment as to the other big cats and lemurs.  The Court addresses each in turn.

## A.  Inadequate Veterinary Care for the Big Cats

PETA contends that the Zoo's inadequate veterinary care killed Cayenne, and thus "harmed" her under the ESA.  AWA regulations compel the Zoo to provide Cayenne with an attending veterinarian with training or experience in caring for tigers. *See* 9 C.F.R. § 2.40(a) ("Each dealer or exhibitor shall have an attending veterinarian who shall provide adequate veterinary care to its animals in compliance with this section."); 9 C.F.R. § 1.1 (defining attending veterinarian as a person who "has received training and/or experience in the care and management of the species being attended").  Dr. Duncan, who cared for Cayenne at the time of

---

[2] Courts dispute how severe harassment or harm must be to become actionable. *Compare Graham v. San Antonio Zoological Soc'y*, 261 F. Supp. 3d 711, 743 (W.D. Tex. 2017) (requiring "more than any minor injury or harm in the literal sense [and] some notion of significance . . . short of requiring a 'grave threat'"), *with People for the Ethical Treatment of Animals, Inc. v. Miami Seaquarium*, 879 F.3d 1142, 1150 (11th Cir.), *adhered to on denial of reh'g sub nom., People for the Ethical Treatment of Animals, Inc. v. Miami Seaquarium*, 905 F.3d 1307 (11th Cir. 2018) (requiring a "threat of serious harm").  Because the death of an animal satisfies either standard, and genuine issues of material fact preclude summary on the other grounds, the Court need not resolve this legal question at this juncture.

her death, admitted to the Zoo that she lacked *any* specialized experience or training in medical care for tigers. ECF No. 99-24 at 33–34. Duncan, a recent graduate from veterinary school, had taken no specialized courses in big cats and before the Zoo, never treated big cats. Rather, she practiced on small cats and dogs, and examined the occasional horse. Indeed, Duncan's primary source for learning about big cat feeding practices went no further than watching documentaries aired on Animal Planet. ECF No. 94-6 at 99–100.

Duncan's lack of training and experience with big cats showed in her care of Cayenne. No sooner did Duncan put Cayenne under anesthesia, Cayenne went into respiratory arrest. ECF No. 19-19 at 4. The unrebutted record evidence demonstrates that Duncan should have immediately reversed the anesthesia. ECF No. 99-10 at 84.[3] Duncan did not have the proper equipment to proceed with such a risky immobilization—she could not provide Cayenne with intravenous fluids or respiratory support. *Id.* Duncan also lacked the requisite equipment to monitor Cayenne's oxygenation, blood pressure, and heart. ECF No. 99-30 at 204–07; ECF No. 99-10 at 83 (noting that these types of monitoring equipment are "the most basic requirements" for anesthetizing a tiger).

Then, after completing the diagnostics, Duncan left Cayenne alone to recover from the anesthesia, despite the high risk of an adverse reaction during the recovery period. ECF No. 99-30 at 191–92; ECF No. 99-10 at 84 ("The most critical times during anesthesia are induction and recovery."). While she was alone, Cayenne suffered a heart attack and died. ECF No. 19-19 at 4.

It is without dispute in the record that "Cayenne died due to the lack of basic veterinary care." ECF No. 99-10 at 84. Cayenne's death constituted harm, and as such, the Zoo unlawfully

---

[3] As stated at the hearing, the Court accepts both Dr. Kim Haddad and Dr. Jay Pratte as experts in their relevant fields regarding care of lions, tigers, and lemurs.

took Cayenne.  *See* 50 C.F.R. § 17.3; *see also Kuehl v. Sellner*, 161 F. Supp. 3d. 678, 716 (N.D. Iowa 2016), *aff'd*, 887 F.3d 845 (8th Cir. 2018) (finding that untimely and inappropriate veterinary care harmed tigers).  Accordingly, PETA is entitled to summary judgment on the claim that Cayenne was subject to a take, in violation of the ESA.

PETA also contends that Mbube's death, Mowgli's ringworm, Peka's gait, and the overarching lack of specialized training or experience and adequate preventative care program constitute a take as a matter of law.  ECF No. 120 at 53–54.  Regarding Mowgli's annually recurring ringworm, the Court cannot grant summary judgment in PETA's favor.  PETA's veterinary expert, Dr. Haddad, opines that ringworm "typically occurs in poorly managed facilities."  ECF No. 99-10 at 81.  However, Haddad also concedes that ringworm can manifest in "immunocompromised" big cats *or* when they live in damp, unsanitary conditions.  *Id.* Taking all reasonable inferences in the light most favorable to the Zoo, a genuine issue of disputed fact exists as to the causal connection between Mowgli's ringworm and the Zoo's inadequate veterinary care.  *See* ECF No. 99-30 at 138 (noting that white tigers are genetically predisposed to a number of health problems); *see also* 50 C.F.R. § 17.3 (defining harm as "an act which actually kills or injures wildlife").

