**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

PEOPLE FOR THE ETHICAL       *
TREATMENT OF ANIMALS, INC.,

                                   *

      Plaintiff,

                                   *

   v.                             *             Civil Action No. 8:17-cv-02148-PX

                                   *

TRI-STATE ZOOLOGICAL PARK OF
WESTERN MARYLAND, INC., *et al.*,     *

      Defendants.                *

                              ***

## <u>MEMORANDUM OPINION</u>

This opinion and order follow a six-day bench trial brought by People for the Ethical

Treatment of Animals ("PETA") against Defendants Tri-State Zoological Park of Western

Maryland Inc., Animal Park, Care & Rescue, Inc., and Robert Candy (collectively, "Tri-State"),

the owners and operators of a zoological park in Cumberland, Maryland. ECF No. 26 ¶¶ 12–14.

The animals protected under the Endangered Species Act (ESA)—the lions, tigers, and lemurs—

are the subject of this lawsuit. ECF No. 1 ¶¶ 2–3.

Shortly before this lawsuit began, Tri-State was home to two lemurs, Bandit and Alfredo;

five tigers, Cheyenne, Cayenne, India, Kumar, and Mowgli; and two lions, Peka and Mbube.

Since 2016, five of the nine animals, more than half of the protected species, have died at Tri-

State. Alfredo has been transferred to the Maryland Zoo (JX7 at 3), and only Cheyenne,

Mowgli, and Peka remain alive and at Tri-State.

PETA initiated suit on July 31, 2017, alleging violations of the Endangered Species Act,

16 U.S.C. § 1531 *et seq.* ECF No. 1. The suit proceeded to summary judgment and on July 8,

2019, this Court granted in part and denied in part summary judgment in PETA's favor. ECF

No. 138.

At trial, PETA argued that Defendants have violated the ESA by subjecting the protected animals to harm and harassment. PETA contended that Defendants have committed a "take" as understood in the ESA arising from Tri-State's provision of unsanitary living conditions, poor diets, substandard veterinary care, and inadequate shelter and enrichment. Trial exposed Tri-State and Candy's flagrant and persistent violations of the ESA. For the following reasons, and based on the following facts, the Court finds in favor of PETA on all theories of liability.

## I. Findings of Fact[1]

### A. General Conditions Affecting the Protected Species

#### 1. The Zoo Grounds

The uncontroverted testimony reflects that every animal at issue suffered under Tri-State's living conditions. The zoo is situated on sixteen acres of what used to be an old campground. Trial Tr. vol 5, 11. Past the ramshackle entrance are a range of enclosures and buildings that house its approximately fifty animals. Trial Tr. vol. 5, 21–22; JX37. These include a gated farm animal enclosure, a reptile room and a kinkajou room, both situated around the corner of a kitchen in which food is prepared, an aviary across the path from the reptile room, an approximately six-foot diameter pool for large alligators, and a group of small primate enclosures. *See generally* JX37. And, of course, the zoo houses separate enclosures for the tigers, lions, and lemurs.

Trial evidence demonstrated that since PETA began its investigation, the animals have

---

[1] The evidence presented at trial largely consisted of PETA's undercover visits (December 11 and 12, 2014; January 28, 2015; and March 5, 2015) (Trial Tr. vol 1, 53); PETA's site inspections conducted after this lawsuit commenced (March 3, 2018 and September 22, 2019) (ECF No. 34; PX84; ECF No. 145); the expert testimony and reports of Dr. Kim Haddad, a veterinarian with education and training in small primates and Big Cats, and Mr. Jay Pratte, a specialist in the field of animal husbandry; records kept by Tri-State; and abundant video and photographic evidence obtained by PETA during the course of its many visits to the facility. The Court also admitted deposition testimony of several witnesses, including Connie Collins, Stuart Henstock, Christopher Fontes, and Brittany Peet. On behalf of Tri-State, the Court heard from Robert Candy, Tri-State's owner and founder.

been housed in fetid and dystopic conditions. Filth and feces dominate Tri-State. PETA's undercover investigation in 2014 and 2015 documented animal excrement throughout the zoo grounds—in the kitchen where animal food is prepared, the room that houses the reptile exhibits, the grounds generally, and in each of the protected animals' enclosures. *See generally* PX20–24; PX30; PX45–47; PX74; PX77; *see also* photos below (documenting feces and decaying vegetables in kinkajou cages and the aviary across more than a month).


***Kinkajou cage***, PX45 at :53 (12/12/2014)


***Kinkajou cage***, PX46 at :59 (1/28/2015)


***Kinkajou cage***, PX45 at 1:13 (12/12/2014)


***Kinkajou cage***, PX46 at :51 (1/28/2015)


***Aviary***, PX76 at :12 (12/12/2014)


***Aviary***, PX47 at :38 (1/28/2015)

Rotting vegetables spilled over large receptacles, decaying meat sat in piles outside the kitchen and in the furnace room under the nearby reptile house, and decomposing carcasses were left for days in the enclosures for the tigers and lions (collectively "Big Cats"). *See generally* PX21–22; PX27; PX73–74; PX77. General filth coated the kitchen, from the walls and sink to the refrigerator. PX75; Trial Tr. vol. 2, 101. A trashcan filled with waste stood uncovered. *Id.*



***Moldy sweet potatoes***
PX75 at :14 (12/11/2014)



***Uncovered kitchen trashcan***
PX75 at :09 (12/11/2014)

Outside the kitchen, piles of donated produce lay unrefrigerated, many in a state of decay and long past their expiration dates. PX73; PX19; PX17; Trial Tr. Vol. 1, 80, 97, 100. Free-roaming cats, chickens, and ducks took turns scavenging the piles. *Id.*





***Food stored in piled boxes outside the kitchen***, PX17 (3/4/2015); PX 32 (12/11/2014)

In the reptile room, just feet away from the kitchen, "decaying remnants of fruits and vegetables were scattered across the floor, and there were [] large smears of feces, presumably from the sulcatas [tortoises]." PX74 at :00–2:09, 2:27–3:50; Trial Tr. vol. 1, 78–80. Rotten scraps of vegetables and feces scattered the marmoset cage, which is stationed in the reptile

room.  PX77; Trial Tr. vol. 1, 92.  Of the rooms near the kitchen, PETA investigator Stuart Henstock stated that they "smelled horrendous, [ ] an almost choking smell of feces" and of "rotting vegetables."  Trial Tr. vol. 1, 79, 89.



*Accumulation of feces and rotten scraps of vegetables in the marmoset cage, located in the reptile room*
PX77 at :47, 12/12/2014.

In the indoor tiger enclosures, tufts of fur coated rusted bars, and carcasses, bones, feathers, fur, and debris mixed with dirty straw.  Trial Tr. vol. 1, 138–39, 144.



*Mowgli's indoor enclosure*, PX27 (12/14/14)



*Cheyenne's indoor enclosure*, PX20 (1/28/15)

The tigers' outdoor enclosures contained piles of feces, discolored water sources filled with decaying leaves, and large spots of urine residue accumulated over time.  PX31; Trial Tr. vol. 1, 76; Trial Tr. vol. 4, 34.



*Tiger enclosure*, PX24 at 1:39 (12/12/14)



*Tiger enclosure*, PX16 (9/11/16)

Throughout the grounds, free-roaming animals traipsed between rooms and enclosures. *See generally* PX11; PX12; PX19; PX74; PX75; Trial Tr. vol. 1, 135. Scores of domestic cats, many of whom are unvaccinated, sported matted and unkempt fur along with crusted, watery, or bloody discharge seeping from their eyes, nose, or ears. JX39, Candy 30(b)(6) Dep. 336; PX12 at 1; Trial Tr. vol. 2, 66–68, 101–102. The cat in the screenshot below, for example, had "obvious ocular discharge," according to Dr. Haddad. Trial Tr. vol. 2, 102.



***Cat in kitchen***, PX25 at 27 (12/11/14)

Candy and zoo volunteers take no precautions to minimize the filth or stop the spread of disease. Tri-State has no areas designated for cleaning that are standard at zoos and sanctuaries, such as footbaths and cleaning receptacles. Trial Tr. vol. 4, 10–11. Perhaps PETA investigators Stuart Henstock and Chris Fontes said it best: that even though they had visited dozens of zoos and sanctuaries combined, Tri-State was "the dirtiest" and "worst place" they had ever seen. Trial Tr. vol. 1, 101, 149.[2]

### 2. Inadequate Veterinary Care

Tri-State has never provided adequate veterinary care to its lemurs, tigers, and lions. The

---

[2] Although Tri-State attempted to clean in preparation of the 2018 and 2019 site visits, the conditions improved only marginally. *See, e.g.,* PX11 at 18:29; Trial Tr. vol. 2, 105–06.

Animal Welfare Act (AWA) governing Tri-State's USDA-issued exhibitors license requires that Tri-State secure an attending veterinarian with species-specific training and experience. *See* 9 C.F.R. § 2.40(a) ("Each dealer or exhibitor shall have an attending veterinarian who shall provide adequate veterinary care to its animals in compliance with this section."); 9 C.F.R. § 1.1 (defining attending veterinarian as a person who "has received training and/or experience in the care and management *of the species being attended*") (emphasis added). Defendants never came close to complying with this regulation.

Between 2009 and 2018, Tri-State employed Dr. Timothy Fox as the attending veterinarian. JX39, Fox Dep. 8–9. After PETA initiated suit, Dr. Fox was no longer willing to serve as the zoo's veterinarian, and he was replaced with Dr. Gale Duncan. Neither Dr. Fox nor Dr. Duncan had acquired any formal or informal training, education, or experience working with Big Cats or primates other than the animals at Tri-State. "I'm just a regular old veterinarian [,] I'm not a specialty in any of those zoo animals," Dr. Fox admitted. JX39, Fox Dep. 28. Dr. Duncan readily conceded that she did not have any experience with Big Cats or lemurs apart from some training in veterinary school. ECF No. 138 at 6.