PETA further argues that no genuine disputed issue of fact exists as to the lack of preventative veterinary care harassing the big cats, as well as the potential exposure to disease from the free-roaming animals.  The Court disagrees.  PETA must demonstrate that lack of care "annoyed" the big cats "to such an extent as to significantly disrupt normal behavioral patterns." *See* 50 C.F.R. § 17.3.  Importantly, as a matter of law, harassment does not merely constitute a likelihood of injury—the injury must be caused by an annoyance that is significantly disruptive to normal behavior.  *Id.*  To read the definition otherwise would render meaningless the word

13

"annoy." *See Hill*, 867 F.3d at 509 & n.5. Although in the end PETA may be able to demonstrate that the lack of adequate veterinary care did harass the big cats as defined in the regulation, this question is best left for trial.[4]

Finally, as to the other allegations of harm or harassment due to inadequate veterinary care, at this stage, PETA cannot overcome the disputed facts on whether the Zoo provided inadequate care to Mbube, leading to his death (ECF No. 114-3 at 14–16); whether the Zoo inadequately treated Peka's abnormal gait (ECF No. 99-47 at 16); and whether the Zoo employed an inadequate pest control program, leading to the fly bites on India's ears. ECF No. 99-17 at 307. Altogether, summary judgment is granted in part and denied in part on whether the Zoo unlawfully took big cats by providing inadequate veterinary care.[5]

### B.  Inadequate Shelter

PETA also argues that the record evidence, viewed most favorably to the Zoo, supports that the Zoo's provision of inadequate shelter harasses the big cats and lemurs by exposing them to inappropriately hot and cold temperatures. However, the parties' have generated competing evidence as to whether the big cat enclosures were sufficiently insulated or provided for adequate shade to protect the big cats from extreme weather. *Compare* ECF Nos. 99-10 at 42, 99-47 at 9, *with* ECF No. 114-3 at 23, 33. Similarly, competing evidence exists as to the adequacy of the lemurs' shelter. *Compare* ECF No. 99-47 at 61, *with* ECF No. 99-29 at 68. When "considering a summary judgment motion, the court may not make credibility determinations," and so cannot find, as a matter of law, that PETA prevails. *See Courtney-Pope v. Bd. of Educ. of Carroll Cty.*,

---

[4] PETA argues that the free-roaming animals annoy the big cats because their mere presence causes psychological distress. This annoyance, however, is distinct from the threats posed by disease transmission, and so is analyzed separately.

[5] PETA concedes that, on a summary judgment standard, disputed material facts exist precluding summary judgment on whether substandard veterinary care of the lemurs rose to the level of a take. ECF No. 120 at 40–41 & n.17. This liability theory will proceed to trial.

304 F. Supp. 3d 480, 489 (D. Md. 2018).  Summary judgment is denied on these grounds.

### C.      Insufficient enrichment

PETA next argues that the Zoo harmed and harassed the animals by providing insufficient environmental enrichment.  Although PETA presents a robust record supporting the causal connection between lack of enrichment and the physical and psychological distress such deficiencies visit on the big cats and lemurs (ECF No. 99-47 at 26, 55–56, 110; ECF No. 99-10 at 15–17), certain evidence raises at this stage a genuine dispute as to whether the Zoo actually provided adequate enrichment.  *Compare* ECF No. 99-10 at 15, 37; ECF No. 99-47 at 24, 54, 74, *with* ECF No. 114-3 at 9, 30.  The parties also dispute whether Peka's social isolation and the presence of free-roaming animals has harassed or harmed the protected species.  *Compare*, ECF No. 99-10 at 38–39; ECF No. 99-47 at 21, 48, *with* ECF No. 114-3 at 12, 25.  Given these disputes of fact, the Court cannot enter judgment in PETA's favor on these additional grounds.

### IV.     Conclusion

For the foregoing reasons, the Court grants in part and denies in part PETA's motion for summary judgment.  ECF No. 99.  A separate Order follows.

7/08/2019                                                            /S/
Date                                                          Paula Xinis
                                                              United States District Judge

15