Unsurprisingly, Dr. Fox and Dr. Duncan, in concert with Candy, utterly failed to implement a satisfactory program of veterinary care for the lions, tigers, and lemurs. The AWA provides that "each exhibitor shall establish and maintain programs of adequate veterinary care that include . . . the use of appropriate methods to prevent, control, diagnose, and treat diseases and injuries . . . " 9 C.F.R. § 2.40(b)(2). The Program of Veterinary Care (PVC) must be written, reviewed on an annual basis, and modified as needed. Trial Tr. vol. 2, 47, 77. Similarly, as is standard in any medical field, the provision of medical services must be documented contemporaneously. Applying here is the old adage, "if it is not written down, it did

not happen." PX69 at 52; Trial Tr. vol. 3, 153.

Stunningly, Tri-State maintained only 86 pages of medical records in connection with Dr. Fox's veterinary care for the *last decade* and for the *entire zoo population*.[3] PX4. Some of the 86 pages are invoices or duplicates. Trial Tr. vol. 2, 73–74. Only 121 pages of records are associated with Dr. Duncan's care. PX5. This shallow sheaf makes a mockery of the simple requirement that exhibitors maintain "documentation for all covered animals showing that current medical problems and existing chronic conditions are being addressed, and/or receiving proper care." PX52 at 150 (USDA Animal Welfare Inspection Guide).

Although Tri-State minimizes the significance of its record-keeping failures, the fact remains that lack of such documentation detrimentally affects animal care. As Dr. Haddad explained, Big Cats especially do not manifest obvious signs of illness until their conditions are serious, if not terminal. Trial Tr. vol. 2, 72. Early detection and treatment of illness depends on recording seemingly trivial changes in animal behavior and appearance. Provision of related veterinary care must likewise receive the same careful documentation to ensure the animals receive proper and consistent care. Trial Tr. vol. 4, 7.

Tri-State has also abdicated its responsibility to provide its animals preventative or palliative care. Preventative care is fundamental to an adequate veterinary plan because "it [is] much easier to prevent disease than it is to treat it once [disease has] manifested itself . . . . The sooner you intervene in any kind of medical condition or illness, the much higher the likelihood of a successful outcome." Trial Tr. vol. 2, 53. Preventative care requires, at a minimum, routine physical examination, blood tests, fecal examinations, and immunizations. Trial Tr. vol. 2, 54–56. Tri-State failed to provide any of it.

---

[3] Although the zoo currently has approximately fifty animals in its care, it had "three times that much back in 2010." Trial Tr. vol. 5, 22.

As to routine examinations, Tri-State records reflect little to no routine care for the animals. PX2 at 11–12. In 2014, Dr. Fox logged one visit to the zoo, and did not return for eleven months. *Id.* In 2015, he visited just twice. *Id.* Dr. Fox then waited an entire year to return and only did so for a focused evaluation of a terminally-ill Mbube in 2016. *Id.*; Trial Tr. vol. 2, 78–84. Another *year and a half* passed with no visits to evaluate *any* of the fifty-plus animals at Tri-State. PX2 at 11–12. In 2018, Dr. Duncan visited for the first time, *id.*, and Cayenne's death at Dr. Duncan's hands followed soon after. ECF No. 138 at 12. Even accepting Candy's representations that he discussed with Dr. Fox and Dr. Duncan the animals' care as needed, the consistent lack of in-person evaluations shows clearly that the provision of veterinary care remained grossly inadequate.

As a more concrete example, no record exists that any of the Big Cats received routine vaccinations for common and highly communicable diseases like rabies, panleukopenia, calicivirus, herpesvirus, as well as vaccines for distemper and feline leukemia virus, which are commonly administered to high-risk Big Cats. PX69 at 32; Trial Tr. vol. 2, 61–64. As grounds for not giving basic preventative vaccinations, Dr. Fox claimed "self-preservation…[g]iving a tiger a shot, that's difficult" and "I don't believe they are required to have any." JX39, Fox Dep. 76. No record exists of routine fecal or blood tests performed on any of the animals at issue.

When the animals became sick, Tri-State utterly failed to provide adequate and timely care. 9 C.F.R. § 2.40(b)(2) requires the maintenance of programs of care that include the availability of emergency, weekend, and holiday medical assistance when needed. In addition, palliative treatment and pain management for serious illnesses is a basic standard of care that should be offered even if the cause of the underlying symptoms is unknown. *See* PX69 at 13. Failure to do so may exacerbate a condition and interfere with an animal's ability to engage in

species-typical behavior. *Id.* Yet all the animals at issue have suffered from longstanding, chronic conditions for which veterinary care was always too little and far too late. Tri-State's "pattern of waiting until animals are very, very ill before either bringing it to the attention of the veterinarian or until the veterinarian actually comes out to look at the animals" has, according to PETA's experts, contributed to long and painful deaths of five endangered species. Trial Tr. vol. 2, 30.[4]

### 3. Lack of Enrichment

Overall the Big Cats and lemurs at Tri-State have lived in a bacteria-ridden wasteland, and in stark contrast to their natural habitats. General animal husbandry practices in the industry require that any exhibitor who chooses to keep captive such animals must provide adequate shelter and enrichment that resembles their natural habitat. Candy and Tri-State made no meaningful effort to even come close to industry standards. To illustrate the harm that Defendants have visited -- and continue to visit -- on the animals, the following section addresses each species separately.

### a. Ring-Tailed Lemurs (Bandit and Alfredo)

Ring-tailed lemurs come from Madagascar, a tropical and lush island country in Africa. PX70 at 59. Lemurs naturally are social and highly developed. They travel in packs of seven to as many as thirty and enjoy complex social structures. *Id.* at 72. Accordingly, basic animal husbandry standards require that lemurs in captivity should be housed in groups of at least four to seven. *Id.* at 72–73; Trial Tr. vol. 4, 92–93. Forcing a lemur to live a solitary existence, as

---

[4] Defendants violated generally accepted standards of care even after some of the animals at issue died. Performing a necropsy is a basic standard of care, especially on an animal protected under the ESA. Trial Tr. vol. 2, 136. Necropsies provide a definitive diagnosis for cause of death and help the zoo understand the cause and prevent it from affecting other animals. Trial Tr. vol. 2, 150. Yet Defendants failed to perform necropsies on Mbube and Bandit, even though both may have died from communicable diseases that could have infected their peer species or other animals at Tri-State.

was done to Bandit, visits permanent psychological and physical injury on a species born to engage in constant interaction with his kind. Trial Tr. vol. 2, 147–48; Trial Tr. vol. 4, 93.

The Madagascar habitat is complex and varied, such that lemurs have evolved to respond to and interact with its complex surroundings. PX70 at 59. For example, foraging, exploring, marking, and grooming are natural species-specific behavior developed in conjunction with their environment.



**Lemur enclosure**, PX12 at 12 (3/3/18)

Exhibitors who choose to care for lemurs must endeavor to replicate their natural habitat so that the animals may replicate their species-specific behaviors—which is to say, so they can simply *be* lemurs.

At Tri-State, the lemur enclosure, while sufficiently large, was barren and at odds with the lemurs' natural habitat. PX13; PX12 at 12; Trial Tr. vol. 4, 95–96. Defendants also never developed any real enrichment plan for the lemurs. Rather, Defendants' "enrichment" plan consisted of a single written page with four nondescript bullet points under "activities," and no goals or appropriate list of usable items. PX2 at 20; Trial Tr. vol. 4, 94. The "plan" never

comported with generally accepted husbandry practices, and no evidence suggests that it was ever designed to provide the lemurs any opportunity to engage in the vast array of complex and diverse behaviors known to its species. *Cf.* PX70 at 102–07 (multi-page list from a small facility outlining dozens of items and opportunities to offer lemurs to elicit a wide-range of species typical behavior). Moreover, in the decade since the "plan" was created, it has never been updated.

In practice, too, Defendants failed its enrichment obligations to its lemurs. Animal husbandry standards call for complex enclosures with "horizontal platforms, horizontal bars, tree branches, hanging tires, plastic chains, and nest boxes," PX69 at 7, along with a dynamic variety of sensory objects. *See* PX70 at 102. Yet at Tri-State, the enclosure was bare, with only a few dirty, old toys that hung in the enclosure *for years*. Trial Tr. vol. 4, 95; *See* PX30 at :50, JX19 at :44, PX13, PX11 at 6:35 (each depicting the same children's toy hanging in the lemurs' enclosure on December 11, 2014; January 28, 2015; September 16, 2015; and March 3, 2018, respectively). Moreover, the toys were often hazardous or unsanitary to the point of serving as disease carriers. Trial Tr. vol. 4, 97.

The Court credits the testimony of PETA's animal husbandry expert, Mr. Jay Pratte, whose over 25 years of training, education, and experience aided this Court in its fact-finding mission. PX70 at 1. As Pratte opines, Defendants exhibited a stunning ignorance as to how to provide the lemurs an environment remotely appropriate to their species. Pratte found that Defendants did not have "any process, information, research done…into how [to]…alleviate these [] problems, let alone that they were even aware that they were a problem to begin with." Trial Tr. vol. 4, 99.

Rather than being provided enrichment, the lemurs experienced a daily onslaught of

environmental horribles. Lemurs naturally are "olfactory" animals. They engage in scent marking and communication. Indeed, smelling is "inherent to their communication, to how they interact with one another, to detecting potential threats or resources in the environment." Trial Tr. vol. 4, 100. Smells of dung and urine are not only "inherently irritating and stressful" to the lemurs, but also "obscure their ability to understand what's happening in the world around them, and so [] directly impacts their ability to exhibit normal species-typic behavior." Trial Tr. vol. 4, 100. In fact, exposure to such offending smells can cause lemurs physical pain and permanent damage to their mucous membranes. Trial Tr. vol. 4, 100.

At Tri-State, the lemurs were surrounded by filth that undoubtedly created a significant impediment to their ability to communicate. In their own enclosures stood feces and bird waste. Trial Tr. vol. 4, 89–90. Just feet away, the potbelly pig enclosure was piled with foul-smelling pig feces. Trial Tr. vol. 1, 67; PX30 at 4:52–5:30. Directly behind them was another fecal-ridden enclosure housing two barking dogs, PX30 at 3:26; Trial Tr. vol. 1, 66, or more aptly put, "a direct predator ten feet away that is vocalizing" and thus presenting a "constant source of distress." Trial Tr. vol. 4, 85–87; JX19.

Moreover, the lemur enclosure's indoor section gave little real shelter from the elements. Lemurs come from a tropical climate, and therefore do not have insulating coats to maintain internal body temperatures when exposed to the cold. PX70 at 61. Accordingly, for exhibitors who choose to house lemurs, the Association of Zoos and Aquariums ("AZA") guidelines advise that lemurs not be subjected to temperatures below 45 degrees for longer than four hours, and that they should always have access to adequate supplemental heat. Trial Tr. vol. 2, 140; PX69 at 9. Exposure to such temperatures negatively affects lemurs' health, which can lead to hypotension, suppressed appetite, and increased vulnerability to disease. Trial Tr. vol. 2, 144;

PX70 at 61.

Cumberland in the winter is decidedly not like Madagascar. Snow falls and temperatures dip below freezing several months of the year. JX19; Trial Tr. vol. 4, 86. In 2015 alone, the animals at Tri-State were exposed to temperatures below 45 degrees for four consecutive hours for 149 days. JX17. The lemurs had little refuge from this cold. For "insulation," Candy provided two electric heaters and one heat lamp stationed below just one portion of the enclosure. PX70 at 61; Trial Tr. vol. 5, 225–26. Candy would monitor the temperature not by thermometer, but by whether the drinking water in the enclosure had frozen. JX39, Candy Dep. 151. No credible evidence exists that the heat source protected the lemurs from prolonged exposure to cold temperatures that are directly at odds with the climate of their African homeland.

### b. Lions (Mbube and Peka)

The lions live in a similarly dissonant environment at Tri-State. Although lions come from far warmer regions than Cumberland, Maryland, at Tri-State they are forced to withstand temperature extremes without proper provision. The lion enclosures allow the cats to travel freely between an indoor and outdoor area in their respective enclosures, DX1 at 7–8, but neither area offers remotely sufficient protection from Maryland temperatures. The indoor enclosures are uninsulated and unheated. Trial Tr. vol. 4, 41, 45; JX39, Candy Dep. Tr. at 133–35. Outdoors, the lions have little shelter from the snow, sleet, wind, or freezing rain.

Exposing Big Cats to inappropriately cold temperatures can lead to hypothermia, dehydration, and damage to the cats' pads and mucous membranes. PX70 at 9. Big Cats must have access to heated or cooled areas when ambient temperature falls below 30 degrees Fahrenheit, adjusted for windchill, or rises above 85 degrees Fahrenheit; greater caution must be

exercised with elderly, infant, and disabled Big Cats. PX121 at 18 (Global Federation of Animal Sanctuary ("GFAS") standards); JX17. For the Big Cats and at Tri-State, Candy monitors the temperature in the Cat enclosures by just "feeling it." JX39, Candy Dep. Tr. at 135.

The summer months are equally brutal on the cats. A few sparse trees and a single wall provide inadequate shade, especially on days when the temperatures creep into the 80s and 90s. *Compare* DX1 at 33 *with* Trial Tr. vol. 4, 25. As a result, the Cats are at risk for overheating, dehydration, heat sickness, and stroke. PX70 at 9.[5]

As for enrichment needs, lions are a highly social species who travel in prides of as many as 40 lions. They enjoy a complex social structure in which together they stalk, hunt, play, and rear young. PX70 at 22; PX69 at 38. Solitude is extremely stressful for lions and disrupts their natural social behaviors; PETA's experts opine that keeping a lion in solitude does not meet commonly accepted zoological practices. PX69 at 38 (Dr. Haddad); PX70 at 23 (Mr. Pratte).

Yet at Tri-State, Peka has lived alone in her enclosure since 2011. Trial Tr. vol. 5, 94. Prior to his death, Mbube also spent most of his life in solitude. *Id.* Even though Mbube and Peka lived at Tri-State together for several years, Defendants were never able to house them in the same enclosure. *Id.*

The outdoor areas for the two lions included nothing to engage them. No enrichment plan existed for the lions because, according to Candy, the Big Cats "make their own fun." JX39, Candy Dep. 366. Mbube had one ball. Trial Tr. vol. 4, 40. Peka's balls are punctured and dirty, as is her old, stuffed teddy bear. PX84 at 57:22–1:05:00; Trial Tr. vol. 4, 76–80. Rather than providing meaningful enrichment, these random, dirty toys were dangerous and unsanitary.

---

[5] The tigers suffer from the same exposure to the elements. The tigers must retreat into wooden uninsulated holding areas that have gaps in the wood and brick, and which are hotter than the ambient temperature in the summer and unheated in the winter. Trial Tr. vol. 4, 45; JX39, Candy Dep. Tr. at 119–20; PX70 at 36.

Trial Tr. vol. 4, 79. As Mr. Pratte aptly noted, a lion forced to live in solitude with a single ball for company is tantamount to confining a human in a single room with a single book for years on end. Trial Tr. vol. 4, 40. "That's all you get. That's the only choice you have provided to you" if you are a lion at Tri-State. *Id.*



***Peka's enclosure***, PX85 at 115 (9/22/19)

### c. Tigers (Cheyenne, Mowgli, Cayenne, Kumar, and India)

Tigers, in contrast to the lions, are generally solitary animals who should not be housed together. Trial Tr. vol. 4, 63; PX70 at 52. But Tri-State, inexplicably, housed three sibling tigers together since they were cubs, and until each met their untimely deaths. When they were alive, the two sisters, India and Cheyenne, as well as brother Kumar, were all sexually active and non-contracepted. PX69 at 18. Veterinary records reflect evidence of mating activity between India and her brother, and in direct violation of generally accepted animal husbandry practices. PX5 at 118. The tiger siblings' forced cohabitation ran contrary to their basic and natural instincts, which manifested in obvious signs of stress such as overt conflict and stereotypic pacing, as well as an imbalance in feeding. Trial Tr. vol. 4, 64–66; PX70 at 52. Kumar, the brother, feasted, while the sisters went without. At their deaths, each sister showed signs of poor nutrition. Trial Tr. vol. 2, 85–86; PX70 at 52–53; JX39, Woolard Dep. 258.

As for enrichment, the tigers lived in a fetid cesspool. The tigers' den was previously a

summer camp concrete swimming pool, and has since been repurposed by Candy to hold the tigers in captivity. With little grass or foliage, the tigers lived for years in conditions bearing little resemblance to their natural habitat. PX16, Trial Tr. vol. 4, 21–22. Due to the barren enclosure, they were given little opportunity to do what tigers do—conceal, hunt, prowl, stalk, or rest. PX 70 at 30; Trial Tr. vol. 4, 21–22, 150. Moreover, because the pool sinks below ground, the tigers were confronted constantly with visitors peering into the exhibit from above. Trial Tr. vol. 4, 21. Such placement violates generally accepted husbandry practices because it induces constant fear of threats without means to escape or hide. *Id.*




*Tiger outdoor enclosure*, PX33 (12/11/2014)        *Tiger outdoor enclosure*, PX24 (12/12/2014)

Like the lions, Tri-State gave the tigers nothing remotely resembling adequate enrichment. Rather, they had bowling balls for play that were never changed or cleaned and were broken and jagged in places. PX16; Trial Tr. vol. 4, 76; PX70 at 30–31. Lack of adequate enrichment for Big Cats can cause frustration and distress, which can, in turn, manifest as stress, hypertension, respiratory and cardiac distress, suppression of the immune system, atrophy of the hippocampus, myopathy, injury, and ultimately death. PX70 at 55–56; PX69 at 17. Such a barren environment fails to "stimulate normal species-typical behaviors in any meaningful way." Trial Tr. vol. 4, 40. *Cf.* PX70 at 30 (noting that zoos meeting industry standards would include for tigers visual barriers affording privacy, varied substrates for marking and scratching, barriers

to weather, and ledges and platforms for resting and vigilance).

### 4. Inadequate and Unhealthy Food

The food at Tri-State is commensurate with its other deficiencies. Tri-State feeds its Big Cats carcasses donated by hunters or delivered as roadkill. Trial Tr. vol. 2, 88, 95. The USDA discourages use of roadkill as food; however, if roadkill is used, it must not be left out more than 12 hours or the risk of spoilage materially increases. PX58 at 36 (2017 USDA Animal Care Policy Manual); Trial Tr. vol. 2, 96. Tri-State maintains no record of the freshness or source of roadkill nor does it employ any reliable method of evaluating the roadkill for disease or contamination. Trial Tr. vol. 2, 96, 101; *Cf.* PX 58 at 36–37 (manual requiring that roadkill be evaluated for signs of disease, chemicals, and other issues). Although Candy attests to knowing when roadkill is fresh, his methods are rudimentary at best. Trial Tr. vol. 5, 40 (explaining that if the dead animal's "legs are sticking straight up in the air[,] [i]t's the sun dial effect and so we don't take those").

Candy has also admitted to allowing carcasses to remain in the Big Cats' enclosures for up to three days, or six times as long as recommended by the USDA. JX39, Candy 30(b)(6) Dep. 169 (stating that on at least one occasion, Mbube consumed a deer carcass over "more than three days" and subsequently stating that "[i]t's usually only for a couple of days we'll leave a carcass sitting there."). Notably, the Defendants' repeated defiance of USDA guidelines presents not only loss in nutritional value but also places the Big Cats at risk of "serious [gastrointestinal] diseases" including sepsis, from which India succumbed. Trial Tr. vol. 2, 96–101.

Nor does Tri-State employ generally accepted standards in handling frozen meats fed to the Big Cats. According to the USDA, "the thawing process is crucial to the product's final quality … [i]ncorrect thawing increases the potential for nutrient loss, lipid peroxidation

(rancidity), microbial buildup, and loss of palatability." PX57 at 10 (2001 USDA Manual on Handing Frozen/ Thawed Meat and Prey Items Fed to Captive Exotic Animals). Meats must be thawed under refrigeration," "never…at room temperature" and not "in standing water," in order to maintain freshness and nutritional integrity. *Id.* at 36–37.

Robust evidence demonstrates that Candy defies these standards. In 2014 and again in 2018, PETA representatives documented piles of grocery store meat, some expired, left to thaw in a heated room under the reptile exhibit while domestic cats foraged freely atop the packages. Trial Tr. vol. 2, 86–87, 107–11; PX11 at 22:00–22:35. Although Candy at trial maintained that such meats were not fed to the Big Cats, he testified otherwise in his deposition and to the PETA representatives. JX39, Candy Dep. 258–59 (stating that some of the meat stored in the furnace room under the reptile exhibit goes to the Big Cats). The Court credits that the Big Cats were indeed exposed to such rotting, putrid meats.



***Donated food in furnace room***, PX11 at 22:09 (left) and 22:31 (right) (3/3/2018)

Critically, Candy and Tri-State persisted in feeding the Big Cats dangerous spoiled food and ignored the ready availability of "[a] number of commercially prepared diets…appropriate for the varying needs for exotic or wild felids." PX58 at 36 (USDA Animal Care Policy Manual). Nor did Tri-State ever enlist the assistance of a trained veterinarian, preferably in

consultation with a nutritionist, to make sure the Big Cats were given a safe and balanced food supply. *Cf. id.* Tri-State maintains no records of written diets, or the use of supplements, but does have a record of feeding their Big Cats vastly outsized amounts of processed meats and roadkill, which also controverts husbandry standards. In short, the Big Cats were not provided "basic nutritional needs," Trial Tr. vol. 2, 88, 93–95, the absence of which "result[s] in skeletal, structural damage, neurologic problems, or other potentially irreversible health problems including death." PX58 at 36.

Fresh water, too, is scarce for the tigers. Records show that the pools in the outdoor enclosures are chronically filthy. PX24 at 6:30–7:05; PX33; Trial Tr. vol. 1, 166. Water in the indoor enclosures is similarly dirty and confined to small dog bowls. *See, e.g.,* PX28. Tigers tend to defecate in the pools they sip from and failure to regularly clean the water sources "expose them to a variety of enteric pathogens and put them at risk of disease." PX69 at 20. Unsurprisingly, no one at Tri-State tests the water supply in the tigers' enclosure. *See* JX39, Candy Dep. 168 ("Q. Is [the water in the tigers' pool] tested at all? A. No.").

 

*Tiger drinks from feces-lined pool*, PX 24 at 6:50 and 7:00 (12/12/2014)

The lemur's diet, like those of the Big Cats, was also deficient. Lemurs should eat "[a]ssorted fruits and vegetables, mazuri leafeater primate biscuits, . . . a grain/seed mix." PX69 at 14. They should not eat foods high in sugar and starch, which "can contribute to diarrhea,

obesity, dental decay, and diabetes." *Id.* However, at Tri-State, Bandit and Alfredo were regularly fed grapes, gummy bears, and baked goods. *See, e.g.,* JX39, Candy Dep. 215, 393–94 (discussing treating the lemurs with baked goods, such as cupcakes, every day); JX 39, Candy 30(b)(6) Dep. 371. No evidence demonstrated that Defendants knew or cared about feeding the lemurs properly.

## B. Deaths at Tri-State

In just over three years, *five* of the nine ESA protected animals at Tri-State have died early and tragic deaths. The Court incorporates its determinations at the summary judgment stage regarding Cayenne's death, which corroborate Defendants' other ESA violations, but will not repeat those facts here. However, the deaths of the other four animals remain critical to understanding why Defendants have so flagrantly violated the ESA. The Court, therefore, summarizes its findings of fact as to each animal in order of their deaths.

### 1. Mbube, the Lion

Mbube (also known as "Bu") was born March 15, 2005, lived most of his life in solitude, and was euthanized on December 15, 2016. At the time of his death, Bu was only 11 years old, well short of a captive lion's average lifespan of 16 to 18 years old. PX1 at 9; Trial Tr. vol. 2, 161. Although the Court does not know exactly what killed Bu, that is in part because Tri-State chose not to perform a necropsy on him. The uncontroverted evidence, however, reveals that Bu met a slow and painful demise without any real veterinary care.

On August 2, 2016, Candy first noted that Bu's mane was "darkening [in] color" and thinning. Bu was also "eating less." PX1 at 13. As of that date, Bu had lost so much weight that Candy could see his "bare hips protruding more than normal" and noted Bu experienced "watering from the eyes." PX1 at 17. Candy did not seek any veterinary help for Bu.

Bu's condition persisted.  So later in August, Candy called Dr. Fox.  Dr. Fox never examined Bu in person, and instead gave his *own personal prescription of testosterone* to Candy, who then administered it to the lion.  Trial Tr. vol. 5, 209; PX1 at 13, 17; JX39, Fox Dep. 306; PX10 at 82.  Not surprisingly, Bu's condition worsened.

 

*Bu, healthy*, PX35                    *Bu on September 11, 2016*, JX34

Based on a review of the above right-hand photo, taken on or around September 11, 2016, Dr. Haddad opined that Bu was emaciated.  Trial Tr. vol. 2, 170.  "You can see very prominent pelvic bones.  His femur is sticking out.  You can see his vertebra along his spine. You can see his ribcage."  Trial Tr. vol. 2, 169.  Again, Dr. Fox prescribed an antibiotic, Clindamycin, to Bu without having first examined the lion.  Trial Tr. vol. 5, 67; PX1 at 13.

Another month passed without any improvement in Bu's condition.  Defendants' dereliction as to Bu led to the USDA citing Tri-State and Candy for failure to provide the lion adequate veterinary care.  PX10 at 82.  As the USDA report notes, Bu "is not in good health or body condition.  He appears thin and the pelvic bones are prominent.  His coat is rough and has turned a dark brown.  And the mane has thinned, as would be seen on a one-year old lion.  There is also a watery discharge around the lion's eyes."  *Id.*[6]

---

[6] In fact, the USDA has cited Tri-State for dozens of violations, some of which resulted in a 45-day suspension of the zoo's license.  *See* PX10; JX8.

On October 11, 2016, a couple days after the USDA visit—and more than two months after Candy observed Bu in dire physical straits—Dr. Fox finally examined Bu, PX3 at 10, and performed blood tests two days later. *Id.*; PX4 at 25. Although Dr. Fox speculated that Bu may be suffering from hypothyroidism, Addison's disease, or a pituitary tumor, his speculations were plainly off-base. JX39, Fox Dep. 72, 180; 305 PX1 at 14. As Dr. Haddad noted, not only are such conditions extremely rare in Big Cats, the test results did not support Dr. Fox's tentative diagnoses. Trial Tr. vol. 2, 172–75. Rather, according to Dr. Haddad, the blood test, combined with the physical condition of Mbube, signaled anemia, which could be caused by other diseases or conditions. Trial Tr. vol. 2, 174. Without further tests (which were never performed), Bu's condition could not be definitively diagnosed. Trial Tr. vol. 2, 175; *see also* PX69 at 60 ("When test results like this occur, the generally accepted practice is to perform additional diagnostic testing to get an actual diagnosis, and then treat the underlying disease.").

Two more months passed. Bu continued to worsen. By December, he could not stand or walk properly, and was not eating or drinking. PX1 at 15. Bu was also falling over, "causing numerous cuts [and] abrasions (largest bleed from tail)." *Id.*; PX69 at 62. Yet Tri-State and Candy did nothing to treat Bu's medical condition or make him comfortable with palliative care. Trial Tr. vol. 2, 177. Bu was euthanized two days later on December 15, 2016. PX1 at 15. Although Candy and Dr. Fox lamented the "mystery" of Bu's condition, Defendants declined to perform a necropsy on Bu, which would have provided important evidence regarding his cause of death.

### 2. Bandit, the Lemur

Bandit was born August 18, 2005, lived most of his life alone and died on January 15, 2018. PX1 at 1. The scant medical records reveal that Bandit never received any preventative

veterinary care, such as regular check-ups, vaccinations, or routine tests. Records from 2006 reflect that he received one fecal test. PX1 at 2.

Bandit, however, suffered from a protracted respiratory infection for nearly two years, from 2016 till his death in January 2018. *See* Trial Tr. vol. 5, 83–85; PX1 at 3–6 (Candy writing "congestion" and "still concern with breathing, making a gurgling sound, no drainage from eyes, nor sinuses); PX4 at 40 (record of prescriptions given to Bandit); PX4 at 39 (record from hospital noting "shallow breathing" as the reason for the initial January 15, 2018 visit). Although Candy says otherwise, no medical record supports that Bandit received *any* examinations until the day of his death. Rather, the records more clearly reflect that Dr. Fox prescribed Bandit a series of medications, again without examining the animal, as was evidently custom at Tri-State. *Compare* PX1 at 3 *and* PX4 at 40 (noting prescriptions) *with* JX39, Fox Dep. 281 ("Q: But you don't have any record of why you would have dispensed it? A: No, it may have been in one of those conversations he came in and asked questions and we said to try this to see if it improved.").[7]

On January 14, 2018, Bandit was first observed "bleeding from genital area" where he had "torn skin and bites." PX1 at 4. Candy took Bandit to Dr. Fox the next day, who documented "torn prepuce, damage to penis tip." PX4 at 38. In layperson's terms, Bandit had ripped off his own penis. JX39, Fox Dep. 289–90, 375–76. On the same visit, Dr. Fox took x-rays of Bandit, and diagnosed Bandit with disc disease on his vertebra. PX4 at 83–85, 38.

It was at this same visit that Bandit died. JX11 at 15. Defendants now assert, with *no* medical support, that Bandit died from "cancer." PX1 at 1; JX11 at 15 (Defendants' response to

---

[7] Bandit also experienced wide fluctuations in his weight over a short period of time, from three pounds to as much as six. PX4 at 40; PX1 at 3. On the day he died, Bandit weighed 4.1 pounds. PX4 at 38. According to Dr. Haddad, "[t]his degree of weight loss is suggestive of an undiagnosed and untreated underlying disease condition." PX69 at 12.

interrogatories: "He died of cancer during a visit to the veterinarian…The tumor was a degenerative tissue disease affecting the mouth and sinus cavities and was not operable."); *Cf.* Trial Tr. vol. 2, 126–27 (Dr. Haddad noting that, of the evidence provided, none points to cancer). And again, Defendants chose not to perform a necropsy on Bandit, even though Candy has kept Bandit's body, wrapped in a trash bag, in a freezer on zoo grounds and for reasons not altogether clear to the Court. JX11 at 5; Trial Tr. vol. 2, 136, 150. The Court does not credit that Bandit died of "cancer."

The Court does credit, however, that at the time of Bandit's death, he likely was in "a lot of pain" and hypothermic. JX39, Fox Dep. at 260–62. In fact, evidence shows Bandit was suffering from untreated pain stemming from his unresolved respiratory infection. PX4 at 39. However, like all the other protected animals who died long deaths at Tri-State, no record evidence reflects Bandit having received any palliative care. PX69 at 13.

It is also beyond dispute that Bandit exhibited signs of significant distress. Both Dr. Haddad and Mr. Pratte opine that Bandit's ripping at his penis represented a long-term condition due to chronic stress and anxiety. *See* Trial Tr. vol. 2, 137 (Dr. Haddad) ("self-mutilation is a well-known cause or presentation of result of chronic stress and anxiety… [s]o it's most likely that he did this to himself, and I would say my suspicion would be that it was due to stress and anxiety"); Trial Tr. vol. 2, 138 (Dr. Haddad) ("I did not see anything to suggest that there was a medical problem that caused him to in this one instance bite at his genitals. So there's definitely an underlying most likely psychological problem. Again, stress, anxiety would be my conclusion as what caused him to self-mutilate himself."); Trial Tr. vol. 4, 101 (Mr. Pratte) ("I think that Dr. Haddad was correct with a high probability that this was behavioral."). Because Bandit suffered no underlying medical condition to explain his mutilated genitals, and in

combination with the deplorable conditions in which Bandit lived every day—isolation or near isolation, stinky filth, predators nearby—the Court credits PETA's experts' conclusion that Bandit's self-mutilation was in "response to chronic distress." Trial Tr. vol. 4, 102.

### 3. Kumar, the Tiger

Kumar was born at Tri-State on March 24, 2007, along with his siblings India and Cayenne. PX1 at 38. Cheyenne, who remains at Tri-State, is their mother. Trial Tr. vol. 5, 100. Kumar died on July 7, 2019, at 12 years old, well short of the average life span of tigers, who live into their teens and twenties in captivity. PX6 at 1; Trial Tr. vol. 2, 161.

Kumar's necropsy revealed that Kumar died of a spinal infarct, or stroke of the spine. It is a rare condition and cannot be attributable to Defendants' acts or omissions. Trial Tr. vol. 2, 208–09. However, the other findings on the necropsy, in concert with the record evidence submitted at trial, show clearly that Kumar died a long, painful death resulting from his years of captivity in a fetid, concrete swimming pool.

On June 27, 2019, Candy noted that Kumar "was down" in an area where the cats usually defecated. PX1 at 53. Two hours later, Kumar had still not moved. *Id.* Candy notified Dr. Fox's replacement, Dr. Duncan, who evaluated Kumar and gave him steroids, by injection, although the course of treatment was not medically indicated. *Id.* At that point, Kumar could not stand or lift his head normally; he leaned on the platform for support and had been incapacitated for eight hours. PX1 at 53; PX5 at 106.

The next morning, Candy noted that Kumar had dragged himself roughly 30 feet across his enclosure; he had also chewed on both wood and meat. PX1 at 53. In the days to follow, Kumar's condition continued to deteriorate. He had difficulty raising his head and could not get up. *Id.* at 54–55. Then, he had to be hand-fed. *Id.* at 55. On July 1, 2017, Kumar was given,

without explanation, another steroid shot. *Id.* at 56. He could not stand and he could not eat. Candy had to syringe blended food and water directly into his mouth. *Id.* Kumar's condition remained the same for seven more days, till his death on July 7, 2019. *Id.* at 57.

For the *ten days* Kumar was down, he received no meaningful care. Although Dr. Duncan recommended on her first visit on June 27, 2019 that Kumar be euthanized if he did not improve, Candy and Tri-State never gave the tiger anything to manage his pain and obvious distress. PX5 at 106. Five days later, on July 2, 2019, Dr. Duncan again noted that Kumar "remains completely unable to rise" and "strongly recommended euthanasia" to put Kumar out of his pain and suffering. PX5 at 104. The "humane thing to do," Dr. Haddad opined, would have been to euthanize Kumar as Dr. Duncan recommended. Trial Tr. vol. 2, 211. Candy chose instead to let Kumar suffer.

Alternatively, "[a]t the very minimum," Kumar "should have been given something for pain." Trial Tr. vol. 2, 210. Candy did not. PX5 at 104.[8] On July 7, ten days after first being found down and immobile and seven days after being unable to eat without food being syringed into his mouth, Kumar died.

The other results of Kumar's necropsy bespeak the horribly painful way in which he died. Kumar's mouth was riddled with ulcers, cuts, and other injuries at the time of his death. Large portions of two canine teeth were missing, exposing the raw pulp. PX6 at 2, 10. One canine tooth had punctured Kumar's mandible, creating a deep, penetrating wound. Trial Tr. vol. 2, 194. His gums were heavily inflamed, and, deep sores lined his mouth. PX6 at 2, 10; Trial Tr.

---

[8] *See also* Trial Tr. vol. 2, 212 ("Q: And do you see any recommendation by Dr. Duncan in her entries at this point in time, July 2, 2009, recommending palliative care, pain meds, anything, something to make him more comfortable? A: No. Unfortunately, no" "Q: Just one last question. Pain meds for a tiger, I mean, are they expensive? A: They don't have to be. You can—aspirin can be given to cats. That's pretty cheap. They are injectable. There's a whole variety of medications that could be tried. So there is no excuse to not give pain medication.").

vol. 2, 191–97.  The ulcers, broken teeth, wounds, and inflamed gums were not only chronic, but consistently painful.  Trial Tr. vol. 2, 191–97.


*Necropsy photo of Kumar*, PX6 at 10

Kumar also had open and painful ulcers and lesions on each of his paw pads and the side of his hind legs.  PX6 at 6.  The ulcers and lesions were consistent with walking and laying on concrete his whole life and then becoming infected through exposure to the filth and feces in his enclosures.  Trial Tr. vol. 2, 197–200.  As Dr. Haddad noted, Kumar's ulcers presented as having developed over time, Trial Tr. vol. 3, 142.  The skin from the padding under Kumar's toes was also "gone…falling off…unhealthy."  Trial Tr. vol. 3, 156.

At the time of death, painful ulcers also lined Kumar's stomach, which was empty but for some grass and wood.  PX6 at 6; Trial Tr. vol. 2, 204–07.  Kumar's colon was distended by firm feces composed predominantly of large mats of fur, and there was a two-centimeter long tear and hemorrhaging in the membrane of his abdominal cavity.  *Id.*  Dr. Haddad opined that given the state of Kumar's numerous infections, administering steroids was not recommended, and without also prescribing medication to protect Kumar's stomach, the steroids quite likely contributed to his severe stomach condition.  Trial Tr. vol. 2, 204–07.

### 4. India, the Tiger

India was born March 24, 2007 and died August 14, 2019, just over a month after her brother Kumar and at an age significantly younger than the average life expectancy for tigers held in captivity. PX1 at 41; PX7 at 1. Prior to her death, she did not receive any routine examinations or preventative veterinary care.

India died of sepsis and myocarditis (enlarged heart). PX7 at 3. Sepsis is a severe systemic bacterial infection that tigers simply do not contract in captivity. Trial Tr. vol. 3, 9, 28; PX69 at 104. Sepsis ravaged India's body so intensely that pus-filled pockets had formed in her heart, tongue, and diaphragm. PX7 at 3; Trial Tr. vol. 3, 27. The pathologist report notes that the sepsis was likely due to an untreated or poorly treated bacterial infection and that the myocarditis was in turn the result of the sepsis. PX7 at 3. Dr. Haddad opines that India's sepsis was likely brought about by exposure to contaminated food or water and perpetuated by poor sanitary conditions and a lack of preventative care. Trial Tr. vol. 3, 10–11.

India's suffering was great, needless, and ignored. In the month before her death, she ate hardly anything; at the time of her death, her intestinal tract was completely empty, and she was pale and icteric. PX7 at 3. Icterus is either caused by liver disease or the result of a prolonged period of anorexia, the latter of which was the likely culprit. PX69 at 104. Additionally, the pus-filled pockets in her heart and diaphragm made her every breath painful.

Despite these symptoms, Tri-State and Candy ignored India's serious condition. Although she had not eaten much during July, Candy summoned no veterinary assistance. By the time Dr. Duncan saw India in the beginning on August 10, 2019, the cat was already sick. That day alone, she had not moved, ate, or drank, and, atypically, had allowed Candy to enter her pen. PX7 at 3; PX5 at 118. Indisputably, India was gravely ill. Trial Tr. vol. 3, 19.

Blood tests on India revealed that she was suffering from a severe infection[9] necessitating immediate aggressive, broad spectrum antibiotic therapy, as well as fluid therapy and pain medication. PX5 at 119; PX69 at 102; Trial Tr. vol. 3, 21. Defendants, however, did nothing for three more days. PX5 at 115–119. India's condition deteriorated rapidly, and on August 12 and 13, after India had stopped eating and eliminating her bowels, Dr. Duncan urged immediate transfer to a facility that could conduct further diagnostics and life-saving surgery. PX5 at 115. Candy declined—even when Dr. Duncan stated that India "will likely die without a referral." *Id.*

Not only did Defendants neglect to treat India's infections, they also did nothing to make her comfortable. For over a month, India ate little to nothing as a virulent infection ravaged her body. Her heart was enlarged, which is "considered incredibly painful. It's like having a heart attack." Trial Tr. vol. 3, 20. The diaphragm was similarly infected and filled with pus— "so every time she took a breath, she was in pain." *Id.* India received no palliative care. Not even aspirin. *Id.*

Defendants' abject neglect of India was not confined to her last month. Throughout her life, flies feasted on India's ears. PX1 at 44 (Candy noting "[t]ips of ears raw. prob due to flies"); PX1 at 43 (2017 medical record stating "continue to treat ears for scratches/ flies"); Trial Tr. vol. 1, 166 (2018 Zoo visitor describing tiger's ears covered in flies and dripping blood). Defendants offered India minimal treatment for her ears (sprays and cleaning) but did not take steps to rectify the source of the problem (likely, sanitation issues), even though Candy noted that the problem was reoccurring. PX1 at 43–44.

Ear conditions like this, according to Dr. Haddad, are entirely preventable through proper

---

[9] Dr. Duncan offered a potential diagnosis of pyometra, an infection of uterus, on August 10, 2019, PX5 at 118, which according to Dr. Haddad was a reasonable hypothesis that needed to be further explored and ruled out, but Defendants took no such action.

sanitation and treatment.  Trial Tr. vol. 3, 31.  Remarkably, India's ears had been eaten so badly

and for so long that the veterinarian who performed her necropsy believed that her ears had been

"surgically truncated."  PX7 at 4.  No record evidence suggests India had undergone such

surgery.  Instead, India's "ear tips were so chronically eaten away by flies that it appeared to the

pathologist as though someone had actually cut off some of that tissue."  Trial Tr. vol. 3, 28.

### C. The Three Living Protected Animals Currently at Tri-State

#### 1. Peka, the Lion

Peka, born April 21, 2011, came to the zoo when she was two days old.  PX1 at 23.

Since then, she has lived in solitary confinement, in a barren enclosure devoid of meaningful

enrichment, completely divorced from her natural pride habitat.  PX69 at 37–38.  Peka, as a

female lion, is particularly social.  PX69 at 38.  PETA's experts agree that Peka's solitary

confinement produces a constant source of stress and negatively impacts her physical and

psychological health—conditions magnified by little to no enrichment.  PX69 at 38–41.  Peka's

stress is evident from a well-worn path on the perimeter of her enclosure.  PX69 at 41.  Despite

having a sizeable plot of land to roam, Peka has paced back and forth and worn the grass down to

the dirt.  *Id.*

Stereotypic pacing is a generally accepted sign of stress in Big Cats and should be

addressed promptly.  PX70 at 10.  No evidence exists that Defendants have done anything to

rectify Peka's stress, or even that they have recognized that she is in distress.

It is undisputed that Peka also suffers from an abnormal gait yet has never been examined

or treated for it.  PX70 at 16; Trial Tr. vol. 2, 180; PX69 at 51.  The abnormal gait likely causes

Peka discomfort and pain and puts her at risk of further joint problems such as degenerative joint

disease.  Trial Tr. vol. 3, 134; PX70 at 16; PX69 at 51.  But because Peka has received no regular

veterinary care and was taken from her mother immediately after her birth, Defendants' chronic

inattention has put Peka in a black box as to her health status. PX69 at 46–47; Trial Tr. vol. 2,

178–80.

### 2. Cheyenne, the Tiger

Cheyenne was born March 2003, and like Peka, her health remains a mystery because

Defendants have provided her no health care. PX1 at 45. She has lost all three cubs, Cayenne,

Kumar, and India. And yet even after their terrible deaths, Defendants have not performed any

laboratory testing, nutritional assessment, or other physical examination to protect Cheyenne

from a similar fate. PX69 at 109. She has also not been tested for feline viral diseases, nor has

she received any of the recommended feline vaccines. *Id*. However, Cheyenne remains in the

same deplorable conditions as the other four dead Big Cats.

### 3. Mowgli, the White Tiger

Mowgli is a white tiger, born July 31, 2009 and acquired by Tri-State shortly after. PX1

at 34. Mowgli has suffered for many years and continues to suffer from a reoccurring skin

condition. PX1 at 35 (medical form from 2014, 2015, 2016, and 2017 stating that skin condition

is an "annual concern"); JX39, Candy Dep. Tr. at 296 (testifying that they treat Mowgli's skin

condition every year). Defendants speculate that Mowgli has either rain rot or ringworm. PX1

at 35–36; Trial Tr. vol. 5, 97 ("We had that tested with a skin scraping and some hair tissue, and

I was told it was either rain rot or ringworm"). Despite Defendants' belief that these two

conditions are the same, Trial Tr. vol. 5, 98, they are markedly different. Ringworm is a fungal

infection with a range of treatments. PX70 at 42. Rain rot is a bacterial infection, requiring a

completely different medical course of treatment. *Id*. A definitive diagnosis is easily obtained

through a skin biopsy. Defendants have not obtained the biopsy and nothing in the record

suggests their disinclination will change in the future. Trial Tr. vol. 3, 33–34; PX70 at 42.

Mowgli's skin condition manifests itself in red, itchy hotspots and large patches of lost fur. JX20. The condition creates a risk of additional infections as the loss of fur allows bacteria—plentiful in Mowgli's unsanitary enclosure—to enter his skin and proliferate, and the constant rubbing of his skin across the deteriorating wood in his enclosure drives bacteria further into his lesions. Trial Tr. vol. 3, 32, 35. In addition, because Mowgli is a white tiger, he suffers from an already compromised immune system, making him especially susceptible to disease, and thus, especially vulnerable to Defendants' inadequate care. PX69 at 20.

The Court credits that Mowgli's skin condition has been caused and exacerbated by Defendants' dereliction. Trial Tr. vol. 4, 35–36; Trial Tr. vol. 3, 36. His enclosures are uninsulated, damp, rarely cleaned, and filled with feces and rotting carcasses. *See* PX27. He is fed contaminated food and is constantly exposed to diseases from humans, free-roaming cats, and other animals. Defendants have not taken any meaningful steps to change Mowgli's environment since this litigation began almost three years ago.


*Mowgli*, JX20 at :04 (1/28/2015)


*Mowgli*, PX85 at 95 (9/22/2019)

Of the screenshot on the left, Dr. Haddad opined, "Where we see the pink, those are patches of hair loss. So alopecia…[i]t's a hard to see here, but it is moist. So he's got a secondary bacterial infection happening already. . . he's continually rubbing his body against this plywood wall because it's extremely itchy. He's very uncomfortable. And by doing that, he's continuing to basically drive bacteria into his skin, which is going to create an even worse bacterial infection." Trial Tr. vol. 3, 35.

Mowgli is also severely overweight. *See* right-hand photo above (taken Sept. 22, 2019).

His body condition score is 7 on a scale of 1 through 9, with 9 being morbidly obese. PX69 at 106. He is flabby and untoned, also reflecting muscle loss. *Id*. Like the other protected animals at Tri-State, nothing is known about Mowgli's medical history. As a white tiger, Mowgli is immune-compromised and thus susceptible to diseases, and despite his suffering for years with an obvious skin condition, Defendants have produced no record evidence that Mowgli has *ever* had a routine examination by a veterinarian or received basic vaccinations. PX69 at 107.

### D. The Lone Escapee: Alfredo, the Lemur

Alfredo's birthday is unknown (though Candy guesses he is nine years old), and he was acquired by Defendants on June 11, 2012. PX1 at 7; JX7 at 1. He shared an enclosure with Bandit for five and a half years, before Bandit's death on January 15, 2018. Alfredo was then transferred to the Maryland Zoo on March 1, 2018, by agreement. JX7 at 3. Thus, even though Alfredo is not currently at Tri-State, the Court must reach whether he had been subjected to a take in so far as Defendants may seek to return Alfredo to Tri-State.

The Maryland Zoo, prior to receiving Alfredo, asked Candy for medical records so that they could plan for his stay. JX7 at 5. Candy responded by email, "He is pretty easy. No medical form as he has never been sick nor needed any vet care while at our zoo." *Id.* Indeed, no medical records for Alfredo exist for his entire six years at Tri-State. Clearly, Alfredo had undergone no preventative care at Tri-State—despite being housed in a barren enclosure surrounded by olfactory (urine, feces, decaying leaves) and auditory (dog barking) stressors. Candy's assumption raises the obvious question posed by Dr. Haddad: How do they know Alfredo's never been sick, if they've never examined him? Trial Tr. vol. 2, 155.

By contrast, Alfredo's first month at the Maryland Zoo generated 19 pages of veterinary records. JX6 at 1–19. Alfredo's "first couple of weeks [at the Maryland Zoo]" provided "more

care than he received…for his entire life [] at Tri-State."  Trial Tr. vol. 2, 157.

## II.  Standard of Review

The Endangered Species Act ("ESA") protects covered animals, which include lions, tigers, and lemurs, from an unlawful taking.  16 U.S.C. § 1538(a)(1)(B); 50 C.F.R. §§ 17.11, 17.21(c), 17.31(a).  The ESA also prohibits possession of unlawfully taken lions, tigers, and lemurs.  16 U.S.C. § 1538(a)(1)(D).

To "take" a species means to "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or attempt to engage in any such conduct."  16 U.S.C. § 1532(19).  A "take" must be construed in the "'broadest possible manner'" to provide maximum protection under the Act.  *Babbitt v. Sweet Home Chapter of Communities for a Great Or.*, 515 U.S. 687, 704 (1995) (quoting S. Rep. No. 93-307, at 7 (1973), reprinted in 1973 U.S.C.C.A.N. 2989, 2995).

One manner in which an animal is subject to a take under the ESA is if the animal is harassed.  To "harass" a covered animal means to intentionally or negligently "create[] the likelihood of injury to wildlife by annoying it to such an extent as to significantly disrupt normal behavioral patterns."  50 C.F.R. § 17.3.  Pertinent to this matter, inadequate housing and care of lemurs and tigers may constitute "harassment" as defined under the ESA.  *Kuehl v. Sellner*, 161 F. Supp. 3d 678 (N.D. Iowa 2016), *aff'd*, 887 F.3d 845 (8th Cir. 2018).

An animal is also "taken" if he is harmed.  Harm "means an act which actually kills or injures wildlife." 50 C.F.R. § 17.3.  The ESA also prohibits attempted harm, and as such, manifests that the statute is "designed to include claims of future injury."  *Animal Welfare Inst. v. Beech Ridge Energy LLC,* 675 F. Supp. 2d 540, 563 (D. Md. 2009), *judgment amended*, No. 09-1519 (RWT), 2010 WL 11484179 (D. Md. Jan. 26, 2010); *see also People for Ethical Treatment of Animals, Inc. v. Miami Seaquarium,* 879 F.3d 1142, 1150 (11th Cir.), *adhered to on denial of*

*reh'g sub nom. People for the Ethical Treatment of Animals, Inc. v. Miami Seaquarium*, 905 F.3d 1307 (11th Cir. 2018) (reading "harm" to also include a *threat* of serious harm).

The Court recognizes that the interpretation of the ESA as to the degree of injury or potential injury necessary to constitute harassment or harm is scant and in disharmony. In *Graham v. San Antonio Zoological Soc'y*, for example, the court determined that harm or harassment under the ESA requires "more than any minor injury or harm in the literal sense" but "comes short of requiring a 'grave threat.'" 261 F. Supp. 3d 711, 743 (W.D. Tex. 2017). However, at least one other court has required proof of "threat of serious harm," although not limited just to "deadly or potentially deadly harm." *Miami Seaquarium*, 879 F.3d at 1150. This Court need not wade into this debate because, as more fully explained below, the evidence overwhelmingly demonstrates that every protected animal has been harassed, harmed, or both in a most grievous fashion at Tri-State.

## III. Analysis

### A. Standing

As a preliminary matter, the Court addresses PETA's standing to bring this suit. At trial, Defendants argued that PETA had not suffered a sufficiently concrete and particularized injury to confer standing. Based on the record evidence, however, the Court finds that PETA indisputably has standing.

PETA as an organization may establish what is known as organizational standing on its own behalf. *Equal Rights Ctr. v. Equity Residential*, 798 F. Supp. 2d 707, 719 (D. Md. 2011). Organizational standing is conferred where the defendants' misconduct causes injury to the organization by frustrating the organizational mission, thus requiring the organization to divert resources in response. *Id.* at 720; *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982).

The record evidence at trial demonstrates that PETA's mission has been frustrated through its protracted involvement in attempting to prevent the abuse of protected species and correct the misperception that Tri-State properly cares for the same. *Compare* Trial Tr. vol. 4, 181–82 (Brittany Peet, Director of the Captive Animal Law Enforcement Division of PETA, noting that PETA's mission requires it to protect and rescue animals from conditions of abuse and neglect) *and id.* at 183 (noting that Defendants' actions have impaired this mission) *with People for the Ethical Treatment of Animals, Inc. v. Miami Seaquarium*, 189 F. Supp. 3d 1327, 1338 (S.D. Fla. 2016), *aff'd*, 879 F.3d 1142, 1146 n.5 (11th Cir. 2018), *adhered to on denial of reh'g*, No. 16-14814-BB, 2018 WL 4903081 (11th Cir. Oct. 9, 2018) (finding that the alleged "take" of an animal is in "direct conflict with PETA's mission of protecting animals" and therefore evidence in favor of satisfying the "injury in fact" element of the standing analysis); *Compare* Trial Tr. vol. 4, 183–87 (Peet citing examples of how Defendants deceptively hold themselves out to be a sanctuary, thereby creating the public misperception that their animal welfare standards are acceptable, if not laudable) *with Organic Consumers Assoc. v. Sanderson Farms, Inc*., 284 F. Supp. 3d 1005, 1011 (N.D. Cal. 2018) (finding standing for organizations that promote organic consumption in suit against company that deceptively labeled products as "natural").

The record evidence also establishes that PETA has diverted significant resources in response to Tri-State's actions. Trial Tr. vol. 4, 188–214 (Peet testifying that since 2006, PETA has complained to the USDA and other regulatory agencies, monitored inspection records, raised awareness of Defendants' actions through media, and filed lawsuits—all of which occupy a significant amount of time and resources). The Court thus finds that PETA has standing to bring this suit.

**B. Defendants Have Subjected the Protected Animals to a Take**

The dead animals at Tri-State share frighteningly similar experiences that, in retrospect, foreshadow their early deaths. All lived in squalid conditions, languished with no enrichment, failed to receive preventative care, were evaluated by a veterinarian only when on the brink of death, were misdiagnosed, and received no pain management to ease their suffering. The remaining animals live in the same conditions as did their predecessors, only they are lucky to have survived thus far. The Court finds that each of the protected animals has been subjected to a take under the ESA, as addressed by species below.

**1. The Lions**

The Court finds that Tri-State's deplorable conditions have harassed Peka and Mbube. Each has lived in isolation and were given no "social interactions [that] are integral to the well-being of lions." PX70 at 22. For years, neither Bu or Peka had any chance to engage in a wide range of normal social behaviors, such as grooming, stalking, hunting, and play. PX69 at 38. Their enclosures are barren. They are exposed to harsh temperatures with little reprieve. A well-worn path in the enclosure reflects that the stress of such an environment resulted in repetitive pacing. PX69 at 41. Peka, the only living lion, is in indefinite isolation. She lives, in short, wholly contrary to how nature intended. The creation and perpetuation of drastic conditions has fosterd the likelihood of serious injury to Peka "by annoying it to such an extent as to significantly disrupt normal behavioral patterns." 50 C.F.R. § 17.3.

The Court further finds that Defendants' failure to diagnose and treat Peka's gait abnormality constitutes harassment under the ESA. Peka's longstanding condition likely causes her chronic pain and interferes with species-typical behaviors, including walking, roaming, and scratching. Trial Tr. vol. 2, 180; PX69 at 51. Peka's gait abnormality is obvious to Defendants,

yet nothing has been done to treat Peka—ever—despite the availability of simple diagnostic tools such as an x-ray. Trial Tr. vol. 2, 181–83. Refusing to treat Peka has likely exacerbated her condition in such a manner that significantly interferes with her normal species behavior. Thus, Defendants have subjected Peka to a take under the ESA.

Defendants have likewise taken Bu. For Bu's entire life, Defendants provided him no veterinary care. *See supra* Section I.B.1. At the end of his life, he suffered for months before Defendants even notified a singular, patently unqualified veterinarian. By this point, Bu was starving. He was emaciated. He had received so little attention that the USDA required that Defendants provide Bu adequate veterinary care under penalties of losing their exhibitor license. Defendants anemic attempts to comply with the USDA are reflected in the results. Nearing death, Bu was at one point so weak that he was constantly falling over, cutting and bruising his own body. *See supra* Section I.B.1. It is without question that Defendants have harmed Mbube, to the point of a painful death, and in violation of the ESA.[10]

### 2. The Tigers

The Court next finds that Defendants provision of squalid living conditions harassed the tigers. The tigers' concrete dens, in which they have been confined for their entire lives, defy generally accepted husbandry practices. The record evidence shows the swimming pool den as a dirty, dilapidated pen. The water in the outdoor enclosures is similarly filthy, static, and filled with feces. *See supra* Section I.A.3.c. The water in the indoor enclosures, too, is dirty and sits in uncleaned bowls. *Id.* Failure to clean routinely the animals' enclosures squarely disregards industry standards. *See* PX93 at 13 (Tiger Care Manual from the AZA stating, under "cleaning

---

[10] Defendants also harassed Bu. Failing to provide veterinary care for months—to a point where Bu lay weak, injured, and emaciated—significantly disrupted Bu's normal behavior patterns of eating, walking, grooming, and play.

and sanitation," that "dirt and grass substrates in outdoor enclosures should be spot-cleaned daily. Hard surface enclosures, both inside and out, should be cleaned daily and disinfected routinely"); see *also* Trial Tr. vol. 4, 34. The filthy state of the tiger's enclosures is shocking but not surprising—no protocol or schedule for cleaning and sanitation of the tigers' enclosures exists at Tri-State. PX69 at 19.

Tri-State's lack of sanitation for the tigers "puts them at risk of bacterial infection as well as other diseases that could be spread due to the attraction of rodents and insects to the feces and food waste." PX69 at 21. This risk is not just hypothetical—at least two of the tigers (India and Mowgli) contracted diseases (sepsis and ringworm or rain rot) consistent with unhygienic conditions. Poor sanitation with a track record of causing infection and death creates an ongoing and serious threat of injury for the tigers.

According to AZA standards, tiger enclosures should be designed with a variety of vegetation, water sources, trees, and natural substrates to offer them the chance to exhibit natural behaviors. PX93 at 12. Exposure to concrete should be minimal, and they should be provided with a complex and changing enrichment. PX69 at 16. The tigers' enclosures at Tri-State stands in direct contrast to these standards. It is, in short, a concrete jungle. *See supra* Section I.A.3.c. As a result, the barren enclosures and lack of enrichment deprive the tigers of their ability to "engage in their natural behaviors such as stalking through brush or grasses, scratching on trees or deadfall, [and] exploring different vantage points on platforms." PX69 at 17. Further, the "lack of enrichment leads to boredom and the development of abnormal behaviors such as pacing, excessive grooming, and other potentially self-injurious behaviors." PX69 at 17. The enclosures are also deficient in that their lack of insulation and adequate cooling and shade puts the tigers at risk of hypothermia, dehydration, and damage to the cats' pads and mucous

membranes, as well as overheating, dehydration, heat sickness, and stroke. PX70 at 9, 36. Overall, the tigers' enclosures are so far removed from their natural habits and from accepted husbandry practices that they significantly disrupt a multitude of typical tiger behaviors and put the tigers at a high likelihood of injury. As such, they constitute "harassment" of all the tigers (dead and alive) and violate the ESA.

As to Kumar, the manner of his death indisputably demonstrates that Defendants harmed him. His necropsy reflects that he suffered for months before his death, from broken, pulp-exposed teeth, ulcerated gums, and a punctured lip. PX6 at 2, 10; Trial Tr. vol. 2, 191–97. The condition of his mouth was undoubtedly painful, such that it "affected [his] ability and desire to eat," one of his most basic functions, as well as his ability to groom himself. Trial Tr. vol. 2, 191–97. Similarly, Kumar's paws and hind leg were pocked with ulcers most likely caused by the filthy concrete on which Kumar had dragged his body while Defendants left him to suffer after his spinal stroke. PX6 at 6; Trial Tr. vol. 2, 197–200. Defendants' complete failure to treat Kumar's mouth and paws, while leaving him to languish in filthy surroundings, caused injury to Kumar and disrupted his normal behaviors such that he was both harmed and harassed in violation of the ESA.

The lack of veterinary care during the days leading up to Kumar's death also injured Kumar and significantly disrupted his normal behaviors, such that it constitutes both harm and harassment under the ESA. Kumar was "down" for ten days. He did not eat. He had to drag his body across the enclosure. Yet he received *no* adequate evaluation, treatment, or pain management, which unnecessarily prolonged whatever illnesses he endured. *See supra* Section I.B.3. His health was worsened, in fact, by the decision to treat him with steroids, without any medical reason to do so and without medication to protect his stomach. Trial Tr. vol. 2, 204–07.

His necropsy reveals stomach ulcers, a distended colon, and hemorrhaging in the membrane around his abdominal cavity—all painful injuries that were likely a direct cause of inadequate veterinary care. *See supra* Section I.B.3. Defendants' take of Kumar is beyond any doubt to this Court.

India, too, was harassed and harmed directly by Defendants. India died of sepsis, an infection of colossal proportions not seen in cats in captivity. Trial Tr. vol. 3, 28 (Dr. Haddad) ("Sepsis doesn't happen in zoos. Tigers don't die of sepsis. This is just unbelievable to me."). For *more than a month*, Defendants allowed the virulent infection to ravage India. *See supra* Section I.B.4. She barely ate or moved yet was given no care. *Id.* In fact, Candy expressly refused to secure medical treatment—even when Dr. Duncan told him that failure to do so would lead to her death. PX5 at 115. And, while opting to ignore treatment, Defendants simultaneously failed to provide her with *anything* to ease her severe pain. India's myocarditis and pus-filled pockets in her heart and diaphragm meant she experienced *daily* pain "similar to a heart attack" and that occurred "every time she took a breath." Trial Tr. vol. 3, 20. And at the time of her death, India's ears had been so mangled by flies that the veterinarian who performed the necropsy mistakenly believed her ears had been surgically truncated. *See supra* Section I.B.4. Unquestionably Defendants are directly responsible for India's death. Their violation of the ESA is patent. Defendants have thus subjected India to a take under the ESA.

Although Mowgli is thankfully alive, it is the result of good fortune and in spite of Defendants' lack of care. Mowgli is obese. His muscles are flaccid. He has suffered for years with a skin infection that can easily be diagnosed, but has yet to be, and which is likely easily treated, but has not been. *See supra* Section I.B.5. Video evidence shows Mowgli in obvious discomfort as he rubs his coat continuously across deteriorating wood in his damp enclosure. *Id.*

As he is a white tiger, his caretakers must be ever more vigilant to avoid disease and infection. Trial Tr. vol. 4, 35. Yet he has lived, for years, in the same environment as did Kumar and India, two victims of obvious painful infections. Defendants have injured Mowgli and as such, have harassed and harmed him in violation of the ESA.

### 3. Lemurs

Defendants subjected Bandit and Alfredo to an onslaught of environmental assaults that harassed and harmed them. Bandit lived largely in isolation and contrary to his normal species behavior. PX70 at 72–73; Trial Tr. vol 4, 92–93. He, and later with Alfredo, were deprived of any real opportunity to act as lemurs do. PX70 at 59. In a stark environment, Bandit and Alfredo could not forage, explore, mark, or engage in other normal behaviors. PX69 at 7. Defendants further harassed the lemurs by surrounding them with filth and a natural predator. *See supra* Section I.A.3.a. Smells of lingering urine and feces disrupted their olfactory communication and their ability to scent-mark and put them at high risk of physical pain and permanent physical damage to their mucous membranes. *Id.* Defendants also failed to protect the lemurs from the elements for nearly half of calendar year 2015. *Id.* Exposure to such temperature visits harm on lemurs' health, including hypotension, suppressed appetite, and increased vulnerability to disease. Trial Tr. vol. 2, 144; PX70 at 61.

The lemurs' isolating, barren, freezing, dirty, stress-inducing enclosure essentially stripped Bandit and Alfredo of almost of all their natural behaviors, creating a high likelihood of both psychological and physical injury. PX69 at 8; *see supra* Section I.A.3.a. As such, Defendants harassed both Bandit and Alfredo in violation of the ESA.

To be sure, Bandit's life and death provides the best evidence as to Defendants' ESA violations with regard to the lemurs. Bandit suffered for months with a poorly treated respiratory

infection.  His weight fluctuated significantly.  *See supra* Section I.B.2.  Toward the end of his

life, and for no medical *physical* reason, Bandit bit, picked, and tore at his own penis.  *Id.*

Bandit's death, in subfreezing temperatures and for reasons not fully known, bespeak his hard

life at Tri-State.

The Court finds that Defendants' chronic lack of care to Bandit harmed him. The Court

further finds that Bandit's self-mutilation was mostly likely the result of significant distress that

was the natural byproduct of his living at Tri-State.  *See id.*; Trial Tr. vol 2, 137–138.  Because

Defendants confined Bandit to an environment that disrupted his normal behaviors leading to his

self-mutilation, and because they then failed to monitor, treat, and alleviate those life-threatening

and ultimately fatal injuries, they have both harmed and harassed Bandit in violation of the ESA.

As for Alfredo's future, based on the totality of the evidence, if he were returned to Tri-

State, he would be once again subjected to the same deplorable conditions that caused him to be

harassed in the first instance.  Nothing in the record suggests that Alfredo would withstand Tri-

State any better than Bandit did.  By contrast, Alfredo's current placement at the Maryland Zoo

provides him a welcome reprieve.

In sum, the Court finds that Defendants have unlawfully "taken" or continue to "take" all

animals at issue—Cayenne, Mbube, Bandit, Kumar, India, Mowgli, Peka, Alfredo, and

Cheyenne—in violation of the Endangered Species Act.  Therefore, the Court finds in favor of

PETA on all theories of liability.

## IV.  Relief

Pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201 and the ESA, the Court will

enter by separate order a declaration that Defendants have violated the ESA by unlawfully taking

nine federally protected animals, and continue to violate the ESA by unlawfully taking the

remaining Big Cats and by continuing to possess the Big Cats who have been unlawfully taken. The Court further will enjoin Defendants, pursuant to 16 U.S.C. § 1540(g), from continuing to violate the ESA with respect to the animals at issue; permanently enjoin Defendants from owning or possessing any endangered or threatened species; and terminate Defendants' ownership and possessory rights in the animals at issue. Finally, the Court will order that Defendants must immediately transfer ownership and custody of the surviving animals to The Wild Animal Sanctuary (TWAS).

On December 10, 2019, Defendants moved to stay relief pending appeal. ECF No. 178. They argue that injunctive relief would cause Defendants irreparable harm and that a substantial likelihood exists that they will prevail on appeal. The Court flatly disagrees that based on this record, and all prior rulings, Defendants are likely to succeed on appeal. Moreover, the Court does not credit that Defendants will suffer irreparable harm. In fact, the record bears out quite the opposite: Defendants' protracted and flagrant violations of the ESA render it likely that the remaining protected animals will be irreparably harmed were the Court to stay its order pending appeal.

Finally, the public interest, which the Court must consider, counsels in favor of denying Defendants' requested stay. *See Hilton v. Braunskill*, 481 U.S. 770, 776 (1987). Regarding enforcement of the ESA as a matter of public interest, "Congress has spoken in the plainest of words, making it abundantly clear that the balance has been struck in favor of affording endangered species the highest of priorities." *Salix v. U.S, Forest Service*, 995 F. Supp. 2d 1148, 1155 (D. Mont. 2014), *aff'd sum nom Cottonwood Envtl. Law Ctr. v. U.S. Forest Serv.*, 789 F.3d 1075 (9th Cir. 2015) (quoting *TVA v. Hill*, 437 U.S. 153, 194 (1978)). The Court finds that the public interest is best served by ensuring that the remaining protected animals are not forced to

endure life at Tri-State any further.  Defendants' motion for stay (ECF No. 178) is therefore

DENIED.[11]

      A separate order follows.


_____12/26/2019_____          _____/S/_____

Date                                                Paula Xinis

                                                United States District Judge

---

[11] Because the Court will address separately the propriety of assessing fees and costs, Defendants may raise separately any request for this Court to stay any such award pending appeal.